# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket. Nos. 49615, 49817, 49899

PLANNED PARENTHOOD GREAT
NORTHWEST, HAWAII, ALASKA,
INDIANA, KENTUCKY, on behalf of itself, its
staff, physicians and patients, and Caitlin
Gustafson, M.D., on behalf of herself and her
patients,

    Petitioners,

v.

STATE OF IDAHO,

    Respondent,

and

SCOTT BEDKE, in his official capacity as
Speaker of the House of Representatives of the
State of Idaho; CHUCK WINDER, in his
official capacity as President Pro Tempore of
the Idaho State Senate; and the SIXTY-SIXTH
IDAHO LEGISLATURE,

    Intervenors-Respondents.
_____

PLANNED PARENTHOOD GREAT
NORTHWEST, HAWAII, ALASKA,
INDIANA, KENTUCKY, on behalf of
itself, its staff, physicians and patients,
and CAITLIN GUSTAFSON, M.D., on behalf
of herself and her patients,

    Petitioners,

v.

STATE OF IDAHO; BRAD LITTLE, in his
official capacity as Governor of the State of
Idaho; LAWRENCE G. WASDEN, in his

**Boise, October 2022 Term**

**Opinion filed: January 5, 2023**

**Melanie Gagnepain, Clerk**

1

**official capacity as Attorney General of the** )
**State of Idaho; JAN M. BENNETTS, in her** )
**official capacity as Ada County** )
**Prosecuting Attorney; GRANT P. LOEBS, in** )
**his official capacity as Twin Falls County** )
**Prosecuting Attorney; IDAHO STATE** )
**BOARD OF MEDICINE; IDAHO STATE** )
**BOARD OF NURSING; and IDAHO STATE** )
**BOARD OF PHARMACY,** )
)
    **Respondents,** )
)
**and** )
)
**SCOTT BEDKE, in his official capacity** )
**as Speaker of the House of** )
**Representatives of the State of Idaho;** )
**CHUCK WINDER, in his official** )
**capacity as President Pro Tempore of the** )
**Idaho State Senate; and the SIXTY-** )
**SIXTH IDAHO LEGISLATURE,** )
)
    **Intervenors-Respondents.** )

Original proceedings before the Supreme Court of the State of Idaho.

The petitions for extraordinary writs of prohibition and declaratory relief are denied.

Wilmer Cutler Pickering Hale and Dorr, LLP, New York and Bartlett & French, LLP, Boise, Idaho, for Petitioners Planned Parenthood, et al. Alan Schoenfeld argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent State of Idaho. Megan Larrondo argued.

Monte Neil Stewart, Las Vegas, Nevada, and Morris Bower & Haws PLLC, Nampa, Idaho, for Intervenors Scott Bedke, Chuck Winder, and the Legislature. Monte Neil Stewart argued.

BRODY, Justice.

These cases primarily concern whether the Idaho Constitution protects abortion from the legislature's broad power to enact laws concerning the public's health, welfare, and safety. Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky, and Caitlin Gustafson, M.D., on behalf of herself and her patients (collectively "Petitioners"), bring three petitions, each seeking a

writ of prohibition and declaratory relief blocking implementation and enforcement of recently enacted laws: Idaho Code sections 18-622(2) ("Total Abortion Ban"), 18-8804 and -8805 ("6-Week Ban"), and 18-8807(1) ("Civil Liability Law"). Apart from their central claim that these laws violate an implicit fundamental right to abortion purportedly contained in the Idaho Constitution, Petitioners also raise various facial challenges, claiming these laws offend important constitutional principles, such as equal protection, due process, the special laws provision, the separation of powers doctrine, and purported "informational privacy" protections under the Idaho Constitution. Petitioners further claim that the Idaho Human Rights Act limits the legislature's ability to regulate abortion through the Total Abortion Ban and 6-Week Ban. For the reasons discussed below, we deny Petitioners' requests for extraordinary writs of prohibition and declaratory relief.

## I.    BRIEF SUMMARY

The Idaho Constitution does not contain an explicit right to abortion. Nevertheless, Petitioners argue that certain provisions *implicitly* enshrine abortion as a right entitled to heightened protection from the legislature's broad power to regulate conduct. In other words, they contend abortion is a "fundamental" right. If Petitioners are correct, this would place abortion alongside other "fundamental" rights that are *expressly* granted in the Idaho Constitution, such as: the right to vote, the power of the people to propose laws and enact the same at the polls independent of the legislature (i.e., the voter initiative), and the power of the people to approve or reject at the polls any act or measure passed by the legislature (i.e., the referendum).

For the reasons discussed below, we cannot read a fundamental right to abortion into the text of the Idaho Constitution. Since Idaho attained statehood in 1890, this Court has repeatedly and steadfastly interpreted the Idaho Constitution based on the plain and ordinary meaning of its text, as intended by those who framed and adopted the provision at issue. That is our duty as the judicial branch: to sustain the rule of law—not to promote our personal policy preferences. If we were to jettison that disciplined approach, even in the face of a uniquely emotional and politically divisive policy issue, the Idaho Constitution would no longer be the voice of the people of Idaho— it would be effectively replaced by the voice of a select few sitting on this Court.

The Inalienable Rights Clause in Article I, section 1 of the Idaho Constitution, which lists the rights to life, liberty, and property, provides the textual basis for the recognition of implicit fundamental rights. Indeed, Article I, section 21, while not purporting to be a repository of implicit

3

rights, provides that the listing of rights in the Idaho Constitution "shall not be construed to impair or deny other rights retained by the people." The Inalienable Rights Clause was framed at Idaho's constitutional convention in 1889 and ratified by the people of Idaho later that same year. Thus, for us to read a fundamental right into the Idaho Constitution, we must examine whether the alleged right is so "deeply rooted" in the traditions and history of Idaho at the time of statehood that we can fairly conclude that the framers and adopters of the Inalienable Rights Clause intended to implicitly protect that right.

When we apply that test to this dispute, there simply is no support for a conclusion that a right to abortion was "deeply rooted" at the time the Inalienable Rights Clause was adopted. Nothing in the territorial laws of Idaho, the record of the 1889 constitutional convention, the surrounding common law and statutes, the surrounding publications of the times, or Idaho's medical regulations at that time show abortion was viewed as a right entitled to heightened protection from the legislature's regulatory power. To the contrary, the relevant history and traditions of Idaho show abortion was viewed as an immoral act and treated as a crime. Thus, we cannot conclude the framers and adopters of the Inalienable Rights Clause intended to implicitly protect abortion as a fundamental right.

Importantly, nothing about this decision prevents the voters of Idaho from answering the deeply moral and political question of abortion at the polls. For example, if the people of Idaho are dissatisfied with these new laws, they can elect new legislators. Additionally, the Idaho Constitution is not immutable. Indeed, a review of the session laws of this State reveals that the people of Idaho have amended the Idaho Constitution 135 times since 1889—and many of these amendments span the political spectrum. In fact, voters rejected a proposal in 1970 which would have added an explicit "right of privacy" in Article I, section 1 of the Idaho Constitution in a proposed re-write of the Constitution. 1970 Idaho Sess. Laws 739, 740. Thus, we emphasize that all we are deciding today is that the Idaho Constitution, as it currently stands, does not include a fundamental right to abortion.

This conclusion answers the central question Petitioners have raised in their petitions. Additionally, as explained below, we conclude that the Total Abortion Ban, 6-Week Ban, and Civil Liability Law each pass the familiar test for determining the constitutionality of most legislation: "rational-basis" review. Under that form of review, each of these laws is constitutional because it is rationally related to the government's legitimate interest in protecting prenatal fetal life at all

stages of development, and in protecting the health and safety of the mother. Importantly, the questions of whether a law passes constitutional muster—and whether a law is good policy—are distinct. In the challenges Petitioners bring today, we can only judge these laws—as demanded by the constitutional principle of separation of powers—based on their constitutionality, not on whether they are wise policy.

## II. BACKGROUND

### A. Idaho's Historical Criminalization of Abortion

Before *Roe v. Wade*, 410 U.S. 113 (1973), declared a federal constitutional right to abortion in 1973, abortion had been a criminal offense in Idaho for more than 100 years. Since Idaho's earliest territorial days, performing an abortion was criminally prohibited except when necessary to preserve the life of a pregnant woman.

The Idaho Territory was created on March 3, 1863, when President Abraham Lincoln signed the Congressional Act of March 3, 1863, Public Law 37-96, 12 Stat. 808. Nine months later, from December 7, 1863, through February 4, 1864, the legislative assembly for the Territory of Idaho held its first session. At its conclusion, the assembly enacted a law that made performing an abortion a crime except when a physician deemed it "necessary" to "save" the life of a pregnant woman:

> [E]very person who shall administer or cause to be administered, or taken, any medicinal substance, or shall use or cause to be used, any instruments whatever, with the intention to procure the miscarriage of any woman then being with child, and shall thereof be duly convicted, shall be punished by imprisonment in the territorial prison for a term not less than two years, nor more than five years: *Provided*, That [sic] no physician shall be effected by the last clause of this section, who in the discharge of his professional duties, *deems it necessary* to produce the miscarriage of any woman *in order to save her life*.

Act of Feb. 4, 1864, ch. IV, § 42, 1863–64 Idaho Terr. Sess. Laws 443 (emphasis in original and added) (alterations added).

Roughly ten months later, at the second territorial session, the legislative assembly reenacted the same criminal prohibition:

> [E]very person who shall administer or cause to be administered, or taken, any medicinal substance, or shall use or cause to be used, any instruments whatever, with the intention to procure the miscarriage of any woman then being with child, and shall thereof be duly convicted, shall be punished by imprisonment in the territorial prison for a term not less than two years, nor more than five years: *provided*, that no physician shall be effected by the last clause of this section, who

5

in the discharge of his professional duties, *deems it necessary* to produce the miscarriage of any woman *in order to save her life*.

Act of Dec. 23, 1864, ch. III, § 42, 1864 Idaho Terr. Sess. Laws 305 (emphasis in original and added) (alteration added).

Eleven years later, the legislative assembly for the eighth territorial session allowed the same criminal prohibition against abortion to remain in force:

> [E]very person who shall administer or cause to be administered, or taken, any medicinal substance, or shall use or cause to be used, any instruments whatever, with the intention to procure the miscarriage of any woman then being with child, and shall thereof be duly convicted, shall be punished by imprisonment in the Territorial prison for a term not less than two years, nor more than five years: *provided*, that no physician shall be effected by the last clause of this section, who in the discharge of his professional duties, *deems it necessary* to produce the miscarriage of any woman *in order to save her life*.

Act of Jan. 14, 1875, ch. IV, § 42, 1874–75 Idaho Terr. Sess. Laws 328 (emphasis in original and added) (alteration added).

Roughly ten years later, at the thirteenth territorial session in 1885, the assembly authorized a commission to revise, simplify, arrange, and consolidate the laws of the Idaho Territory into the Revised Statutes. *See* 1884–85 Idaho Terr. Sess. Laws 132, 132–33. Roughly two years later, at the fourteenth territorial session, the Revised Statutes of 1887 were enacted, and included the same prohibition previously enacted against performing an abortion—with a new section adding a criminal penalty against the pregnant woman and making a change in the exception from "save" to "preserve" the life of the woman:

> **Sec. 6794.** Every person who provides, supplies or administers to, any pregnant woman, or procures any such woman to take, any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the Territorial prison not less than two nor more than five years.
>
> **Sec. 6795.** Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the Territorial prison not less than one nor more than five years.

Idaho Rev. Stat. (R.S.) §§ 6794, 6795 (1887) (emphasis added).

In 1889, two years after enacting the Revised Statutes of 1887, a constitutional convention was held to formulate and propose a state constitution for Idaho as a precursor to obtaining

6

statehood. *See* PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION OF IDAHO 1889 (I. W. Hart ed., 1912) (hereinafter "PROCEEDINGS AND DEBATES"). The topic of abortion was never mentioned in the minutes of the convention, *see id.* at 1–2143, despite many delegates to the convention having served as members from prior sessions of the territorial assembly—including two of the three commissioners responsible for compiling the criminal abortion laws in the 1887 Revised Statutes. *See id.* at 7–9, 2090 (listing as delegates and framers: Sol. Hasbrouck, a member of the House of Representatives for the Second Session of the Territory of Idaho (1864); A. S. Chaney and John S. Lewis (Commissioner), members of the House of Representatives for the Fourteenth Session of the Territory of Idaho (1886–87); and Jas. (James) H. Beatty (Commissioner), Jas. (James) I. Crutcher, and A. E. Mayhew (President), members of the Council (Senate) for the Fourteenth Session of the Territory of Idaho (1886–87)).

The delegates at the convention assembled and adopted the Idaho Constitution on August 6, 1889, PROCEEDINGS AND DEBATES 2090 (I. W. Hart ed., 1912), and three months later, it was ratified by the voters of Idaho on November 5, 1899. Eight months later, following Congressional approval on July 3, 1890, Idaho became a state. At the first legislative session following statehood, from 1890 to 1891, roughly one year after the constitutional convention, many portions of the 1887 Revised Statutes were repealed, amended, or revised—but no legislator moved to change the criminal abortion laws still in force in sections 6794 and 6795. *See* H.R. JOURNAL IDAHO, 1ST SESS. 1–221 (Dec. 8, 1890, to Mar. 14, 1891); SENATE JOURNAL IDAHO, 1ST SESS. 1–222 (Dec. 8, 1890, to Mar. 14, 1891).

In fact, sections 6794 and 6795 of the Revised Statutes remained in effect for another eighteen years. In 1907, the legislature authorized a code commissioner to again revise, arrange, simplify, and consolidate the laws of Idaho. *See* Sec. 1, 1907 Idaho Sess. Laws 178, 178–79. Two years later, the legislature enacted the resulting Revised Code as the general laws of the state of Idaho in a two-volume set, 1909 Idaho Sess. Laws 3, and within it, sections 6794 and 6795 were recodified with minor word changes:

> **Sec. 6794.** Every person who provides, supplies or administers to, any pregnant woman, or procures any such woman to take, any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than two nor more than five years.

7

**Sec. 6795.** Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than one nor more than five years.

Idaho Rev. Code (R.C.) §§ 6794, 6795 (1909) (emphasis added).

Roughly eight years later, the legislature authorized another revision and recodification of Idaho's laws. *See* 1917 Idaho Sess. Laws 241. And two years after that, in 1919, the legislature enacted the resulting Compiled Statutes as the general laws of Idaho in a four-volume set, 1919 Idaho Sess. Laws 4. Within these newly compiled laws, the criminal prohibition against abortion was recodified but remained substantially the same:

**§ 8281. Procurement of abortion.** Every person who provides, supplies or administers to, any pregnant woman, or procures any such woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the State Prison not less than two nor more than five years.

**§ 8282. Submitting to abortion.** Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than one nor more than five years.

Idaho Comp. Stat. (C.S.) §§ 8281, 8282 (1919) (emphasis added).

Twelve years later, in 1931, the legislature authorized another compilation and reorganization of the laws of Idaho. *See* 1931 Idaho Sess. Laws 415. By the next year, the compilation was complete, and one year after that, the legislature adopted the resulting Idaho Code in a four-volume set as "the authorized compilation of the statutes and codes of the State of Idaho[.]" 1933 Idaho Sess. Laws 3. Once again, the criminal prohibition against abortion was recodified but remained substantially the same:

**17-1810. Abortion—Procurement of.—**Every person who provides, supplies or administers to, any pregnant woman, or procures any such woman to take any medicine or drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than two nor more than five years.

**17-1811. Abortion—Submitting to.—**Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure

8

a miscarriage, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than one nor more than five years.

I.C. §§ 17-1810, 17-1811 (1932) (emphasis added).

Roughly fifteen years later, in 1947, the legislature authorized the "1947 Idaho Code Commission" to compile, reorganize, and publish the existing laws of Idaho into a more permanent compilation; i.e., the modern Idaho Code. 1947 Idaho Sess. Laws 541, 543. The criminal prohibition against abortion was recodified, but again, otherwise remained the same:

> **18-601. Abortion—Procurement of.**—Every person who provides, supplies or administers to, any pregnant woman, or procures any such woman to take any medicine or drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than two nor more than five years.

> **18-602. Abortion—Submitting to.**—Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the state prison not less than one nor more than five years.

I.C. §§ 18-601, 18-602 (1947) (emphasis added).

Idaho Code sections 18-601 and -602 remained in effect for the next twenty-five years, until 1973, when the United States Supreme Court announced a federal constitutional right to abortion in *Roe v. Wade*, based on a right of privacy implicit in the United States Constitution:

> This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.

410 U.S. 113, 153 (1973).

Notably, roughly three years before *Roe* was handed down, the people of Idaho, at the general election on November 3, 1970, rejected the legislature's proposed rewrite of the Idaho Constitution. 1970 Idaho Sess. Laws 739. One of the provisions the people rejected was the proposal to *add* an express "right of privacy" to Article I, section 1 of the Idaho Constitution: "All men are by nature free and equal and have certain *inalienable rights*, among them to enjoy and defend life and liberty; to acquire, possess, and protect property; and *enjoy the right of privacy*; to have the quality of their environment preserved and enhanced; to pursue happiness and secure safety." 1970 Idaho Sess. Laws 739, 740 (emphasis added).

After *Roe* was announced in 1973, the legislature, "[w]ithout condoning or approving abortion or the liberalization of abortion laws generally," repealed sections 18-601 and -602. *See* 1973 Idaho Sess. Laws 442, 443. However, at the same time, the legislature enacted new regulations based on *Roe*, and included a trigger provision that would repeal the new statutes and implement the prior criminal prohibitions against abortion "[i]n the event that the states are again permitted to safeguard the lives of unborn infants before the twenty-fifth week of pregnancy[.]" *See* 1973 Idaho Sess. Laws 442, 448; *see also* I.C. § 18-613 (1979) (providing that sections 18-604 to -611 would be repealed, and sections 18-612 to -615 would become effective, on the occurrence of certain events).

The trigger provisions in Idaho Code sections 18-614 and -615, which embodied the prior criminal prohibitions against procuring or submitting to an abortion at any gestational age except to "preserve" the life of the woman (*see* I.C. §§ 18-601, -602, *supra*), sat dormant for the next seventeen years until both were repealed in 1990. *See* 1990 Idaho Sess. Laws 464, 464 (repealing I.C. §§ 18-613 through -615). Against this legislative backdrop comes the present dispute.

**B. Idaho's Recent Criminalization of Abortion**

In 2020, thirty years after repealing sections 18-614 and -615, the legislature passed the Total Abortion Ban, making it a felony for anyone to perform, attempt to perform, or assist with an abortion. *See* I.C. § 18-622(2). The legislature, recognizing the constitutional impediments presented by *Roe v. Wade*, 410 U.S. 113 (1973), crafted the Total Abortion Ban to expressly provide that it will go into effect thirty days following "[t]he issuance of the judgment in any decision of the United States supreme court that restores to the states their authority to prohibit abortion . . . ." I.C. § 18-622(1)(a).

The Total Abortion Ban is not a duplicate of the Idaho laws prohibiting abortion pre-*Roe*. Unlike Idaho's historical abortion laws, which provided an exception to "save" or "preserve" the life of the woman, the Total Abortion Ban makes all "abortions" a crime and includes a provision directing the appropriate professional licensing board to implement certain penalties against "any health care professional" who violates it. *See* I.C. § 18-622(2); *see also* I.C. § 18-604(1) (defining "abortion" for purposes of the Total Abortion Ban); Section VI.C.1.a, *infra* (explaining that ectopic and non-viable pregnancies do not fall within the Total Abortion Ban's definition of "abortion").

Instead, and in place of exceptions, the Total Abortion Ban allows for *legally justified abortions* through affirmative defenses to prosecution. *See* I.C. § 18-622(3). The two affirmative

10

defenses, stated generally, are: (1) "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman"; and (2) in the case of rape or incest, prior to the abortion, the woman provided the physician with a copy of her report of rape or incest to law enforcement. *See* I.C. § 18-622(3)(a)(i)–(iii), (3)(b)(i)–(iv). The allowance of a defense based on the subjective "good faith medical judgment" of the physician, coupled with the inclusion of rape and incest defenses, actually provides physicians with greater protections than the pre-*Roe* laws. In addition, unlike the pre-*Roe* laws, the Total Abortion Ban does not subject the mother to any criminal penalties, I.C. § 18-622(5).

One year later, in 2021, the legislature passed the Fetal Heartbeat Preborn Child Protection Act ("Fetal Heartbeat Act"). *See* 2021 Idaho Sess. Laws 867, 867–69 (H.B. No. 366) (originally codified as I.C. §§ 18-8701 to -8708). The Fetal Heartbeat Act makes it a felony to perform an abortion on a woman when a fetal heartbeat is detected but *exempts* from prosecution cases involving a medical emergency, rape, or incest. *See* I.C. § 18-8704 (2021). In its original form, the Fetal Heartbeat Act also provided a private cause of action for a woman who underwent an abortion to recover damages from medical professionals who intentionally, knowingly, and recklessly violated the Act. *See* I.C. § 18-8707 (2021). Again, recognizing federal constitutional impediments to implementing the law, the Fetal Heartbeat Act expressly provides that it takes effect " . . . immediately upon the issuance of the mandate in any United States appellate court case in which the appellate court upholds a restriction or ban on abortion for a preborn child because a detectable heartbeat is present on the grounds that such restriction or ban does not violate the United States constitution." *See* I.C. § 18-8706 (2021).

The next year, in 2022, the Idaho Legislature amended and re-codified the Fetal Heartbeat Act to expand the private cause of action in favor of fathers, grandparents, siblings, aunts, and uncles of the preborn child and to add statutory minimum damages of $20,000. *See* I.C. § 18-8807(1) (2022) (this is the "Civil Liability Law"). Importantly, the amended Fetal Heartbeat Act also repealed Idaho Code section 18-8706—the provision which delayed the effectiveness of the Act—and moved the "trigger language" to the section providing criminal penalties for a violation of the Act. *See* 2022 Idaho Laws Ch. 152 (S.B. No. 1309) and I.C. § 18-8805. This amendment meant the Civil Liability Law would become immediately effective (on April 22, 2022, pursuant

to an emergency clause in S.B. No. 1309), but the criminal liability provisions in Idaho Code sections 18-8804 and -8805 (the "6-Week Ban") would remain dormant until "triggered."

## C. Procedural Background

On March 30, 2022, a week after Idaho Governor Brad Little signed S.B. No. 1309 (Fetal Heartbeat Act) into law, Petitioners filed their first Petition for Writ of Prohibition, Docket No. 49615-2022, against the State of Idaho. Petitioners challenged the Civil Liability Law as violative of the Idaho Constitution under: (1) the separation of powers doctrine by usurping the executive branch's enforcement authority and handing it to private citizens to the exclusion of executive actors; (2) the "special" law prohibition; (3) an implicit constitutional guarantee of informational privacy; (4) the due process clause based on the law's minimum statutory damages of $20,000; (5) the equal protection clause by disproportionately punishing medical providers who provide abortions compared to other medical providers; and (6) an *implicit* fundamental right to abortion within one, some, or a combination of sections 1, 17, and 21 in Article I. Petitioners asked this Court to declare the Civil Liability Law unconstitutional and to issue a peremptory writ prohibiting its implementation.

The Court initially agreed to hear the matter on an expedited basis, but subsequently granted a motion to reconsider filed by the State and agreed to allow the parties additional time to submit briefing. As part of its Order Granting Motion to Reconsider, the Court also ordered that the implementation of S.B. No. 1309 (Civil Liability Law) be stayed to preserve the status quo as requested by the parties. Afterwards, on April 18, 2022, the Court granted a motion to intervene by Scott Bedke, in his capacity as Speaker of the House of Representatives of the State of Idaho, Chuck Winder, in his capacity as President Pro Tempore of the Idaho State Senate, and the Sixty-Sixth Idaho Legislature ("Intervenors"). The State and the Intervenors responded to the petition, arguing the Idaho Constitution does not contain an implicit fundamental right to abortion, and that no part of the Civil Liability Law is otherwise unconstitutional.

The State later moved to vacate the stay, disputing that it had requested the stay. The Court denied the motion and on June 1, 2020, set the Civil Liability Law case for oral argument on August 3, 2022. Approximately three weeks later, the United States Supreme Court issued its landmark decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (June 24, 2022). In *Dobbs*, the Supreme Court held: "The [United States] Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion. *Roe* and [*Planned Parenthood of Se.*

12

*Pennsylvania v. Casey*, 505 U.S. 833 (1992)] arrogated that authority. We now overrule those decisions and return that authority to the people and their elected representatives." 142 S. Ct. at 2284 (alterations added).

The *Dobbs* decision "triggered" the Total Abortion Ban, and three days after it was issued, Petitioners filed their second Petition for Writ of Prohibition, Docket No. 49615-2022. In that petition, Petitioners challenged the Total Abortion Ban under the Idaho Constitution and the Idaho Human Rights Act and asked this Court to issue a peremptory writ of prohibition barring its enforcement. Unlike the Civil Liability Law challenge, Petitioners sued (in addition to the State of Idaho) specific state officials who would be in a position to enforce the Total Abortion Ban: Brad Little, in his capacity as Governor of the State of Idaho; Lawrence G. Wasden, in his capacity as Attorney General; Jan M. Bennetts, in her capacity as Ada County Prosecuting Attorney; Grant P. Loebs, in his capacity as Twin Falls County Prosecuting Attorney; the Idaho State Board of Medicine; the Idaho State Board of Nursing; and the Idaho State Board of Pharmacy (collectively "Respondents").

Like their first petition, Petitioners contended that there are implicit constitutional rights under the Idaho Constitution to bodily autonomy, privacy, and intimate family decision making that include the right to abortion. Petitioners additionally asserted that the Total Abortion Ban violates equal protection under the Idaho Constitution, and the prohibition against discrimination in the Idaho Human Rights Act. In their initial filing, Petitioners also moved to prevent the Total Abortion Ban from taking effect during the pendency of their challenge.

Six days after *Dobbs* was issued, on June 30, 2022, this Court vacated the merits argument for the Civil Liability Law and ordered the parties to brief certain procedural questions to be argued at a public hearing on August 3, 2022. Before the ordered briefing was complete, the United States Court of Appeals for the Eleventh Circuit upheld a Georgia law prohibiting abortions after a detectable human heartbeat, thus "triggering" the 6-Week Ban (I.C. §§ 18-8804, -8805). *See SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (holding that *Dobbs* foreclosed the abortion providers' challenge to Georgia's fetal heartbeat act). Five days later, on July 25, 2022, Petitioners filed their third Petition for Writ of Prohibition, Docket No. 49899-2022, this time challenging the 6-Week Ban. That petition contains essentially the same arguments presented in Petitioners' challenge to the Total Abortion Ban.

13

Before the August 3 hearing, the Court granted the Intervenors' motion to intervene and oppose the petitions challenging the Total Abortion Ban and the 6-Week Ban.

Nine days after the August 3 hearing, on August 12, 2022, this Court issued a written opinion ("August 12 Opinion"), and (1) ordered the three petitions consolidated for purposes of oral argument and opinion; (2) vacated the stay against the Civil Liability Law; (3) denied Petitioners' request for a stay against the Total Abortion Ban until the Court could reach a decision on the merits; and (4) retained the consolidated petitions instead of transferring the matters to the district court for development of a factual record under Idaho Appellate Rule 5(d). In addition, the Court set oral argument for the merits of the consolidated petitions to be held on September 29, 2022 (which was later vacated and set for October 6, 2022). Respondents and Intervenors filed briefs opposing Petitioners' second and third petitions on the merits. Respondents and Intervenors essentially argue that the Idaho Constitution does not implicitly contain a fundamental right to abortion because such a right is not part of Idaho's "ordered liberty" as it is not "deeply ingrained" or "deeply rooted" in Idaho's history and tradition at the time the Idaho Constitution was adopted.

Of note, one day before the August 3 hearing, the United States sued the State of Idaho requesting declaratory and injunctive relief against enforcement of the Total Abortion Ban to the extent it allegedly conflicts with the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. *See Complaint*, *United States v. State of Idaho*, 2022 WL 3137290 (D. Idaho Aug. 2, 2022). On August 24, 2022, twelve days after this Court issued its August 12 Opinion, and one day before the Total Abortion Ban took effect, the United States District Court for the District of Idaho granted the United States' request for a preliminary injunction against enforcement of the Total Abortion Ban, I.C. § 18-622(2). *See United States v. Idaho*, No. 1:22-CV-00329-BLW, 2022 WL 3692618, at *15 (D. Idaho Aug. 24, 2022).

Specifically, the federal district court ordered that, during the pendency of the federal suit, the Total Abortion Ban cannot be enforced in a criminal prosecution, or a proceeding to suspend, revoke, or impose any form of liability on a medical provider or hospital where an abortion is necessary to avoid: (1) " 'placing the health of' " a pregnant patient 'in serious jeopardy' "; (2) " 'serious impairment to bodily functions' of the pregnant patient"; or (3) " 'serious dysfunction of any bodily organ or part' of the pregnant patient," pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)–(iii). *Id*.

Throughout these proceedings, the State and Respondents raised a number of procedural, jurisdictional, and evidentiary matters. In response to the first petition challenging the Civil Liability Law, the State argues: (1) Petitioners have not properly invoked this Court's original jurisdiction; (2) Petitioners do not have standing and their claims are not ripe; and (3) the State of Idaho is not a proper respondent thus, it should be dismissed along with the petition. In response to the second petition challenging the Total Abortion Ban, Respondents similarly argue: (1) Petitioners have not properly invoked this Court's original jurisdiction; (2) Petitioners lack standing to sue on behalf of women; and (3) the State of Idaho is not a proper respondent and thus, it should be dismissed. In response to the third petition challenging the 6-Week Ban, Respondents include the same procedural arguments as against the second petition but add that the challenge to the 6-Week Ban is "largely moot" now that the Total Abortion Ban is in effect. Intervenors did not take a position on the jurisdictional issues, but joined, in part, with Respondents' mootness argument against the 6-Week Ban.

Finally, in response to declarations from Kristine Smith and Caitlin Gustafson, M.D., filed in support of Petitioners' first and second petitions, and a similar declaration from Dr. Gustafson filed in support of the third petition, the State and Respondents filed motions to strike certain portions of each declaration as inadmissible under the Idaho Rules of Evidence. On September 13, we ordered that immediately prior to oral argument on the merits (which occurred on October 6), the State and Respondents, and Petitioners, would be allotted time to present argument on the outstanding motions to strike.

### III. LEGAL STANDARD

The party challenging a statute on constitutional grounds "bears the burden" of establishing that the statute is unconstitutional "and must overcome a strong presumption of validity." *CDA Dairy Queen, Inc. v. State Ins. Fund*, 154 Idaho 379, 382, 299 P.3d 186, 189 (quoting *State v. Korn*, 148 Idaho 413, 416, 224 P.3d 480, 483 (2009)). When possible, the Court is "obligated to seek an interpretation of a statute that upholds it[s] constitutionality." *Am. Falls Reservoir Dist. No. 2 v. Idaho Dep't Water Res.*, 143 Idaho 862, 869, 154 P.3d 433, 440 (2007) (quotations and citations omitted) (alteration added). The Court's power to "declare legislative action unconstitutional should be exercised only in clear cases." *Id.*

15

## IV.    MOTIONS TO STRIKE

To begin, we will address the State and Respondents' motions to strike certain statements from the declarations submitted by Petitioners in support of their petitions: (1) the Declaration of Kristine Smith, the Area Services Director of Planned Parenthood, and (2) the Declaration of Caitlin Gustafson, M.D., a physician who performs abortions. They contend the declarations contain testimony that is speculative and inadmissible under Idaho Rules of Evidence 602, 701, and 702. Petitioners respond by explaining that the declarations contain testimony necessary to provide "sufficient facts" for the Court to exercise its original jurisdiction, as was done in previous original actions before the Court. *See, e.g.*, *Reclaim Idaho v. Denney*, 169 Idaho 406, 418, 497 P.3d 160, 172 (2021), *Ybarra v. Legislature by Bedke*, 166 Idaho 902, 906, 466 P.3d 421, 425 (2020), and *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 124, 15 P.3d 1129, 1132 (2000). Petitioners further rely on their declarations to rebut the State and Respondents' argument that Petitioners have not presented a justiciable controversy.

Idaho Rule of Evidence 602 requires that for testimony to be admissible, the witness must have personal knowledge of the matter to which they testify. Next, Idaho Rule of Evidence 701 provides the standard for when a lay witness may testify in the form of an opinion or inference:

> If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is:
>
> > (a) rationally based on the witness's perception;
> >
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

If a witness is testifying as an expert, Idaho Rule of Evidence 702 provides the following requirements to admit their opinion testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

When it comes to the declarations of Kristine Smith, the State and Respondents challenge a multitude of statements made by Smith relating to, and opining on, medical terms, national poverty statistics, "barriers" for women seeking abortion care, how Idaho's abortion laws impact Idaho women, the safety of abortion procedures, the reasons a woman might seek an abortion, that

medical staff are in danger of losing their "livelihoods and their liberty," Idaho's healthcare system, Idaho's social services, and the experience of Texas residents related to abortions. The State and Respondents argue that Smith is not qualified to opine on these medical, sociological, psychiatric, and economic issues as a lay person who only performs managerial duties as an Area Services Director of Planned Parenthood. We agree. Smith's testimony here is inadmissible under Rule 602 for lack of foundation and personal knowledge, and under Rule 702, because Smith has not been shown to be a qualified expert with the knowledge, skill, experience, training, or education to offer an opinion in these areas. To the extent Smith's declarations in the Civil Liability Law and Total Abortion Ban cases contain such statements or opinions, the motions to strike are granted.

However, to the extent the State and Respondents moved to strike paragraphs in Smith's declarations that testify to Smith's personal knowledge of the operational aspects of Planned Parenthood, its services, and its general client data, the motions are denied. As the Area Services Director of Planned Parenthood, Smith has personal knowledge to testify to those facts; thus, those statements are admissible under Rule 602. Finally, to the extent that any of Smith's declarations contain statements that could arguably be read as legal conclusions, this Court will disregard such statements as a matter of course.

Regarding the declarations of Dr. Gustafson submitted in support of the petitions in the Civil Liability Law, Total Abortion Ban, and 6-Week Ban cases, the State and Respondents move to strike several paragraphs as speculative and beyond Dr. Gustafson's personal knowledge. In particular, the State and Respondents challenge opinions made by Dr. Gustafson regarding the experience or circumstances of women in Idaho, the reasons women in Idaho might seek an abortion, sociological impacts on women, that other providers will be prevented from providing abortions, logistical issues that women seeking an abortion could face, and that the challenged laws deny access to safe medical care. We deny the motions to strike.

The "test for determining whether a witness is qualified as an expert is not rigid" but "practical experience or special knowledge must be shown to bring a witness within the category of an expert." *Reclaim Idaho*, 169 Idaho at 417, 497 P.3d at 171 (cleaned up) (quoting *Phillips v. E. Idaho Health Services., Inc.*, 166 Idaho 731, 755, 463 P.3d 365, 389 (2020). Here, Dr. Gustafson has adequately demonstrated her qualifications, experience, and expertise to offer expert opinions under Rule 702. Contrary to the State and Respondent's position, the opinions in Dr. Gustafson's declarations that touch on the above matters are not speculative because each provides an opinion

17

upon which an expert in the field can properly opine. *See Reclaim Idaho*, 169 Idaho at 417, 497 P.3d at 171. Any objections to Dr. Gustafson's methodology in reaching her opinions go to the weight, not the admissibility, of her testimony. Therefore, the State and Respondent's motions to strike paragraphs in Dr. Gustafson's declarations are denied.

## V.     JURISDICTION, PROCEDURE, AND JUSTICIABILITY

### A.  Original Jurisdiction

Before addressing the merits of Petitioners' challenges, we must determine whether Petitioners have properly invoked this Court's original jurisdiction. In *Reclaim Idaho v. Denney*, a recent case where we interpreted the people's initiative and referendum powers under the Idaho Constitution, we reiterated the legal basis for exercising original jurisdiction:

> Article V, Section 9 of the Idaho Constitution vests this Court with original jurisdiction to issue writs of mandamus and prohibition, as well as 'all writs necessary or proper to the complete exercise of its appellate jurisdiction.' This original jurisdiction is limited only by the separation of powers provisions contained in Article II, Section 1 of the Idaho Constitution and this Court's own rules. *Mead v. Arnell*, 117 Idaho 660, 663, 791 P.2d 410, 413 (1990). 'Any person may apply to the Supreme Court for the issuance of any extraordinary writ or other proceeding over which the Supreme Court has original jurisdiction.' I.A.R. 5(a). The procedural guidelines over special writs are outlined in Idaho Appellate Rule 5. Once this Court asserts its original jurisdiction, 'it may issue writs of mandamus and/or prohibition.' *Mead*, 117 Idaho at 663–64, 791 P.2d at 413–14.

169 Idaho 406, 418, 497 P.3d 160, 172 (2021) (quoting *Ybarra v. Legislature by Bedke*, 166 Idaho 902, 906, 466 P.3d 421, 425 (2020)).

In *Reclaim,* we explained that "we have accepted original jurisdiction in matters where 'the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature[.]' " 169 Idaho at 418, 497 P.3d at 172 (alteration added) (quoting *Sweeney v. Otter*, 119 Idaho 135, 138, 804 P.2d 308, 311 (1990)); *see, e.g.*, *Regan v. Denney*, 165 Idaho 15, 19, 437 P.3d 15, 19 (2019) (concluding that the challenge to Idaho Code section 56-267 as violative of Article III, section 1 was "of an urgent nature" due to the time requirement in that statute).

Here, based on the declarations submitted by Petitioners and the sea-change in abortion jurisprudence caused by *Dobbs*, we recognize the urgent and immediate need to answer the constitutional violations alleged against the Civil Liability Law, the Total Abortion Ban, and the 6-Week Ban. Before *Dobbs* disclaimed any fundamental right to abortion under the federal constitution on June 24, 2022, Idaho abortion law had been under the purview of the United States Supreme Court's decision in *Roe* and its ensuing progeny since 1973. Therefore, there can be no

serious dispute that the Petitioners' challenge to the Civil Liability Law (S.B. No. 1309), which was drafted pre-*Dobbs* and seriously affected the then-existing federal constitutional right to abortion, presented a possible constitutional violation of an urgent nature to properly invoke this Court's original jurisdiction.

After *Dobbs* was issued, the previously dormant Total Abortion Ban was triggered and later went into effect on August 25, 2022. Roughly one week before the Total Abortion Ban took effect, the 6-Week Ban took effect on August 19, 2022. The Total Abortion Ban is still in effect to the extent it does not conflict with EMTALA, and where it does conflict, the 6-Week Ban is no longer "superseded" and is in effect. Notably, the 6-Week Ban and Civil Liability Law have a "medical emergency" exemption, *see* Section VI.C.2.a., *infra*, which appears to apply in nearly identical circumstances in which EMTALA might preclude the Total Abortion Ban from being enforced.

Nevertheless, in the short time since *Dobbs*, there has been a serious shift in the laws concerning how abortions are treated in Idaho. This shift in the constitutional landscape, paired with Petitioners' supporting declarations explaining how this shift affects them and the people they serve, warrants our conclusion that Petitioners have alleged potential constitutional violations of an urgent nature in challenging the Civil Liability Law, the Total Abortion Ban, and 6-Week Ban. For these reasons, we will exercise our original jurisdiction over these consolidated petitions.

### B. The State of Idaho is a proper respondent.

Next, we reject the State's and Respondents' contention that the State of Idaho cannot be named as a respondent in these consolidated petitions. It is neither procedurally improper nor unusual to name the State of Idaho as a party in a case seeking declaratory relief when a constitutional violation is alleged. *See Idaho Sch. for Equal Educ. Opportunity v. State*, 142 Idaho 450, 453, 129 P.3d 1199, 1202 (2005); *see also Tucker v. State*, 162 Idaho 11, 18, 394 P.3d 54, 61 (2017) ("[S]overeign immunity is inapplicable when constitutional violations are alleged."). Under Idaho Rule of Civil Procedure 74(a)(2), the Court has authority to enjoin unconstitutional conduct by issuing a writ of prohibition against a "person" acting on behalf of the State of Idaho to enforce or implement the 6-Week Ban or Total Abortion Ban. This necessarily means that when the State of Idaho is named as a respondent, the relief may issue against those persons the State is comprised of (i.e., all its officers, employees, and agents). Furthermore, any practical doubts as to whether the State of Idaho could be named in the challenge to the Civil Liability Law were dispelled after

the recent decision in *SisterSong* triggered the criminal liability provision (the 6-Week Ban) in the Fetal Heartbeat Act. Accordingly, we deny the motions to dismiss the State of Idaho from these consolidated petitions.

### C. Justiciability

Finally, before we reach the merits, we must address the justiciability of Petitioners' challenges to the Civil Liability Law, the Total Abortion Ban, and the 6-Week Ban. Related to the Civil Liability Law, the State argues that the Petitioners do not have standing and their claims are not ripe. Related to the Total Abortion Ban, the Respondents similarly argue that the Petitioners do not have standing to sue on behalf of women. Related to the 6-Week Ban, the Respondents point to the same procedural deficiencies, but add that the challenge against the 6-Week Ban is "largely moot" because the Total Abortion Ban is in effect. Intervenors join in the mootness question to argue that whether the trigger provision in the 6-Week Ban is unconstitutionally vague is moot as of the August 12 Opinion.

"A party must present a justiciable controversy in order to invoke the original jurisdiction of this Court and seek declaratory relief." *Reclaim Idaho*, 169 Idaho at 418, 497 P.3d at 172. "A prerequisite to a declaratory judgment action is an actual or justiciable controversy." *Id*. (quoting *Miles v. Idaho Power Co.*, 116 Idaho 635, 639, 778 P.2d 757, 761 (1989)). Questions of justiciability typically center on standing, ripeness, and mootness. *Id*. For the reasons explained below, we conclude that Petitioners' challenges against the Civil Liability Law, the Total Abortion Ban, and the 6-Week Ban are justiciable.

#### 1. Ripeness

The State's argument that Petitioners' claims against the Civil Liability Law are not ripe is meritless. "[R]ipeness asks 'whether there is any need for court action at the present time.' " *State v. Philip Morris, Inc.*, 158 Idaho 874, 883 n.6, 354 P.3d 187, 196 n.6 (2015) (quoting *Miles*, 116 Idaho at 642, 778 P.2d at 764). If a controversy has not "actually arisen, and it is shown that a controversy might never arise, the case is not ripe for judicial review." *Philip Morris, Inc.*, 158 Idaho at 883 n.6, 354 P.3d at 196 n.6. Here, as explained under the original jurisdiction question, *supra*, there is an immediate and palpable controversy post-*Dobbs* over whether the Civil Liability Law violates the Idaho Constitution. Thus, Petitioners' challenge is ripe for judicial review.

2. <u>Standing</u>

"It is a fundamental tenet of American jurisprudence that a person wishing to invoke a court's jurisdiction must have standing." *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002). Although the Idaho Constitution does not contain a "case or controversy" clause like the United States Constitution, we have, to avoid advisory opinions, nevertheless adopted this self-imposed constraint from federal practice:

> To establish standing a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. An injury sufficient to satisfy the requirement of an injury in fact must be concrete and particularized and actual or imminent, not conjectural or hypothetical.

*Coeur D'Alene Tribe v. Denney*, 161 Idaho 508, 513, 387 P.3d 761, 766 (2015) (cleaned up) (quoting *Philip Morris, Inc.*, 158 Idaho at 881, 354 P.3d at 194).

"[S]tanding 'requires a *showing* of a 'distinct palpable injury' and 'fairly traceable causal connection between the claimed injury and the challenged conduct.' " *Philip Morris, Inc.*, 158 Idaho at 881, 354 P.3d at 194 (emphasis in original) (quoting *Young*, 137 Idaho at 104, 44 P.3d at 1159). The "bar for standing can vary with the circumstances of each individual case[,]" and "is admittedly 'imprecise and difficult to apply.' " *Reclaim Idaho*, 169 Idaho at 419, 497 P.3d at 173 (quoting *Young*, 137 Idaho at 104, 44 P.3d at 1159).

As to the Civil Liability Law challenge, the only issue in dispute is whether Petitioners have met the injury-in-fact requirement. In a pre-enforcement challenge to governmental action, the injury-in-fact requirement is satisfied when the challenger alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbit v. Farm Workers*, 442 U.S. 289, 298 (1979)). Here, in support of its challenge, Petitioners submitted declarations alleging they *only* ceased performing abortions because of the "severe consequences on medical practitioners like Petitioners[.]" Petitioners allege the "risk of ruinous and uncertain financial liability" from violating the Civil Liability Law gives them no choice but to cease all abortion services. Moreover, because the law appears to be aimed at enforcing a legislatively sponsored abortion ban through private actors instead of governmental actors, *see* I.C. § 18-8807(6)–(7), it is essentially a governmental ban against conduct Petitioners allege the Idaho Constitution protects. Accordingly, we conclude Petitioners have made a sufficient showing to meet the injury-in-fact requirement.

21

As to the Total Abortion Ban and 6-Week Ban challenges, Respondents argue that Petitioners do not have third-party standing to sue on behalf of Idaho women and assert their legal interests. This Court, as illustrated in *State v. Doe*, 148 Idaho 919, 936, 231 P.3d 1016, 1033 (2010), is hesitant to hear cases where the rights asserted are not those of parties to the litigation. As noted in *Doe*, "this requirement is based on the presumption that the third parties themselves are the best proponents of their own rights." *Id.* (quoting *Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976)). However, we agree with the United States Supreme Court that there are certain times when a third-party litigant is able to advocate for particular rights. *Id.*; *Powers v. Ohio*, 499 U.S. 400, 411 (1991). As a result, both the Idaho and the U.S. Supreme Court require a litigant who seeks to assert the rights of another party to demonstrate three interrelated criteria: (1) the litigant suffered injury in fact, providing a significantly concrete interest in the outcome of the matter in dispute; (2) a sufficiently close relationship to the party whose rights are being asserted; and (3) a bar to the third parties' ability to protect their interests. *Doe*, 148 Idaho at 936, 231 P.3d at 1033 (citing *Powers*, 499 U.S. at 411).

As discussed above, Petitioners have demonstrated an injury in fact with a significantly concrete interest in the outcome of the matter of this dispute. Based on the severe consequences of performing abortions after the enactment of these laws, the potential financial liabilities, and the governmental control on an allegedly constitutionally protected activity, Petitioners have met the first criteria for third-party standing.

Next, the doctor-patient relationship has long been held to be a sufficiently close relationship to meet the requirements for third-party standing in the abortion context. *See Kootenai Med. Ctr. ex rel. Teresa K. v. Idaho Dep't of Health & Welfare*, 147 Idaho 872, 879, 216 P.3d 630, 637 (2009); *Singleton*, 428 U.S. at 117; *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965). Respondents argue that by overturning abortion's federal constitutional protection, *Dobbs* means this Court cannot rely on the standing principles defined in *Roe* or its progeny. *See Dobbs*, 142 S. Ct. at 2275 (citing other abortion cases as "ignor[ing] the Court's third-party standing doctrine.") (alteration added). However, *Dobbs* held that "the Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion" and that *Roe* and *Casey*'s improper arrogation of that regulatory authority to the United States Supreme Court was overturned. *Id*. at 2284. The *Dobbs* decision did not, however, abrogate the basic third-party standing principle that "[a]side from the woman herself . . . the physician is uniquely qualified to litigate the

22

constitutionality of the State's interference with, or discrimination against, that decision [to get an abortion]." *Singleton*, 428 U.S. 106 at 117. As such, Petitioners have demonstrated a sufficiently close relationship for third-party standing.

With respect to the third criteria, Respondents argue that because women have the ability to bring a privacy or equal protection based claim using a pseudonym, there is not a sufficient bar to establish third-party standing. However, the use of a pseudonym does not obviate the other obstacles women face in bringing this type of challenge. *See Singleton*, 428 U.S. at 117–118 (explaining that while the obstacles a woman faces in bringing one of these suits are not insurmountable, they are sufficient for a physician to establish third-party standing); *Kootenai Med. Ctr. ex rel. Teresa K. v. Idaho Dep't of Health & Welfare*, 147 Idaho 872, 879, 216 P.3d 630, 637 (2009) (noting that some of the "obstacles" mentioned in *Singleton* included privacy concerns and "the inherent time limitation in which a woman may obtain an abortion"). Between the privacy concerns of the women of Idaho, and the potential stigmatization connected to these situations in a post-*Dobbs* world, Petitioners have demonstrated a sufficient bar to the third parties' ability to protect their own interests.

### 3. Mootness

Finally, we address the mootness challenge against the 6-Week Ban. "An issue becomes moot if it does not present a real and substantial controversy that is capable of being concluded by judicial relief." *State v. Barclay*, 149 Idaho 6, 8, 232 P.3d 327, 329 (2010) (quotations omitted). However, we recognize three exceptions to the mootness doctrine: "(1) when there is the possibility of collateral legal consequences imposed on the person raising the issue; (2) when the challenged conduct is likely to evade judicial review and thus is capable of repetition; and (3) when an otherwise moot issue raises concerns of substantial public interest." *Koch v. Canyon Cnty.*, 145 Idaho 158, 163, 177 P.3d 372, 377 (2008) (quoting *Ameritel Inns, Inc. v. Greater Boise Auditorium Dist.*, 141 Idaho 849, 851, 119 P.3d 624, 626 (2005)).

Here, our conclusion below upholding the Total Abortion Ban might, in normal circumstances, warrant dismissal of the petition against the 6-Week Ban as moot because the Total Abortion Ban "supersede[s]" the 6-Week Ban. *See* I.C. § 18-8805(4). Thus, we would not need to reach the constitutionality of the 6-Week Ban. However, the circumstances of these consolidated petitions are far from normal. As explained above, a preliminary injunction was issued on August 24, 2022, against enforcement of the Total Abortion Ban where it allegedly conflicts with

EMTALA. *See United States v. Idaho*, No. 1:22-CV-00329-BLW, 2022 WL 3692618, at \*15 (D. Idaho Aug. 24, 2022). Because we cannot know how or when this pending federal case will resolve, and there are concerns of "substantial public interest" at stake, we conclude that Petitioners' constitutional challenges against the 6-Week Ban are still ripe.

Petitioners' only other mootness challenge is the one pointed out by Intervenors relating to the 6-Week Ban's trigger date. Petitioners' initial briefing argues the trigger date for when the 6-Week Ban takes effect is "unconstitutionally vague" because "a person of ordinary intelligence" is "unable to determine when the statute in fact takes effect." However, as explained above, the trigger date for the 6-Week Ban was August 19, 2022. Thus, we conclude Petitioners' challenge to the trigger date for the 6-Week Ban is moot.

## VI.    CONSTITUTIONAL ISSUES

### A. The Idaho Constitution does not contain an implicit fundamental right to abortion.

Petitioners' facial challenges under the Idaho Constitution to the Civil Liability Law, the Total Abortion Ban, and the 6-Week Ban have one theme in common: each is predicated on the theory that one, some, or a combination of various sections within Article I of the Idaho Constitution implicitly guarantee a fundamental right to abortion. If Petitioners are correct, laws passed by the legislature that regulate the exercise of this right would be presumptively unconstitutional unless they are narrowly tailored to serve a compelling governmental interest. *See Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 126, 15 P.3d 1129, 1134 (2000). If Petitioners are incorrect, laws regulating or prohibiting abortion are presumptively constitutional like any other law related to health, safety, welfare, or morals, *see Gomersall v. St. Luke's Reg'l Med. Ctr., Ltd.*, 168 Idaho 308, 313, 483 P.3d 365, 370 (2021), and will only be deemed unconstitutional when they are not rationally related to a legitimate governmental purpose, *Nelson v. Pocatello*, 170 Idaho 160, __, 508 P.3d 1234, 1244 (2022).

It is undisputed that the Idaho Constitution does not contain an express right to abortion. *See* IDAHO CONST. Art. I–XXI. Nevertheless, Petitioners maintain that Article I *implicitly* protects overarching rights to "privacy," "bodily autonomy," and "intimate familial decisions," and that within one of these rights, sits the right they argue for: a fundamental right to abortion. Petitioners contend that some combination of sections 1, 17, and 21 in Article I are the appropriate textual root(s) for finding an implicit fundamental right to abortion. In other words, instead of directly arguing that a particular section or combination of sections in Article I implicitly contains the

24

"right to abortion," Petitioners seek the recognition of a fundamental right based on three other alleged rights that *also* do not exist in the plain text of the Idaho Constitution—i.e., the rights of "privacy," "bodily autonomy," and "intimate familial decisions." *See* IDAHO CONST. Art. I–XXI.

However, we need not wade through the inferential leaps Petitioners present to answer their central question. Regardless of whether the overarching rights to "privacy," "bodily autonomy," and "intimate familial decisions" exist—there is nothing to indicate that the particular "right of abortion" is part of any of those rights. This is because a "right to abortion" has no support in Idaho's deeply rooted traditions or history at the time Article I, sections 1, 17, and 21 were framed and adopted. Thus, we cannot conclude the Idaho Constitution, as written and intended, implicitly guarantees a fundamental right to abortion. If it is the will of the electorate, the Idaho Constitution can certainly be amended to add a right to abortion, or the people can elect legislators willing to pass laws legalizing abortion. *See* IDAHO CONST. Art. XX, §§ 1–4 (explaining the amendment process). In the 134 years since the Idaho Constitution was ratified, the people of Idaho have successfully amended it 135 times. Nonetheless, "[t]he [Idaho Supreme C]ourt did not make, nor can it change, the provisions of the [C]onstitution." *Cohn v. Kingsley*, 5 Idaho 416, 439, 49 P. 985, 993 (1897) (Houston, J., on denying rehearing) (alterations added).

1. The plain and ordinary meaning of the Idaho Constitution, as intended by its framers, controls our method of constitutional interpretation.

Passing on the constitutionality of statutory enactments is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison*, 5 U.S. 137 (1803). *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 583, 850 P.2d 724, 734 (1993); *see also Miles v. Idaho Power Co.*, 116 Idaho 635, 640, 778 P.2d 757, 763 (1989). When we are called on to perform this duty under the Idaho Constitution, "the primary object is to determine the intent of the framers." *State v. Clarke*, 165 Idaho 393, 397, 446 P.3d 451, 455 (2019) (quoting *Idaho Press Club, Inc. v. State Legislature*, 142 Idaho 640, 642, 132 P.3d 397, 399 (2006)). "This Court has long taken this approach to interpreting our state constitution." *Clarke*, 165 Idaho at 397, 446 P.3d at 455.

Indeed, we have taken this approach since 1891, two years after the Idaho Constitution was ratified, to as recently as January 2022, roughly three months before Petitioners first averred that the Idaho Constitution implicitly guarantees a fundamental right to abortion. *See, e.g.*, *People v. George*, 3 Idaho 72, 76, 26 P. 983, 983 (1891) (interpreting Article XVII, section 3 through the "design of its framers" to hold a statute dividing counties unconstitutional); *Cohn v. Kingsley*, 5 Idaho 416, 422, 49 P. 985, 988 (1897) (interpreting Article III, section 15 through the "intention

25

of the framers" to hold a legislative act "void" for not complying with enactment requirements); *Wilson v. Perrault*, 6 Idaho 178, 180, 54 P. 617, 618 (1898) (interpreting Article XV, section 6 through the "framers" intent where it requires the legislature to provide by law the manner in which reasonable maximum rates may be set for "use of water sold, rented or distributed"); *Christensen v. Hollingsworth*, 6 Idaho 87, 93, 53 P. 211, 212 (1898) (interpreting Article I, section 7 and Article V, section 1 "in the light of the law existing at the time of the adoption of the constitution" to hold the defendants were not entitled to a jury trial in an action to reform and foreclose a mortgage); *Toncray v. Budge*, 14 Idaho 621, 647-49, 95 P. 26, 37–38 (1908) (interpreting the terms "celestial" and "patriarchal" marriage, formerly in Article VI, section 3, as "meant and intended" by the "framers of the Constitution, and the people in its adoption," to prohibit those practicing "bigamous" or "polygamous" marriages from voting, serving as a juror, or holding civil office); *Grice v. Clearwater Timber Co.*, 20 Idaho 70, 76, 117 P. 112, 113–14 (1911) (interpreting Article III, section 19 through the "minds of the framers" to hold the term "highways" was not "intended" to include navigable rivers); *Fralick v. Guyer*, 36 Idaho 648, 653, 213 P. 337, 338 (1923) (interpreting Article XI, section 17 by looking to what the "members of that convention intended when they wrote" that section into the Idaho Constitution); *Williams v. Baldridge*, 48 Idaho 618, 626-29, 284 P. 203, 206–07 (1930) (interpreting the legislature's authority to provide tax exemptions under Article VII, section 5 by looking at what the founders "intended" as "borne out" by the "Constitutional Debates"); *Oregon Short Line R. Co. v. Pfost*, 53 Idaho 559, 567-68, 27 P.2d 877, 880–81 (1933) (interpreting Article XI, section 5 by looking to the "framers" intent behind the phrase "[a]ll railroads shall be public highways" (alteration added)); *Girard v. Diefendorf*, 54 Idaho 467, 478, 34 P.2d 48, 50–52 (1934) (interpreting Article IX, section 11 based on the meaning "within the intent of the framers" at the time an amendment to that section was adopted); *Idaho Mut. Ben. Ass'n v. Robison*, 65 Idaho 793, 800–01, 154 P.2d 156, 159–60 (1944) (interpreting the amendment to Article V, section 9 authorizing direct appeal from orders of the Industrial Accident Board to the Supreme Court by examining the intent of the people who ratified it); *Higer v. Hansen*, 67 Idaho 45, 53–65, 170 P.2d 411, 415–425 (1946) (interpreting Article V, sections 17 and 27, and Article IV, section 19 through the framers' intent by examining the debates during the 1889 constitutional convention); *Thompson v. Engelking*, 96 Idaho 793, 805–07, 537 P.2d 635, 647–49 (1975) (interpreting Article IX, section 1 through the "history of our constitutional convention" to hold that the Idaho Constitution does not guarantee a "fundamental

right to completely equal educational expenditures" per student); *Sweeney v. Otter*, 119 Idaho 135, 142, 804 P.2d 308, 315 (1990) (interpreting Article IV, section 13 by looking to "evidence of the intent of the framers"); *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 398, 987 P.2d 300, 310 (1999) (interpreting Article I, section 7 as securing the jury trial right "as it existed at common law when the Idaho Constitution was adopted"); *Nate v. Denney*, 166 Idaho 801, 810, 464 P.3d 287, 296 (2017) (interpreting the meaning of Article IV, section 10 as "fixed when it [was] adopted" (alteration added)); *State v. Clarke*, 165 Idaho 393, 399, 446 P.3d 451, 457 (2019) ("[W]e conclude that the framers of the Idaho Constitution understood that Article I, section 17 prohibited warrantless arrests for completed misdemeanors." (alteration added)); *State v. Winkler*, 167 Idaho 527, 531, 473 P.3d 796, 800 (2020) (interpreting the term "pardon" in Article IV, section 7 through the "intent of the drafters" by looking to "sources close in time to the adoption of Idaho's constitution"); *Reclaim Idaho v. Denny*, 169 Idaho at 427–230, 497 P.3d at 181–84 (interpreting the initiative and referendum powers added to Article III, section 1 based on what the "drafters of the amendment intended"); *Durst v. Idaho Comm'n for Reapportionment*, 169 Idaho 863, 870–71, 505 P.3d 324, 331–32 (2022) (interpreting Article III, section 5 through the eyes of what the "drafters of this provision and Idaho's citizens intended").

And we have consistently taken this approach since 1891 for good reason. As explained by Judge Cooley, the author of the leading state constitutional treatise relied on by the framers during the 1889 constitutional convention, *see* PROCEEDINGS AND DEBATES 1597, 1598, 1611, 1721, 1732, 1734, 1736, 1738 (I. W. Hart ed., 1912), the Idaho Constitution is an instrument whose meaning is fixed at its creation—wholly unlike the nature of rules established at common law which may undergo "steady and imperceptible change":

> A constitution is not to be made to mean one thing at one time and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. *A principal share of the benefit expected from written constitutions would be lost if the rules they establish were so flexible as to bend to circumstances or be modified by public opinion.* It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. Those beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular and pervading in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public

27

sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. [. . . .] What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require. *The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it.*

*Girard v. Diefendorf*, 54 Idaho 467, 474, 34 P.2d 48, 50 (1934) (emphasis added) (quoting Cooley's Constitutional Limitations (8th ed.) at 124); *see also Cohn*, 5 Idaho at 435, 49 P. at 991–92 (Houston, J., on denying rehearing) (quoting the same from an earlier edition); *Nate v. Denney*, 166 Idaho 801, 810, 464 P.3d 287, 296 (2017) (quoting the same in part).

Indeed, if this Court interpreted the Idaho Constitution through the lens of turbulent moral, political, or social changes that often occur in the time spanning a provision's adoption, this Court would be unconstitutionally amending the Constitution and usurping "a power which belongs to, and can only be exercised by, the people in their sovereign capacity." *Cohn*, 5 Idaho at 439, 49 P. at 993 (Huston, J., on denying rehearing). "[F]or this [C]ourt to do other than to adhere strictly to the provision[s] of the Constitution would be an act of judicial lawlessness." *Fluharty v. Bd. of Comm'rs of Nez Perce Cnty.*, 29 Idaho 203, 211, 158 P. 320, 322 (1916) *superseded on other grounds by constitutional amendment as recognized in Village of Moyie Springs v. Aurora Mfg. Co.*, 82 Idaho 337, 344, 353 P.2d 767, 771 (1960). We are not empowered to sit as a "bevy of Platonic Guardians," L. Hand, The Bill of Rights 73 (1958), that can ignore the original meaning of a constitutional provision in favor of what we think the wiser or better policy. For if we were, "the people may well despair of ever being able to set any boundary to the powers of the government. Written constitutions will be [no] more than useless." *People v. George*, 3 Idaho 813, 72, 81, 26 P. 983, 987 (1891) (Houston, J., concurring) (alteration added).

Our approach to interpreting the Idaho Constitution based on the framers' intent—without regard to the social, economic, or moral preferences of the litigants before us—is not unique or new. Indeed, President Abraham Lincoln—two years before he signed the act creating the Idaho Territory—emulated the imperative to abstain from policy-driven constitutional interpretation when he denounced that the United States Supreme Court should ever take such an approach in interpreting the federal constitution:

28

> [T]he candid citizen must confess that if the policy of the Government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made in ordinary litigation between parties in personal actions the people will have ceased to be their own rulers, having to that extent practically resigned their Government into the hands of that eminent tribunal.

First Inaugural Address of President Abraham Lincoln (Mar. 4, 1861).

We possess no "roving commission" to rewrite the Idaho Constitution to create fundamental rights under the guise of constitutional interpretation. *See Nate*, 166 Idaho at 810, 464 P.3d at 296; *Cf. Shawver v. Huckleberry Ests., L.L.C.*, 140 Idaho 354, 365, 93 P.3d 685, 696 (2004) (explaining that courts have no "roving commission" to rewrite contracts). As explained, our duty is to "faithfully interpret" the Idaho Constitution through the framers' intent. *Miles*, 116 Idaho at 640, 778 P.2d at 762. Accordingly, we emphasize that in determining whether the Idaho Constitution contains an implicit fundamental right to abortion, the competing policies and moralities advanced, or incumbered by, the Civil Liability Law, the Total Abortion Ban, and the 6-Week Ban must play no role in our decision. Our "province and duty" as the judicial branch is to "say what the law *is*[,]" not what it *ought* to be. *See Marbury*, 5 U.S. at 177 (emphasis added). Thus, as we have done since 1891, we look to the plain meaning of sections 1, 17, and 21 in Article I—as intended at the time of their adoption—to answer Petitioners' challenges.

> 2. The plain language of the Inalienable Rights Clause in Article I, section 1, provides the textual basis for recognition of implicit fundamental rights.

"[O]ur State Constitution is an instrument of limitation and not of grant[.]" *Smylie v. Williams*, 81 Idaho 335, 339, 341 P.2d 451, 453 (1959). This means that the Idaho Constitution is not the source of the rights it enshrines; rather, it limits the power of the government to infringe upon those rights. Within that framework, it is well-established that the legislature has "plenary power over all subjects of legislation not prohibited by the federal or state constitution[.]" *Wilson v. Perrault*, 6 Idaho 178, 180, 54 P. 617, 617 (1898). Prohibitions or limitations in the Idaho Constitution on this power "are either express or implied." *Id*. Thus, any implicit fundamental rights the framers intended to protect from that "broad field of police power" to "enact laws concerning the health, welfare and morals of the people[,]" must be based on the plain language of the Idaho Constitution. *Berry v. Koehler*, 84 Idaho 170, 176, 369 P.2d 1010, 1013 (1961).

The consolidated petitions before us illustrate this point. The Civil Liability Law, Total Abortion Ban, and 6-Week Ban are all laws enacted by the legislature in an exercise of its "police power" to address the "profound moral question" of abortion. *Dobbs*, 142 S. Ct. at 2284. *See State*

29

*v. Leferink*, 133 Idaho 780, 784, 992 P.2d 775, 779 (1999) ("Under the broad authority of the police power, the legislature may enact laws concerning the health, safety, and welfare of the people as long as the regulations are not arbitrary or unreasonable."). However, if there is an express or implied prohibition against the laws Petitioners challenge, by way of an implied fundamental right to abortion *within* the Idaho Constitution, each law is presumptively unconstitutional unless it can survive our most exacting form of review, i.e., strict scrutiny. *See Van Valkenburgh*, 135 Idaho at 126, 15 P.3d at 1134. Accordingly, we must first identify the textual basis for the implicit fundamental right of abortion asserted by Petitioners. Petitioners point to sections 1, 17, and 21 in Article I as potential textual bases for an implicit fundamental right to abortion. Each of those sections remain unchanged since their original ratification in 1889, PROCEEDINGS AND DEBATES 2049–52 (I. W. Hart ed., 1912), and read as follows:

> **Section 1.** INALIENABLE RIGHTS OF MAN. All men are by nature free and equal, and have *certain inalienable rights*, among which are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety.
>
> > [. . . .]
>
> **Section 17.** UNREASONABLE SEARCHES AND SEIZURES PROHIBITED. The right of the people to be secure in their persons, houses, papers and effects against *unreasonable searches* and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.
>
> > [. . . .]
>
> **Section 21.** RESERVED RIGHTS NOT IMPAIRED. *This enumeration of rights shall not be construed to impair or deny other rights retained by the people.*

IDAHO CONST. Art. I, §§ 1, 17, 21 (emphasis added).

"In interpreting the Idaho Constitution, the rules of statutory construction apply." *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181. Thus, our objective is to "derive the intent" of those that adopted the provision, and we always begin with the plain language read in context of the entire instrument, such that no provision is read to be "void, superfluous, or redundant":

> The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute

30

so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

*Id.* (quoting *In Re Doe*, 168 Idaho 511, 516, 484 P.3d 195, 200 (2021) (cleaned up)).

"Where the constitutional provision is 'clear and unambiguous,' the expressed intent of the drafters must be given effect." *State v. Winkler*, 167 Idaho 527, 531 473 P.3d 796, 800 (2020) (quoting *Leavitt v. Craven*, 154 Idaho 661, 667, 302 P.3d 1, 7 (2012). "A constitutional provision 'is ambiguous where reasonable minds might differ or be uncertain as to its meaning.' " *Winkler*, 167 Idaho at 531, 473 P.3d at 800 (quoting *City of Idaho Falls v. H-K Contractors, Inc.,* 163 Idaho 579, 582, 416 P.3d 951, 954 (2018)). Furthermore, the compilation of the PROCEEDINGS AND DEBATES (I. W. Hart ed., 1912) from the Idaho constitutional convention of 1889 serves as the "best resource" for determining what meaning the framers intended to impart within sections that have remained unchanged since the constitution was ratified in 1889. *Clarke*, 165 Idaho at 397, 446 P.3d at 455.

### a. The Search and Seizure Clause

We begin with the provision that was not intended by the drafters to enshrine implicit fundamental constitutional rights. Idaho's "Search and Seizure Clause" (contained in Article I, section 17) was plainly not intended by the framers to be a *source* of implicit substantive rights retained by the people of Idaho in 1889. At the 1889 constitutional convention, the Search and Seizure Clause was read and adopted with some debate, but the discussion only concerned a proposed change of the word "unreasonable" to "unlawful" in the phrase "unreasonable searches and seizures" which was ultimately rejected. *See* PROCEEDINGS AND DEBATES 372, 1635-36 (I. W. Hart ed., 1912).

When no debate takes place surrounding a particular provision, we may examine the framers' intent "in light of the practices at common law and the statutes of Idaho" when that section was adopted and ratified by the people of Idaho. *Clarke*, 165 Idaho at 397, 446 P.3d at 455 (quoting *State v. Creech*, 105 Idaho 362, 392, 670 P.2d 463, 493 (1983)). In 1889, when the Search and Seizure Clause was ratified, there was no common law precedent that would support reading the language "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated" as one of many emanating sources of unnamed substantive rights. Indeed, it would be another seventy-six years before that legal concept was first introduced into the federal constitution. *See Griswold v. Connecticut*, 381

31

U.S. 479, 484 (1965) (interpreting the federal Bill of Rights as implicitly guaranteeing a zone of privacy through so-called "penumbras" cast generally by the individual amendments yet emanating from no particular textual root). This is not to say Idaho's Search and Seizure Clause cannot afford greater protections than its federal counterpart in the Fourth Amendment. *See State v. Donato*, 135 Idaho 469, 471, 20 P.3d 5, 7 (2001) (explaining that Idaho's Search and Seizure Clause has provided greater protections than the Fourth Amendment based on "the uniqueness of our state, our Constitution, and our long-standing jurisprudence."). This is only to say the Search and Seizure Clause was not intended by the framers to enshrine substantive and implicit fundamental rights the people did not already possess and retain.

### b. The Reserved Rights Clause

Next, a review of the plain language in the Reserved Rights Clause (Article I, section 21) shows it was not intended to be a repository of implicit substantive rights. Instead, it serves as an interpretive *instruction* that the listing of express rights in the Idaho Constitution "shall not be construed to impair or deny other rights retained by the people." IDAHO CONST. Art. I, § 21. Except for striking the word "popular" from the title of the provision, the Reserved Rights Clause was adopted without comment or debate. *See* PROCEEDINGS AND DEBATES 392, 1636 (I. W. Hart ed., 1912).

We have said that the "convention which framed the [Idaho] Constitution had among its members many of the most prominent lawyers of the territory." *Higer v. Hansen*, 67 Idaho 45, 62, 170 P.2d 411, 422 (1946). We assume the convention had in mind the constitutions which had come before, and "that it was drafted with care and precision in the use of language and with a full understanding of the accepted meaning of every word used therein." *Id*. Because of this, the Reserved Rights Clause is properly viewed as nothing more than Idaho's version of the Ninth Amendment, a provision sitting within the federal constitution since 1791. The Ninth Amendment, with strikingly similar language to Idaho's Reserved Rights Clause, reads: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. amend. IX.

There have been efforts to repurpose the Ninth Amendment to serve a substantive function. *See, e.g.*, *Griswold*, 381 U.S. at 484, 493–99 (Goldberg, J., concurring) (explaining the "penumbras" and "emanations" theory of the Ninth Amendment also spoken of by the majority). However, a plain reading of the Ninth Amendment quickly forecloses that judicial "discovery" as

an unwarranted constitutional detour. Indeed, the United States Supreme Court has generally retreated from that path. *See Dobbs*, 142 S. Ct. at 2245 (explaining that even in *Roe* there was no serious attempt to root a right to abortion in the Ninth Amendment); *see also id*. at 2301 n.* (Thomas, J., concurring) (noting that since *Griswold*, "the Court, perhaps recognizing the facial absurdity of *Griswold*'s penumbral argument, has characterized the decision as one rooted in substantive due process") (citing *Obergefell v. Hodges*, 576 U.S. 664, 663 (2015) and *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Accordingly, there is no reason to think the Reserved Rights Clause was intended to mean anything different than what was understood of the Ninth Amendment at the time the Idaho Constitution was adopted. As explained by Justice Story at that time, the Ninth Amendment *instructs* the reader that the listing of particular rights does not mean any unlisted right is insecure or unprotected:

> [The Ninth Amendment] was manifestly introduced to prevent any perverse or ingenious misapplication of the wellknown [sic] maxim, that an affirmation in particular cases implies a negation in all others; and, *e converso*, that a negation in particular cases implies an affirmation in all others.

J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 651 (5th ed. 1891) (alteration added); *see also* THE FEDERALIST NO. 84 (Alexander Hamilton) (objecting that because it would be impractical to enumerate all rights, it would be dangerous to list some and thereby imply that the government was unrestrained from interfering with those not listed); THE DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES, FIRST CONGRESS, FIRST SESS., Vol. 1, 456 (Gales ed. 1834) (James Madison proposing the Ninth Amendment to appease federalist concerns over enumerated rights).

We have at times pointed to the Reserved Rights Clause when discussing "rights retained by the people" as they existed before the Idaho Constitution was adopted. *See, e.g.*, *Electors of Big Butte Area v. State Bd. of Educ.*, 78 Idaho 602, 612–13, 308 P.2d 225, 231 (1957) ("The right of a parent to the custody, control, and society of his child is one of the highest known to the law.") (pointing to the Reserved Rights Clause and quoting *Martin v. Vincent*, 34 Idaho 432, 435, 201 P. 492, 493 (1921)). However, we have never expressly held that the framers intended the Reserved Rights Clause to be the *textual source* of implicit fundamental rights. Indeed, in the only case where it might be said we did, we provided no justification for lumping the Reserved Rights Clause into our analysis that otherwise turned on the "zone of privacy" announced in *Griswold*, 381 U.S. at 484, under the United States Constitution. *See Murphy v. Pocatello Sch. Dist. No. 25*, 94 Idaho

32, 37–38, 480 P.2d 878, 883–84 (1971) (pointing to the Reserved Rights Clause, along with the Inalienable Rights Clause and the Ninth Amendment, as protecting "the right to wear one's hair in a manner of his choice" and the "right of personal taste").

In sum, there is no legal support for the conclusion that the framers intended the Reserved Rights Clause to be a storehouse of implicit fundamental rights. Instead, it was plainly intended as an interpretive *instruction*.

### c. The Inalienable Rights Clause

When the Search and Seizure and Reserved Rights Clauses are read in context of the Idaho Constitution as a whole, it is clear the framers intended the Inalienable Rights Clause (Article I, section 1) to enshrine implicit fundamental rights as they existed in 1889 when the people ratified that provision. Indeed, based on the instruction provided in the Reserved Rights Clause, the surrounding circumstances at the time of its adoption, and the effect of its plain language, no other conclusion could be reached. To reiterate, the Inalienable Rights Clause provides that:

> All men are by nature free and equal, and have *certain inalienable rights*, *among which* are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety.

IDAHO CONST. Art. I, § 1.

Although the Inalienable Rights Clause was adopted without debate at the 1889 constitutional convention, PROCEEDINGS AND DEBATES 127–28, 1589 (I. W. Hart ed., 1912), the portions of the debates that do reference "inalienable" rights are illuminating. For example, in discussing the jury trial right in Article I, section 7, one delegate referred to "inalienable rights" in Article I as those rights the legislature "cannot take away." *Id*. at 228.

In addition, yet another delegate, in commenting on a proposed version of the eminent domain power in Article I, section 14, echoed the understanding that the Inalienable Rights Clause was substantive in effect, and as he put it, like "a cow which gives a bucket of good milk":

> Mr. PARKER. I have submitted my substitute with the idea of preserving the individual rights of every citizen of this territory. In Sec. 1 of this Declaration of Rights which you have not adopted, I find that 'all men are by nature free and equal and have certain inalienable rights, among which are enjoying and defending life and liberty, acquiring, possessing and protecting property, pursuing happiness and securing safety.' *Now in this Sec. 1 you give us, the individuals of this community, the right to acquire and possess property, but in this Section 14, as it is drafted now, these rights are taken away. This convention, in submitting this section in its present form, is in the position of a cow which gives a bucket of good milk and then kicks it over.*

34

PROCEEDINGS AND DEBATES 291 (I. W. Hart ed., 1912) (emphasis added).

Next, when we look at the plain language of the Inalienable Rights Clause, paired with the instruction in the Reserved Rights Clause, it is clear that the framers did not intend its explicit list of rights to exhaust those "retained" by the people in 1889. Based on the dialogue of the delegates at the 1889 constitutional convention, the framers defined the word "inalienable rights" in the same way it is defined today: those rights that "cannot be transferred or surrendered; esp., a natural right such as the right to own property." *See* Right ("inalienable right"), BLACK'S LAW DICTIONARY (11th ed. 2019). The Inalienable Rights Clause expressly includes the rights to life, liberty, property, happiness, and safety. IDAHO CONST. Art. I, § 1. However, this list is prefaced with the connective term "among which" that, when read with the instruction in the Reserved Rights Clause, plainly indicates the framers intended the list of rights in the Inalienable Rights Clause to be non-exhaustive. *Cf. State v. McKean*, 159 Idaho 75, 356 P.3d 368 (2015) (explaining that a list prefaced by the words "such as" is clearly meant by the legislature to be "non-exclusive").

Indeed, to read the Inalienable Rights Clause otherwise would not only require us to engage in the type of analysis that the Reserved Rights Clause explicitly forbids—it also runs contrary to our rules of construction. *See Idaho Press Club, Inc.*, 142 Idaho at 642, 132 P.3d at 399 (holding that the *expressio unius est exclusio alterius* rule of construction—i.e., to express one thing is to exclude another—only applies when the Idaho Constitution "expressly limits" an enumerated list of powers because the Constitution is an instrument of limitation, not of grant).

In addition, and perhaps most importantly, Idaho's framers specifically included the Inalienable Rights Clause *within* the text of the Idaho Constitution while the framers of the United States Constitution did not do the same. *Compare* IDAHO CONST. Art. I, § 1 *with* U.S. CONST. Instead, the only mention of "inalienable rights" at the federal level is found in the aspirational, but legally inoperative, Declaration of Independence where it states: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776). Given the plain language of the Idaho Constitution, we have no need to adopt an ever-expanding interpretation of the word "liberty" within the Inalienable Rights Clause as the textual basis for an implicit fundamental right as the United States Supreme Court has done in interpreting the word "liberty" within the Due Process Clause of the Fourteenth Amendment. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21

35

(1997). Thus, when a party alleges the framers intended the Inalienable Rights Clause to protect an implicit fundamental right (e.g., abortion), we resolve that question with the test discussed below, and if the framers and adopters so intended, it is protected by the Inalienable Rights Clause without resort to reading it into a previously listed right.

> 3. The "deeply rooted" test determines whether the Inalienable Rights Clause implicitly enshrined a particular right as fundamental in 1889.

Now that we have established the textual basis for implied fundamental rights, we must set forth the test for determining whether an alleged right was intended by the framers to be implicitly protected as a "fundamental" right. We have said "that a right is fundamental under the Idaho Constitution if it is expressed as a positive right, *or if it is implicit in Idaho's concept of ordered liberty*." *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181 (emphasis added) (internal quotations omitted). For example, in *Van Valkenburgh*, we applied the "positive right" test applicable to rights which are explicitly mentioned in the Idaho Constitution to hold that voting is a fundamental right. 135 Idaho at 126, 15 P.3d at 1134. However, we have never applied, nor explained the origin of, our "ordered liberty" test for *implicit* fundamental rights.

We first announced the "ordered liberty" test in *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 582, 850 P.2d 724, 733 (1993). In *Evans*, we were asked to decide whether "education" was a "fundamental right" under Article IX, section 1 for purposes of an equal protection challenge to Idaho's school funding system. *Id*. at 580–82, 850 P.2d at 731–33. Despite our previous reticence to adopt it in *Thompson v. Engelking*, 96 Idaho 793, 805, 537 P.2d 635, 647–48 (1975), the appellants in *Evans* relied on the "fundamental rights" definition used by the United States Supreme Court in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), and argued that education "should be considered a fundamental right for state equal protection analysis because it is expressly mentioned in [Article IX, section 1]." *Evans*, 123 Idaho at 581, 850 P.2d at 732. Under *Rodriguez*, if a right is "explicitly or implicitly guaranteed" by the federal constitution then it is deemed "fundamental" such that any law invading it is presumptively unconstitutional and must pass strict scrutiny to survive. 411 U.S. at 33.

In *Evans*, we explained that, up to that point, we had never held a particular constitutional right to be "fundamental" under the *Rodriguez* definition. 123 Idaho at 581, 850 P.2d at 732. Instead, we had used a case-by-case analysis of the nature of a right at issue, and had "stated in *dicta* that voting, procreation, and constitutional safeguards for persons accused of crimes are fundamental rights under the state constitution." *Id*. (emphasis in original). However, we

determined it was time to "partially abandon" the case-by-case approach as it provided "no neutral criteria" to reach a decision and "could give the appearance of result-oriented decision making." *Id*.

We then rejected the broad definition of "fundamental rights" from *Rodriguez*, but nevertheless adopted the "fundamental rights" nomenclature and held that it applied only to those rights "expressed as a positive right" or "implicit in our State's concept of ordered liberty":

> We now hold that the "fundamental rights" found in our state constitution are those expressed as a positive right. We have considered but reject the appellants' suggestion that the *Rodriguez* definition of fundamental rights be adopted. Although the sections in our state constitution which impose a duty upon the government might be said to invest a derivative right in those to whom the duty is owed, the inclusion of those derivative rights in our definition of fundamental rights would be overly broad. For example, [Article III, section 24] provides that the government should promote temperance and morality; however, this section does not create a positive right to the enjoyment of the same. This is not to say that the state constitution is the exclusive source of fundamental rights. As noted above, this Court has stated that procreation is a fundamental right, and the right to procreate is not explicitly mentioned in the state constitution. *See Tarbox*, 107 Idaho at 960 n.1, 695 P.2d at 345 n.1. *Rights which are not directly guaranteed by the state constitution may be considered to be fundamental if they are implicit in our State's concept of ordered liberty.*

*Evans*, 123 Idaho at 581–82, 850 P.2d at 732–33 (alteration and emphasis added).

Although we used the "ordered liberty" language in *Evans* when speaking of implicit fundamental rights, we had no occasion in *Evans* to apply an ordered liberty test—and to this day we have not applied it in any case. Instead, in *Evans*, we examined the *express* language in Article IX, section 1, and then held that "education is not a fundamental right because it is not a right directly guaranteed by the state constitution." 123 Idaho at 582, 850 P.2d at 733 (pointing to our same conclusion in *Thompson*, 96 Idaho at 806, 537 P.2d at 648). However, in these original actions, the central question is whether a fundamental right to abortion is *implicitly* protected by the Inalienable Rights Clause. Thus, as the proper case has presented itself, we explain our "ordered liberty" test today.

The origin of the term "ordered liberty" can be traced to *Palko v. Connecticut*, 302 U.S. 319 (1937) (Cardozo, J.), where the United States Supreme Court concluded the "liberty" prong of the Due Process Clause in the Fourteenth Amendment did not implicitly include the prohibition against double jeopardy from the Fifth Amendment. In *Palko*, the defendant was charged with

37

first-degree murder, but at trial, the jury found him guilty of second-degree murder, and he was sentenced to life in prison. *Id*. at 320–21. Pursuant to a Connecticut statute, the state appealed, and a new trial was granted. *Id*. at 321. The defendant objected to the Connecticut statute as violative of the Due Process Clause of the Fourteenth Amendment because its effect "was to place him twice in jeopardy for the same offense." *Id*. However, his objection was overruled, and after the second jury found him guilty of first-degree murder, he was sentenced to death. *Id*. at 321–22.

On appeal, the Court in *Palko* explained that certain protections in the Bill of Rights, valid against the federal government, had been "found to be *implicit in the concept of ordered liberty*," and thus, through the "liberty" prong of the Due Process Clause in the Fourteenth Amendment, could be applied against state action (i.e., the Incorporation Doctrine). *Id*. at 324–25 (emphasis added) (citing decisions regarding freedom of speech, freedom of the press, free exercise of religion, the right of peaceable assembly, and the right of the accused to counsel). In *Palko*, the Court was faced with deciding whether the prohibition against double jeopardy set forth in the Fifth Amendment could be applied through the Fourteenth Amendment to prohibit Connecticut's action of putting the defendant twice in jeopardy. *Id*.

Critically, when explaining the appropriate test, the Court in *Palko* equated the "essence of a scheme of *ordered liberty*" with those principles " 'of justice so rooted in the *traditions* and *conscience of our people* as to be ranked as fundamental.' " *Id*. at 325 (emphasis added) (quoting *Snyder v. Com. of Mass.*, 291 U.S. 97, 105 (1934) *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 6 (1964)). Yet, to answer the question before it, the Court in *Palko* made no attempt to analyze the deeply rooted "traditions and conscience of our people" as it relates to double jeopardy protection. *See Palko*, 302 U.S. at 325–28. Instead, the Court applied an abstract "ordered liberty" test that turned on generalized notions of fairness—case-by-case—which asked whether putting the defendant twice in jeopardy was "a hardship so acute and shocking that our *policy* will not endure it?" *Id*. at 328 (emphasis added). To this question, the Court replied: "The answer surely must be 'no.' " *Id*.

In the view of the *Palko* majority, a second trial against the defendant was "not cruelty at all, nor even vexation in any immoderate degree[,]" because the state should have the "reciprocal privilege" of a second trial when reversible error infected the first. *Id*. at 328. In other words, *state* prosecutors putting defendants twice in jeopardy was seemingly fair to the *Palko* majority's sense of universal "justice"—despite the Fifth Amendment prohibiting *federal* prosecutors from doing

38

the same. *See id*. at 325–28. Thus, the Court in *Palko* upheld the Connecticut statute as constitutional and affirmed the defendant's second conviction. *Id*. at 329.

The problem with the subjective "ordered liberty" test employed in *Palko* was made readily apparent by its overruling in *Benton v. Maryland*, 395 U.S. 784, 794 (1969) (holding the Fifth Amendment double jeopardy prohibition *is* enforceable against the states as an implicit part of "liberty" in the Due Process Clause of the Fourteenth Amendment). In *Benton*, the Court explained that it had, by that time, "thoroughly rejected the *Palko* notion that basic constitutional rights can be denied by the States as long as the totality of the circumstances does not disclose a denial of fundamental fairness." *Id*. at 795 (internal quotations omitted). Whether a constitutional right that applied to federal action was so "fundamental to the American scheme of justice," that it implicitly applied to state action could not be determined by merely examining whether its denial is "shocking to [a] universal sense of justice." *Id*. at 794–95 (alteration added). In other words, the "watered-down, subjective version of the individual guarantees of the Bill of Rights" produced by the subjective "ordered liberty" test in *Palko* would no longer be tolerated. *See id*.

Instead, as the Court in *Benton* demonstrated, the principled way to answer whether a particular right is implicitly protected by the term "liberty" in the Due Process Clause of the Fourteenth Amendment is to examine whether the right has been "part of our constitutional *tradition*" and an "ideal *in our constitutional heritage*[.]" *Id*. (emphasis added). Using this mode of analysis, the Court in *Benton* concluded that the double jeopardy protection in the Fifth Amendment was valid against state action through the Fourteenth Amendment because the protection has "from the very beginning been part of our constitutional tradition[,]" like the "right to trial by jury," so as to be "clearly fundamental to the American scheme of justice." *Id*. at 795–96 (quotations omitted) (pointing to its indisputable roots in ancient Greece and Rome, the common law of England, and the common law or constitution of nearly every state).

The analysis from *Benton*, and cases like it, was eventually developed into a test that focuses on whether a right is so "deeply rooted in this Nation's history and tradition" that it could be deemed fundamental to the American "scheme of ordered liberty" and implicitly read into the "liberty" prong of the Due Process Clause of the Fourteenth Amendment:

> Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," *id.*, at 503, 97 S. Ct., at 1938 (plurality

opinion); *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S. Ct. 330, 332, 78 L.Ed. 674 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko v. Connecticut*, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 152, 82 L.Ed. 288 (1937). Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. *Flores*, *supra*, at 302, 113 S. Ct., at 1447; *Collins*, *supra*, at 125, 112 S. Ct., at 1068; *Cruzan*, *supra*, at 277–278, 110 S. Ct., at 2850–2851. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decisionmaking," *Collins*, *supra*, at 125, 112 S. Ct., at 1068, that direct and restrain our exposition of the Due Process Clause. As we stated recently in Flores, the Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." 507 U.S., at 302, 113 S. Ct., at 1447.

*Glucksberg*, 521 U.S. at 720–21 (emphasis in original).

The United States Supreme Court has a long pedigree of examining whether a right is deeply rooted in history and tradition to determine—under the Incorporation Doctrine and substantive due process—whether a particular right is so "fundamental" to the Nation's "scheme of ordered liberty," that it can be *implicitly* guaranteed by the term "liberty" in the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (holding the right to "bring up children" is fundamental as one of the "privileges long recognized at common law as essential to the orderly pursuit of happiness"); *Powell v. State of Ala.*, 287 U.S. 45, 59–69 (1932) (holding the right to assistance of counsel is "fundamental" as evidenced by the history and practice of our nation); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (holding the right to "procreation" is "fundamental" as it is part of "the very existence and survival of the [human] race"); *Gideon v. Wainwright*, 372 U.S. 335, 340–345 (1963) (holding the right to assistance of counsel for indigent criminal defendants in non-capital felony cases is "fundamental" after explaining that *Betts v. Brady*, 316 U.S. 455 (1942) had gathered the relevant "historical data" but reached wrong conclusion); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 277–279 (1990) (holding the right of competent persons "to refuse lifesaving hydration and nutrition" is fundamental as informed by, among other things, the historical treatment of the right to informed consent); *Glucksberg*, 521 U.S. 702, 735 (1997) (holding there is no "fundamental" right to assisted suicide because it is not "deeply rooted" in our history and tradition); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) (holding the right to keep and bear arms is "fundamental" because it is "deeply rooted" in this Nation's heritage); *Timbs v.*

40

*Indiana*, 139 S. Ct. 682, 686–87 (2019) (holding right to protection against excessive fines is "fundamental to our scheme of ordered liberty," with "deep roots in our history and tradition" (cleaned up)).

The focus on the "deeply rooted" test to define the parameters of "ordered liberty" under the federal constitution was even employed in *Roe v. Wade*, 410 U.S. 113 (1973), where the United States Supreme Court went to great lengths in attempting to justify a fundamental right to abortion as rooted in this Nation's history and traditions. *See* 410 U.S. at 129–152 (analyzing the history of abortion through ancient attitudes, the Hippocratic Oath, the common law, English statutory law, American statutory law, and the positions of the American Medical Association, the American Public Health Association, and the American Bar Association). However, the Court's decision in *Dobbs* thoroughly exposed *Roe*'s "faulty historical analysis" by "setting the record straight" that there is no support for a "deeply rooted" right to abortion in the common law of England, the common law of this country, the statutes of the states, the trends of the American territories, or the Nation's traditions immediately before *Roe* announced the right. *Dobbs*, 142 S. Ct. at 2249–2260.

Indeed, even the dissent in *Dobbs* candidly made no effort to defend *Roe*'s flawed attempt at justifying a constitutional right to abortion as "deeply rooted" in our Nation's history and tradition such that it could be ranked "fundamental":

> The majority makes this change based on a single question: Did the reproductive right recognized in *Roe* and *Casey* exist in "1868, the year when the Fourteenth Amendment was ratified"? . . . . The majority says (and with this much we agree) that the answer to this question is no: In 1868, there was no nationwide right to end a pregnancy, and no thought that the Fourteenth Amendment provided one.

*Id.* at 2320–2323 (Breyer, Sotomayor, and Kagan, JJ., jointly dissenting).

Unlike the United States Supreme Court's use of the "liberty" prong of the Due Process Clause of the Fourteenth Amendment to provide a textual basis for implicit substantive rights, we have no reason to employ a "substantive utilization" of the Due Process Clause in the Idaho Constitution (Art. I, § 13) to decide Petitioners' challenge. *See Jones v. State Bd. of Med.*, 97 Idaho 859, 865, 555 P.2d 399, 405 (1976). As explained above, the Idaho Constitution, unlike the federal constitution, has a provision the framers intended to house implicit substantive rights: The Inalienable Rights Clause. Here, our task is to interpret the Idaho Constitution—not the United States Constitution. Thus, in the analysis below, we are only concerned with *Idaho*'s history, traditions, common law, and statutes when examining whether the Inalienable Rights Clause implicitly protects a right as fundamental.

41

We pause to emphasize that our "ordered liberty" test is not—nor should it be—a revival of the "ordered liberty" test in *Palko*. *See Evans*, 123 Idaho at 581, 850 P.2d at 732 (rejecting the case-by-case form of constitutional analysis employed in *Palko*). For if it were, the meaning of the Idaho Constitution would soon turn on arbitrary, unpredictable, and unprincipled decision-making criteria that made up the current justices' respective notions of a "universal sense of justice." *See Benton*, 395 U.S. at 794. Adopting such a subjective "ordered liberty" test not only has no limiting principle—it also distracts from the original meaning of the Inalienable Rights Clause and would leave this Court vulnerable to "subjective elements that are necessarily present" in examining implicit fundamental rights. *See Glucksberg*, 521 U.S. at 722.

Indeed, that amorphous path was well-traveled by the United States Supreme Court in the line of cases starting with *Lochner v. New York*, 198 U.S. 45, 57 (1905) (reading the trending economic theory of *laissez faire* into the "liberty" and "property" prongs of the Due Process Clause in the Fourteenth Amendment) and ending when it was rightly abandoned in *West Coast Hotel Company v. Parrish*, 300 U.S. 379, 392, (1937) ("Liberty implies the absence of arbitrary restraint, not immunity from *reasonable regulations and prohibitions* imposed in the interests of the community." (quotations omitted) (emphasis added)).

In his dissent from *Lochner*, Justice Holmes admonished that the Fourteenth Amendment "does not enact Mr. Herbert Spencer's Social Statics[,]" because constitutions are "not intended to embody a particular economic theory[.]" 198 U.S. at 75 (Holmes, J., dissenting). However, constitutions may nevertheless be offended by laws if they violate our "fundamental principles as they have been understood by the *traditions* of *our people* and *our law*":

> [A] Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire*. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States . . . . *I think that the word 'liberty,' in the 14th Amendment, is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law.*

*Id*. at 75–76 (Holmes, J., dissenting) (emphasis and alteration added).

We heed this admonition. We will not take this Court down an interpretive path that turns on our own sincerely held personal policy preferences that may inevitably yield to a similarly well-

intended self-correction in the future. *See, e.g.*, *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 15 (Tenn. 2000) (holding "[t]he concept of ordered liberty embodied in our constitution requires our finding that a woman's right to legally terminate her pregnancy is fundamental"), *superseded by* TENN. CONST. Art. 1, § 36 (2014) ("Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion."); *Planned Parenthood of the Heartland v. Reynolds*, 915 N.W.2d 206, 237–38 (Iowa 2018) (holding the due process clause in the Iowa Constitution protects abortion as a fundamental right), *overruled by Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 742 (Iowa 2022) (holding the due process clause in the Iowa Constitution does not include a fundamental right to abortion). In short, constitutional interpretation should not be subject to the pendulum swing of prevailing social mores.

Ours is a "government of laws, and not of men." *Marbury*, 5 U.S. at 163. In accord with this principle, our approach to interpreting the Idaho Constitution must avoid subjective injections of what we think "fair," "just," or "good policy" to reach a desired outcome. We do not engage in "result-oriented decision making[,]" *Evans*, 123 Idaho at 581, 850 P.2d at 732, and we will not start now. As explained above, the Idaho Constitution can only mean what was intended by those who framed and adopted it. *Toncray v. Budge*, 14 Idaho 621, 646, 95 P. 26, 34 (1908). Indeed, the Idaho Constitution can only "grow" when it is properly amended by the people. Thus, we decline to make the "ordered liberty" test into a placeholder for what members of this Court might omnisciently think—no matter how principled or well-intended—are the implicit "inalienable rights" in Idaho's Constitution based on shifting personal and subjective policy preferences. This Court is the steward of the Idaho Constitution, not its editor.

The impetus of the "deeply rooted" analysis—which asks whether a right is "so rooted in the traditions and conscience of our people as to be ranked as fundamental[,]" *Glucksberg*, 521 U.S. at 721—serves the same purpose whether it is applied to the Due Process Clause of the Fourteenth Amendment or the Inalienable Rights Clause in the Idaho Constitution. It offers a predictable, consistent, neutral, and principled method of determining what rights were embedded within Idaho's "ordered liberty" when the Inalienable Rights Clause was ratified, and are thereby implicitly protected by it as "fundamental." *See Evans*, 123 Idaho at 581, 850 P.2d at 732 (searching for "neutral" decision-making criteria). Most importantly, its mode of analysis is consistent with our approach to interpreting the Idaho Constitution because it allows us to

determine the original meaning of the Inalienable Rights Clause and the implicit rights it was intended to protect.

With the framers' intent as our polestar, we hold that inalienable rights, which are not expressly guaranteed, may nevertheless be implicitly protected as "fundamental rights" within the Inalienable Right Clause if the particular right is shown to be so rooted in the traditions and conscience of Idaho so as to be ranked fundamental. Our guideposts in this inquiry are Idaho's preexisting territorial laws; the Proceedings and Debates of the Constitutional Convention of Idaho 1889 (I. W. Hart ed., 1912); the surrounding statutes and common law; and the history and deeply held traditions of the people in Idaho when the Inalienable Rights Clause was ratified in 1889. *See Clarke*, 165 Idaho at 397, 446 P.3d at 455.

We emphasize that our holding today is not a license to read every infringement of an express or implied right in the Inalienable Rights Clause as warranting presumptive unconstitutionality and exacting judicial review, i.e., strict scrutiny. *See Reclaim Idaho*, 169 Idaho at 198, 497 P.3d at 444 (Brody, J., concurring in part and dissenting in part) (pointing out that a "reflexive application" of strict scrutiny will not always be warranted in cases "impacting fundamental rights"). "It would be carrying the protection of 'inalienable rights,' guaranteed by the Constitution, a long ways [sic] to say that that guaranty extends to a free and unlimited exercise of the whims, caprices, or proclivities . . . for idleness, ignorance, crime, indigence, or any kindred dispositions or inclinations." *Ex parte Sharp*, 15 Idaho 120, 129-30, 96 P. 563, 565 (1908).

For example, the "right to own and enjoy private property" is secured by the Inalienable Rights Clause but it is also subject to "reasonable limitation and regulation by the state" despite its status as "one of the natural, inherent and inalienable rights of free men." *Newland v. Child*, 73 Idaho 530, 537, 254 P.2d 1066, 1069 (1953). And many of our laws place significant limitations on the "right" to own and enjoy private property. *See, e.g.*, I.C. §§ 7-701 to -721 (eminent domain proceedings); I.C. §§ 18-5901 to -5906 (use of private property that constitutes a "public nuisance"); I.C. §§ 67-6501 to -6539 ("Local Land Use Planning Act"); I.C. §§ 55-101 to -3211 (regulating private property in general). Even the Idaho Constitution invades the right to private property. *See, e.g.*, IDAHO CONST. Art. I, § 14 (eminent domain).

When it comes to the inalienable right of "liberty," it is beyond dispute that many—if not all—of Idaho's criminal laws curtail, infringe, and invade upon the "liberty" of an individual to conduct themselves as they please in the public *and* private sphere. *See, e.g.*, I.C. §§ 18-1501 to -

44

1523 (prohibiting injury to children, underage drinking, use of an "inhalant" "for the purpose of becoming under the influence," abuse, exploitation, or neglect of a vulnerable adult, abandoning a vulnerable adult, female genital mutilation of a child, sexual exploitation of a child, lewd conduct with minors, sexual battery of a minor, enticing of children, providing shelter to runaway children, sale or barter of children for adoption, and tattooing, branding, tanning, or body piercing certain minors); I.C. §§ 18-3301 to -3325 (prohibiting certain sales, conduct, possession, or use of certain firearms, explosives, and other deadly weapons); I.C. §§ 18-3801 to -3810 (prohibiting types of gambling); I.C. §§ 18-4001 to -4017 (prohibiting murder, manslaughter, assisting in suicide, while providing for justifiable homicide); I.C. §§ 18-901 to -925 (prohibiting assault, battery, felonious administering of drugs, removing a firearm from a law enforcement officer, abuse of school-teachers, hazing, "harassment, intimidation or bullying," domestic violence, sexual exploitation by a medical care provider, violating no contact orders, attempted strangulation, and sexual battery); I.C. §§ 18-1101 to -1104 (prohibiting bigamy); I.C. §§ 18-801 to -805 (prohibiting arson); I.C. §§ 18-1301 to -1362 (prohibiting bribery and corruption); I.C. §§ 18-5601 to -5631 (prohibiting prostitution); I.C. §§ 18-6601 to -6605 (prohibiting incest, sexual abuse of an animal, sexual abuse of human remains, and video voyeurism); I.C. § 37-2732 (prohibiting the manufacture, delivery, or possession of certain drugs); I.C. § 37-2732C (prohibiting being "under the influence of" certain drugs in public); *see also* IDAHO CONST. Art. I, § 4 ("Bigamy and polygamy are forever prohibited in the state, and the legislature shall provide by law for the punishment of such crimes.").

We do not pass on the validity of the above laws impacting the inalienable rights of property and liberty. Rather, we merely point out that these laws form our social contract, and "[t]he ability of the legislature to make laws related to a fundamental right arises from the reality that, in an ordered society, few rights are absolute." *Reclaim Idaho*, 169 Idaho at 429, 497 P.3d at 183. As President Lincoln once said: " 'We all declare for Liberty; but in using the same word we do not all mean the same thing.' " *Dobbs*, 142 S. Ct. at 2247 (citation omitted). Indeed, the reasonable regulation of "liberty" and "property" is a power of the legislature necessary for an *ordered* society and government itself:

> It must be conceded that the *very necessity of government itself concedes a power to impose certain restrictions upon individual rights of life, liberty, and property, and the power to regulate the conduct of business as well as the conduct of the individual.* Did not constitutional government possess such power, it could

45

not serve any useful purpose, and, without power to restrain individuals from transgressing the rights of others and to restrain them in their conduct, which is necessary to conserve and protect the rights of all, the government must fall. This power in government is what may be termed and denominated police power. It has been contended in many other courts, as it is here contended, that the Legislature has no power to restrict an individual in the carrying on of his business; that, to do so, is taking property without due process of law; that, to do so, denies him an inalienable right. These objections, however, have not received very favorable consideration by any of the courts of the land. The power of the Legislature to deal with the question is no longer in doubt. *It is conceded by all the courts that, under the police power of the state, the Legislature may restrict individuals in their conduct, may restrict them in their business, and, so long as such regulations are reasonable, they do not violate the provisions of the Constitution of the United States or of this state.*

*State v. Dolan*, 13 Idaho 693, 706-07, 92 P. 995, 998–999 (1907) (emphasis added). In other words, unlike the term "freedom"—which encompasses the broad notion that one can act however one pleases without any constraints—liberty recognizes that a free society can only truly be free when individual freedoms are circumscribed by reasonable laws duly enacted by the people for the benefit of society as whole. *See generally Cox v. State of New Hampshire*, 312 U.S. 569, 574 (1941) ("Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses.").

However, the legislature certainly cannot regulate the rights to "liberty" or "property" into "non-existence," *Reclaim Idaho*, 169 Idaho at 429, 497 P.3d at 183, such that the people of Idaho are subject to unreasonable and arbitrary governmental intrusions. Hence, our standard of review that requires laws to be rationally related to a legitimate governmental purpose in order to withstand the most basic form of constitutional scrutiny, i.e., rational basis review. *See Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 396, 987 P.2d 300, 308 (1999).

Here, it could be claimed that many of the above laws, such as those prohibiting personal drug use, prostitution, incest, bigamy, polygamy, gambling, domestic violence, and underage drinking significantly invade the "universal" notions of "bodily autonomy," "intimate family decision making," and "privacy" which Petitioners have used to conceive their purported right to abortion. Because of this, Petitioners' reliance on such expansive notions of "liberty" as the basis for a fundamental right to abortion would not only call a significant spectrum of our criminal laws into doubt, but it also attempts to divert our attention from the *actual* right Petitioners want this Court to announce. If a party contends a right should be *read into* the Inalienable Rights Clause as

46

"fundamental," we must take special care to determine the particular interest at stake and right alleged. *See, e.g.*, *Glucksberg*, 521 U.S. at 722–23 (rejecting the "right to die" formulation as generalized and imprecise, and instead asking: "[W]hether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." (alteration added)).

Once we accurately frame the right alleged, only then can we examine whether that right, under the test articulated above, has been afforded heightened protection from the otherwise plenary "police powers" of the legislature so that we could fairly conclude transgressions against it are presumptively unconstitutional and are subject to our most demanding form of constitutional review, i.e., strict scrutiny. *See Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 709, 791 P.2d 1285, 1288 (1990). At oral argument, Petitioners agreed that the fundamental right they seek is *not* "bodily autonomy," "intimate familial decisions," or "privacy." Instead, the precise interest at stake in this case is the "right to decide whether to terminate a pregnancy"—or, put more plainly, the "right to an abortion."

4. The Inalienable Rights Clause does not protect an implicit fundamental right to abortion.

Now that the textual basis and test for implicit fundamental rights is settled, we reach Petitioners' central argument. For the reasons discussed below, nothing in Idaho's territorial laws, territorial sessions, early publications, constitutional convention, statutes, common law, or early medical regulations, suggests that a right to abortion is "deeply rooted" in the history and traditions of Idaho. Thus, a "right to abortion" is not part of Idaho's "ordered liberty" such that it could be implicitly protected by, and *read into*, the Inalienable Rights Clause in the Idaho Constitution as a fundamental right. Beginning with Idaho's territorial days through to the ratification of the Inalienable Rights Clause in 1889, Petitioners have put forth no evidence that a *right* to an abortion was any part of the deeply held traditions or history of those who settled Idaho. Instead, as explained below, the territorial sessions, territorial laws, constitutional convention, and local publications at that time only point to the contrary conclusion.

During the territorial assembly's *first* session, less than a year after the Territory of Idaho was created in 1863, procuring an abortion was made a criminal offense punishable by "not less than two years, nor more than five years" in the "territorial prison[,]" except when the physician who procured it "deem[ed] it necessary" to "save [the] life" of the woman. Act of Feb. 4, 1864, ch. IV, § 42, 1863–64 Idaho Terr. Sess. Laws 443. This law applied at every gestational stage,

47

unlike laws of other states that only criminalized abortion after "quickening"—or movement—of the fetus. *See, e.g.*, *Pro-Choice Mississippi v. Fordice*, 716 So.2d 645, 650–51 (Miss. 1998) (discussing Miss. Code 1880, § 2884 which criminalized producing an abortion from a "woman pregnant with a quick child[.]" (emphasis removed)). The criminal prohibition against abortion passed unanimously. *See* H.R. JOURNAL IDAHO TERR., 1ST SESS. 135–36 (Dec. 7, 1863, to Feb. 4, 1864) (passing H.B. No. 114—an "act concerning crimes and punishments"—unanimously); COUNCIL [SENATE] JOURNAL IDAHO TERR., 1ST SESS. 125 (Dec. 7, 1863, to Feb. 4, 1864) (passing the same bill unanimously).

Ten months later, at the second session, the territorial assembly reenacted the same criminal prohibition against abortion with the same narrow exception. *See* Act of Dec. 21, 1864, ch. III, § 42, 1864 Idaho Terr. Sess. Laws 305 (emphasis in original) (alteration added). Like the first session, the bill containing the criminal prohibition against abortion passed with little disagreement. *See* H.R. JOURNAL IDAHO TERR., 2ND SESS. 121–22 (Nov. 14, 1864, to Dec. 23, 1864) (passing Council Bill No. 40 "concerning crimes and punishments" with nine out of twelve members voting in favor after the "Committee on Judiciary" recommended its passage); COUNCIL [SENATE] JOURNAL IDAHO TERR., 2ND SESS. 125 (Nov. 14, 1864, to Dec. 23, 1864) (passing the same bill unanimously).

Eleven years later, members of the eighth territorial legislative session, whose journals from the House of Representatives and the Council for the Territory of Idaho can be found in manuscript (handwritten) form, reaffirmed their commitment to criminally prohibiting abortion and reenacted the same law. *See* Act of Jan. 14, 1875, ch. IV, § 42, 1874–75 Idaho Terr. Sess. Laws 328. The members at the territorial legislative sessions that passed these criminal abortion laws were not only part-time "citizen" legislators (like Idaho's legislature is today)—their intimate entwinement with the *people* of territorial Idaho is apparent by the fact that Idaho's territorial legislature also sat as a divorce court from 1870 to 1883 (i.e., from the sixth through the twelfth territorial sessions). *See, e.g.*, H.R. JOURNAL IDAHO TERR., 11TH SESS. 170 (Dec. 13, 1880, to Feb. 10, 1881) (listing five house bills as "acts" that would divorce named individuals in the territory of Idaho); s*ee also* William John McConnell (U.S. Senator and Governor for Idaho), EARLY HISTORY OF IDAHO 367–68 (1912).

Next, and only two years before the constitutional convention in 1889, the laws and statutes of Idaho were compiled, revised, and reenacted at the fourteenth territorial session. Idaho's

abortion law was amended; this time not only making it a crime to perform an abortion, but also making it a crime to submit to one. *See* R.S. §§ 6794, 6795 (1887). Between the thirteenth and fourteenth territorial sessions, three commissioners charged with revising and compiling the territorial laws—John S. Gray, Hon. R. Z. Johnson, and James H. Beatty (who had replaced Hon. H. E. Prickett after his unexpected death)—completed the "revision, compilation and consolation of the General Statutes of the Territory[.]" *See* H.R. JOURNAL IDAHO TERR., 14TH SESS. 47 (Dec. 13, 1886, to Feb. 10, 1887).

This commission was not unfamiliar with the law in Idaho. For example, one of the commissioners—James H. Beatty—was a member of the Council at the Fourteenth Session for the Territory of Idaho (1886–87); a *vocal* delegate during the 1889 constitutional convention; Chief Justice of the Supreme Court for the Territory of Idaho from May 1889 to July 1890; and the first district judge for the United States District Court for the District of Idaho. *See* COUNCIL [SENATE] JOURNAL IDAHO TERR., 14TH SESS. 4 (Dec. 13, 1886, to Feb. 10, 1887); James H. Hawley, HISTORY OF IDAHO, THE GEM OF THE MOUNTAINS, Vol. I 186, 190, 590 (1920); *see, e.g.*, PROCEEDINGS AND DEBATES 7–9, 18, 25, 70, 134, 205, 277, 362, 420, 534, 619, 767, 873, 919, 1027, 1054, 1059, 1088, 1138, 1140, 1141, 1622, 1749, 1843, 1900, 1906 (I. W. Hart ed., 1912).

At the start of the fourteenth territorial session, Council Bill No. 14 adopted the commission's compilation (including the new criminal abortion laws codified in sections 6794 and 6795 of the Revised Statutes) with a unanimous vote in the Council and near unanimous vote in the House of Representatives. *See* COUNCIL [SENATE] JOURNAL IDAHO TERR., 14TH SESS. 43–44, 58. Thereafter, members of the fourteenth territorial session amended numerous sections within the commission's compilation, and included other new laws passed at the session, before the final version of the compilation was fully enacted and published as the Revised Statutes of 1887. *See* H.R. JOURNAL IDAHO TERR., 14TH SESS. 69, 83, 93, 108, 124, 128, 143, 148–152, 163; COUNCIL [SENATE] JOURNAL IDAHO TERR., 14TH SESS. 52, 58, 63, 67, 74, 82, 110, 111–112, 123–24, 135, 148, 187, 210. During the session, no member moved to amend or repeal the laws in the compilation that criminally prohibited abortion before their final codification in sections 6794 and 6795 of the Revised Statutes of 1887. It is true that the initial compilation from the commission was not read out-loud in full at the fourteenth territorial session. *See* COUNCIL [SENATE] JOURNAL IDAHO TERR., 14TH SESS. 43–44, 58; H.R. JOURNAL IDAHO TERR., 14TH SESS. 45–47. However,

49

there is nothing to suggest that the members at that session—which included a principal drafter of the compilation (James H. Beatty)—did not know its contents.

For example, late in the session, a "joint committee" investigated the compilation, compared it to the new laws enacted, and reported any changes that needed to be made before referring the overall text to two committees on "codification and revision" for publication in its final form as the Revised Statutes of 1887. *See* H.R. JOURNAL IDAHO TERR., 14TH SESS. 148–151; *see also* COUNCIL [SENATE] JOURNAL IDAHO TERR., 14TH SESS. 58 (Governor Edward A. Stevenson instructing the territorial assembly to use its "most careful attention" in incorporating the new laws passed at the session with those compiled by the commission who "spared neither time nor labor to present a complete code of laws for the Territory."). Moreover, as noted above, numerous sections *within* the compilation were selectively amended *during* the fourteenth territorial session. Thus, that no member moved to amend or repeal the criminal laws against abortion located in sections 6794 and 6795 suggests that neither was offensive to any "deeply rooted" tradition which might have viewed abortion as a fundamental right.

Next, in 1889, Idaho held its constitutional convention, and in the record documenting its discussions and debates, the words "abortion," "privacy," and "bodily autonomy" are nowhere to be found. *See* PROCEEDINGS AND DEBATES 1–2046 (I. W. Hart ed., 1912). Petitioners have put forth no evidence, nor can we find any, that the framers at the convention discussed any of these topics in such a way that we could conclude they intended to implicitly protect abortion as a fundamental right when they drafted the Inalienable Rights Clause. On the contrary, some of the delegates at the convention—the framers of the Idaho Constitution—were the same individuals who passed the laws that criminalized abortion since Idaho's early territorial days.

For example, one of the delegates was Solomon Hasbrouck, a member of the House of Representatives at the Second Session for the Territory of Idaho twenty-five years before the 1889 constitutional convention. *See* H.R. JOURNAL IDAHO TERR., 2ND SESS. 3; PROCEEDINGS AND DEBATES 7–9, 2090 (I. W. Hart ed., 1912). During the second territorial session, Hasbrouck—as part of a 16-3 majority between the total from the house and council—voted to reenact Idaho's law from its first territorial session that had (unanimously) made it a crime to procure an abortion unless it was necessary to "save" the life of the mother. *See* H.R. JOURNAL IDAHO TERR., 2ND SESS. 121–22 (passing Council Bill No. 40); Act of Dec. 21, 1864, ch. III, § 42, 1864 Idaho Terr. Sess. Laws 305 (criminally prohibiting abortion); *see also* H.R. JOURNAL IDAHO TERR., 1ST SESS. 135–

36 (passing H.B. No. 114 unanimously); COUNCIL [SENATE] JOURNAL IDAHO TERR., 1ST SESS. 125 (passing H.B. No. 114 unanimously); Act of Feb. 4, 1864, ch. IV, § 42, 1863–64 Idaho (Terr.) Laws 443 (criminally prohibiting abortion).

In addition, five of the members who enacted the criminal abortion laws in sections 6794 and 6795 of the Revised Statutes of 1887 were also delegates to the 1889 constitutional convention. These individuals included two members of the House of Representatives at the Fourteenth Session for the Territory of Idaho: A. S. Chaney and John S. Lewis, *see* H.R. JOURNAL IDAHO TERR., 14TH SESS. 3–4; PROCEEDINGS AND DEBATES 7–9, 2090 (I. W. Hart ed., 1912), and three members of the Council at the Fourteenth Session for the Territory of Idaho: James H. Beatty (commissioner for the Revised Statutes of 1887), James I. Crutcher, and Alexander E. Mayhew (President of the Council), *see* COUNCIL [SENATE] JOURNAL IDAHO TERR., 14TH SESS. 4; PROCEEDINGS AND DEBATES 7–9, 2090 (I. W. Hart ed., 1912). Furthermore, John S. Gray—the second of the three commissioners who compiled the Revised Statutes of 1887 and its criminal abortion laws—was also a delegate to the 1889 constitutional convention. *See id.*

With this many delegates at the constitutional convention involved in enacting the territorial abortion laws of Idaho—including two of the three commissioners for the Revised Statutes of 1887—one would reasonably expect that if abortion *were* a "deeply rooted" right integral to Idaho's "scheme of ordered liberty" at that time—some objection would have been lodged, discussion had, or protest made at the convention regarding the laws then in effect which criminalized both performing and submitting to an abortion. *See* R.S. §§ 6794, 6795 (1887). Instead, the Inalienable Rights Clause was framed, in part, by those *same* individuals who made abortion a crime except when necessary to preserve the life of the mother.

Moreover, immediately after the convention, nine of the framers became members of the newly created Idaho House of Representatives and Senate for the First Legislative Session for the state of Idaho. *See* H.R. JOURNAL IDAHO, 1ST SESS. 4 (Dec. 8, 1890, to Mar. 14, 1891) (Representatives Frank Steunenberg, J. W. Ballentine, Thomas Pyeatt, and Henry Armstrong); SENATE JOURNAL IDAHO, 1ST SESS. 3 (Dec. 8, 1890, to Mar. 14, 1891) (Senators John S. Gray, James M. Shoup, J. W. Brigham, E. S. Jewell, J. L. Underwood). During Idaho's first legislative session, no legislator—including the nine framers of the Idaho Constitution—took issue with the criminal abortion laws in sections 6794 and 6795 despite numerous other actions to amend or repeal provisions in the same Revised Statutes of 1887. *See* H.R. JOURNAL IDAHO, 1ST SESS. 1–

221; SENATE JOURNAL IDAHO, 1ST SESS. 1–222. Again, like its absence at the 1889 constitutional convention, the subject of abortion was altogether omitted, and no legislator found it necessary to challenge sections 6794 and 6795 as offensive to Idaho's heritage and scheme of "ordered liberty." In sum, nothing in Idaho's territorial sessions, territorial laws, constitutional convention, or first legislative session during statehood suggests the framers of the Idaho Constitution, when they drafted the Inalienable Rights Clause, implicitly intended to protect abortion as a fundamental right.

To combat this history, Petitioners argue that the "antiabortion sentiment" implied by the laws criminalizing abortion at that time do not suggest the majority of *people* in Idaho in 1889 (including the voters who ratified the Idaho Constitution) harbored the same attitudes towards abortion. In support of their argument, Petitioners point to "open and notorious public advertisements" for "known abortifacients" that were published in Idaho newspapers between 1884 and 1890. *See* WOOD RIVER TIMES (Hailey, Idaho Territory), Mar. 8, 1884, at 2 (advertisement for a women's health journal providing information "on the diseases of women" with "causes, symptoms, and a sure home treatment" for such things as "Falling of the Womb" and "Suppressed or Painful Menstruation"); THE CALDWELL TRIBUNE (Caldwell, Idaho Territory), Mar. 20, 1885, at 7 (advertisement for "Female Pills" containing "Ergot, Tansy, Savine, Cotton Root and other good Monthly Female Regulators"); IDAHO NEWS (Blackfoot, Idaho), Aug. 6, 1887, at 3 (advertisement for "Dr. Pierce's Favorite Prescription" as a "powerful, invigorating tonic" that treats "those chronic weaknesses and distressing ailments peculiar to females," including "painful menstruation" and "unnatural suppressions"); IDAHO SEMI-WEEKLY WORLD (Idaho City, Idaho Territory), Mar. 18, 1890, at 3 (advertisement for "Dr. Livingston's Tansy Wafers" to "restore suppressed menses," and delivered in a box "securely sealed from eyes of inquisitive people"); IDAHO SEMI-WEEKLY WORLD (Idaho City, Idaho Territory), Apr. 4, 1890, at 3 (advertisements for "Faber's Golden Female Pills" taken by "prominent ladies monthly" and "[g]uaranteed to relieve suppressed menstruation").

Although such advertisements can be found in Idaho newspapers in the time surrounding the adoption of the Inalienable Rights Clause, they do not demonstrate that the people of Idaho at that time were largely *accepting* of abortion nor do they prove that all the advertised products were actually abortifacients masquerading as menstrual relief pills. Indeed, in 1887, the territorial assembly responded, and made it a "felony" for any person to "willfully publish[] any notice or

52

advertisement of any medicine or means for producing or facilitating a miscarriage or abortion . . . or who offers his services by any notice, advertisement or otherwise, to assist in the accomplish of any such purpose[.]" R.S. § 6843 (1887) (alteration added); *see also* R.C. § 6843 (1909) (same); C.S. § 8306 (1919) (same). A review of such advertisements surrounding 1887 shows they were often from out-of-state vendors and did not advertise their "female pills" or "invigorating tonics" as *directly* providing a means for producing a miscarriage or abortion. And contrary to Petitioners' suggestion, it was not unheard of to prosecute this type of crime. *Cf. U.S. v. Kelly*, 3 Sawy. 556, 26 F. Cas. 695, 696 (No. 15,514) (D. Nev. Mar. 22, 1876) (upholding an indictment against the publisher of a newspaper under section 3893 of the United States Revised Statutes for knowingly mailing an advertisement that gave information on where and how to obtain an abortion while noting that "[i]t is not to be expected that a quack doctor will advertise in plain express terms, that he will furnish the means . . . to procure an abortion. Such an advertisement probably has never been, and never will be, published.").

Nevertheless, when the topic of abortion itself is reviewed in newspapers from Idaho's territorial days to the time surrounding 1889—the alleged abortifacient advertisements become largely irrelevant. As illustrated below, many of the same newspapers Petitioners rely on show that prosecuting criminal abortion was just as "open and notorious" from Idaho's territorial days through to the time surrounding the adoption of the Inalienable Rights Clause.

For example, in 1879, a newspaper reported that William Rhett, a member of the "8th session of the Idaho Legislature," was arrested "for incest and lodged in jail in Mount Idaho Nez Perce [C]ounty" after his "oldest daughter," reported he had given her "medicine to produce an abortion" which resulted in her birthing the "child" stillborn. THE IDAHO STATESMAN (Boise, Idaho Territory), July 17, 1879, at 3. Rhett did not deny being the father—but claimed the girl was not his daughter and instead the daughter of "a prominent citizen of Northern Idaho, who has held important offices." *Id*. Six years later, in 1885, another article reported that a husband and wife had been charged as "accessories" to "the crime of abortion," allegedly committed two years prior, with the "victim" being a girl who had lived with the couple. THE KETCHUM KEYSTONE (Ketchum, Idaho Territory), Aug. 29, 1885, at 2 (describing "the real abortionist being a doctor of Ada county").

Two years later, in 1887, an article reported that "Dr. Sanders, of Moscow" was charged with "manslaughter" after it was determined he had performed an abortion on a woman who then

died a few days later. THE CALDWELL TRIBUNE (Caldwell, Idaho Territory), July 9, 1887, at 1. Less than one week later, another newspaper reported on the "sad story of the death" of a girl from Goldendale, Washington, who left town with a "villain, named Lode Waldrom" and died in Portland, Oregon, after Waldrom had an abortion performed on her but he then became "drunk and neglected her until it was too late for medical aid to save her." THE IDAHO STATESMAN (Boise, Idaho Territory), July 14, 1887, at 1. The article described the acts of Waldrom as "the most heinous crime against society" and commented that a "man who seeks to decoy and afterward ruin sweet innocence deserves to be cremated alive." *Id.*

One year after that, in 1888, another Idaho newspaper reported that the local "Dr. Biggars" had made a "hurried departure" from town after he was accused of performing an abortion. WOOD RIVER TIMES (Hailey, Idaho Territory), July 14, 1888, at 3. Another doctor claimed Dr. Biggars had been falsely accused, but nevertheless left town "as it would put him in a very unpleasant predicament and to considerable expense to even bear such an accusation." *Id.*

Two years later, in 1890, immediately after the Inalienable Rights Clause was ratified (and the year Idaho became a state), an article was published about "Dr. E. A. Crain" who had fled Missoula, Montana, the night before. THE IDAHO STATESMAN (Boise, Idaho), July 12, 1890, at 2. Reportedly, Dr. Crain had gained "some notoriety a few days ago by being implicated in the death of a woman" in Missoula through performing an abortion. *Id.* The article then reported that Dr. Crain had "forged several checks on a prominent party, and skipped for the coast, presumably Portland[.]" *Id.* In doing so, "[t]he doctor left his bondsmen in the abortion case to the tune of $800." The article stated that telegrams were sent to "Spokane, Portland and Tacoma for his arrest, but nothing has been heard of him yet." *Id.*

Two years later, in 1892, an Idaho newspaper published a "comment" that an "[e]ight year" sentence by a court in Umatilla, Oregon, imposed "upon a man convicted of procuring an abortion" was "a heavy penalty" but "probably none too much" for "such a crime." LEWISTON TELLER (Lewiston, Idaho), Feb. 25, 1892, at 6. Six years later, in 1898, another article reported that "Dr. J. A. Moffitt" had been charged with "producing an abortion" after a woman he treated died of "blood poisoning"—but that the jury ultimately did not "find a bill against Dr. Moffitt[.]" LEWISTON TELLER (Lewiston, Idaho), July 15, 1898, at 1. One year after that, in 1899, another Idaho newspaper reported on "Mrs. Wright" who died under "peculiar circumstances." THE IDAHO STATESMAN (Boise, Idaho), Dec. 14, 1899, at 6. A coroner's jury was impaneled to investigate,

54

and afterwards, "found that the woman came to her death from a shock resulting from an attempted abortion" but "the party guilty of the crime" was unknown. *Id*. At the time of her death, Mrs. Wright did not live with her husband, and had been boarding with William Beal "for some time." *Id*. The article states there was evidence that "strongly pointed" to Mrs. Wright as performing the abortion on herself, and that the fetus was "about four months old." *Id*.

One year later, in 1900, a newspaper published a summons in an action to annul a marriage where the husband alleged, he was "forced and compelled to participate in said marriage ceremony . . . by threats made by [the wife] and by her father and mother, who had him arrested and threatened to swear falsely against him[,] and to accuse him in a court of justice of *attempting to commit an abortion*, and to send him to the state's prison, and that he participated in said marriage ceremony in order to avert the *shame and scandal* and the loss of his liberty[.]" LEWISTON TELLER (Lewiston, Idaho), Dec. 5, 1900, at 2 (emphasis and alterations added).

Two years later, in 1902 (just thirteen years after the Inalienable Rights Clause was ratified), the Idaho Statesman reported on "[o]ne of the most sensational prosecutions that has been known in the history this state" where warrants were issued for the arrest of Warden C. E. Arney and Dr. J. K. Dubois of the Idaho State Penitentiary based on an affidavit from the only female prisoner at the time, Joise Kensler, that each had caused her to have a criminal abortion. THE IDAHO STATESMAN (Boise, Idaho), Sept. 3, 1902, at 1. The article provides a detailed account, but summarized the "Story of the Case" leading to the warrants as follows:

> It seems that some time in July—at the time of the meeting of the board of pardons—H. W. Dunton, attorney for Mrs. Kensler, who had an application for pardon pending, informed Attorney General Martin that his client had advised him she was pregnant. The attorney general laid the matter before Secretary of State Bassett. The later expressed doubt of the truth of the story, but proposed that the warden be called down the next day. Mr. Martin wished to have an investigation made by the prison physician.
>
> The next day the governor was present and the matter was again discussed, but nothing definite was done. About that time the attorney general went north. When he returned some two weeks later he made inquiry about the matter and learned the woman had been ill. He then investigated on his own account, going to the prison with Mr. Dunton. They there learned that the crime had been committed on or about July 23.
>
> Mrs. Kensler told them that the warden and the physician had told her she must submit to it and she had taken the drugs sent her for the purpose.
>
> Her statement was eventually reduced to the form of an affidavit, and some confirmatory evidence was secured.

*Id*.

55

In her affidavit, made in support of the warrants, Kensler swore that both Warden Arney and Dr. Dubois were involved in procuring her unlawful abortion:

> I am a prisoner confined in the state penitentiary of the state of Idaho, undergoing a life sentence; aged 30 years, and I was in a pregnant condition, and on or about July 17, 1902, I disclosed my condition to C. E. Arney, warden of the state penitentiary, and that about that time I was visited by Dr. Dubois, prison physician, and advised by him to get rid of it, and that he would furnish her [sic] the medicine which would accomplish a miscarriage.
>
> That a few hours afterwards on the same day the medicine was brought by Mr. Chinn, one of the guards at the prison. I took the medicine as directed by said physician for three or four days, and that it produced an abortion on July 22, 1902, and that at time said abortion was produced I had been with child about four months.
>
> That said physician informed affiant that no one knew of the abortion but himself and warden [sic] and two others.

THE IDAHO STATESMAN (Boise, Idaho), Sept. 12, 1902, at 6.

Later, at the preliminary hearing, the prosecutor examined numerous witnesses who confirmed circumstances indicating a criminal abortion had been committed; however, Kensler changed her story on the stand, denied that she ever told Warden Arney or Dr. Dubois that she was pregnant, and instead testified that Attorney General Frank Martin and her attorney Mr. Dunton came to her and asked her to sign the affidavit. *Id*. Afterwards, the probate court dismissed the case against Warden Arney based on insufficient evidence, THE IDAHO STATESMAN (Boise, Idaho), Sept. 16, 1902, at 5, but allowed the case to move forward against Dr. Dubois. THE IDAHO STATESMAN (Boise, Idaho), Sept. 23, 1902, at 6. However, at some point, Kensler signed a second affidavit, and in it, exonerated both Warden Arney and Dr. Dubois. THE IDAHO STATESMAN (Boise, Idaho), Feb. 25, 1903, at 3 (reporting that a legislative committee later investigated and Kensler testified that she was influenced to repudiate her first affidavit and sign the second one "on promise of a pardon").

Although convictions were not secured, that prominent individuals like the warden and physician of the Idaho State Penitentiary were prosecuted at all indicates a strong public sentiment against any abortion not necessary to preserve the life of a woman. Indeed, for the next nine years, from 1904 to 1913, newspapers in Idaho continued to report on suspected criminal abortions and prosecutions. *See, e.g.*, THE TETON PEAK (St. Anthony, Idaho), Mar. 31, 1904, at 1 (reporting on an investigation into potential accomplices to a criminal abortion at the "famous Green House"); THE COEUR D'ALENE PRESS (Coeur d'Alene, Idaho), Sept. 2, 1905, at 1 (reporting that a woman died from procuring an abortion by medicine and that her husband was arrested but the case was

eventually dismissed when the prosecution did not produce a witness); LEWISTON EVENING TELLER (Lewiston, Idaho), July 29, 1908, at 1 (reporting that a "warrant has been issued for the arrest of William Fountain on a charge of attempting to procure and produce an abortion"); THE IDAHO REPUBLICAN (Blackfoot, Idaho), Nov. 13, 1908, at 8 (reporting that "[t]he case of John Sayer and George Kite, charged with abortion, continued for the term"); THE IDAHO STATESMAN (Boise, Idaho), Jan. 3, 1913, at 7 (reporting that Ray Weaver was acquitted in Lincoln County on a charge of second degree murder for causing the death of a woman after sending her "oil of tansy" through the mail to procure an abortion but that he was later convicted in federal court for "sending a poison through the mails for the purpose of procuring an abortion").

In sum, the newspapers from Idaho's territorial days through the early 1900s show that abortion was not condoned but treated as a serious criminal offense. Petitioners have supplied no Idaho publications, and we have found none, that portrayed abortions at that time as anything *less* than a crime. Simply stated, there is nothing that shows the framers of the Inalienable Rights Clause—or the people of Idaho in 1889—held a deeply rooted tradition or heritage in treating abortion as a *fundamental right* beyond governmental proscription. To the contrary, the above history and territorial laws shows the only thing "deeply rooted" about abortion in Idaho was its status as a criminal offense, except when necessary to "preserve" the life of the woman.

Next, when we examine the journals and reports of Idaho's early medical community, Idaho's early medical regulations, Idaho's statutes, and the common law of Idaho from 1889 to the announcement of a federal constitutional right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973)—no support for a nascent right to abortion can be found. To begin, in 1897, eight years after the Inalienable Rights Clause was ratified, Idaho passed its first comprehensive laws regulating the practice of medicine. *See* 1897 Idaho Sess. Law 88. Four years earlier, in 1893, physicians in Idaho had gathered to form the "Idaho State Medical Society,"—the first organized medical association in Idaho, THE CALDWELL TRIBUNE (Caldwell, Idaho), Sept. 16, 1893, at 5— which then worked towards state regulation of the practice of medicine. The 1897 laws created the first state board of medical examiners which was to oversee the new medical licensing and registration requirements, applications, and professional discipline. 1897 Idaho Sess. Law 88, 88– 94. Grounds for revoking a medical license, or denying an application for the same, were enumerated under eight types of "unprofessional or dishonorable conduct[.]" *Id*. at 93–94. The *first* ground listed was "[t]he procuring or aiding or abetting in procuring a criminal abortion." *Id*.

57

However, in late 1897, this Court held the law was void for failing to comply with the "express" command in Article III, section 15 that a bill must be read section by section before the legislative body votes on it. *Brown v. Collister*, 5 Idaho 589, 592-93, 51 P. 417, 418 (1897). Roughly two years later, in 1899, the legislature properly enacted what was essentially the same law from 1897. *See* 1899 Idaho Sess. Laws 345. The 1899 law granted "the governor the authority to appoint a board of medical examiners[,] which, among other things, had the authority to institute proceedings in the district court if it determined that the license of a physician or surgeon should be suspended, revoked, or canceled for unprofessional or dishonorable conduct." *Mena v. Idaho State Bd. of Med.*, 160 Idaho 56, 58–59, 368 P.3d 999, 1001–02 (2016) (internal quotations omitted). The law listed eight grounds for "unprofessional or dishonorable conduct," and again, "procuring or aiding or abetting in procuring a criminal abortion" was the *first* ground listed. 1899 Idaho Sess. Laws 345, 348. Procuring, aiding, or abetting in procuring a "criminal" abortion continued to be proscribed, and repeatedly reaffirmed, as a ground for medical discipline in Idaho from 1899 through the date *Roe* was handed down. *See* R.C. § 1352 (1909); C.S. § 2111 (1919); I.C. § 53-2107(9) (1932); 1949 Idaho Sess. Laws 27, 35 (I.C. § 54-1810 (1949)); 1977 Idaho Sess. Laws 536, 547 (I.C. § 18-1814 (1977)) (changing the word "criminal" to "unlawful"); *see also* I.C. § 54-1814(6) (2022) ("Performing or procuring an unlawful abortion or aiding or abetting the performing or procuring of an unlawful abortion.").

Returning to the early history of medical regulations in Idaho, in 1903, at the "Ninth Annual Meeting of the Idaho State Medical Society" in Boise, a resolution was introduced, stating that the "Idaho State Medical Society takes this opportunity of expressing their *continued approval* of the law regulating the practice of medicine and surgery in this State[.]" *Reports of Society Meetings*, NORTHWEST MEDICINE Vol. I. 599 (Jan. to Dec. 1904) (emphasis added). "On motion the above resolution was adopted by the *unanimous* vote of the Society members present." *Id*.

In the years following 1903, Idaho physicians submitted articles to Northwest Medicine, submitted reports and data on the Idaho State Medical Society (whose name was later changed to the "Idaho State Medical Association"), and attended lectures and events with physicians from the Washington State Medical Association. In 1909, the Idaho State Medical Association joined with the state medical associations of Oregon and Washington and adopted Northwest Medicine as the official medical journal for Idaho, Oregon, and Washington. *See Society Meetings*, NORTHWEST MEDICINE Vol. I. (new series) 27 (Aug. to Dec. 1909). The relevancy here being that articles in

Northwest Medicine regularly condemned medical practitioners who performed voluntary abortions as engaging in an unethical, immoral, and criminal practice and as grounds to revoke a physician's medical license. For example, in a 1907 address before physicians, J. H. Lyons, M.D., President of the Washington State Medical Association, discussed the important line between "criminal abortions" (i.e., voluntary abortions) and "justifiable" abortions necessary to preserve the life of the mother. NORTHWEST MEDICINE Vol. V. 289–96 (Jan. to Dec. 1907). Dr. Lyons discussed the immorality of voluntary abortion, not based on any particular set of religious beliefs, but based on the unborn child's "inalienable right" to life by the "mere fact of its existence" as a "human being":

> One of the greatest obstetricians whom the world has produced has said, "The life of the child does not belong to the physician." The truth of that statement cannot be successfully controverted. *The mere fact of the existence of a human being carries with it the right to a continuance of that existence, and this is an inalienable right, a natural right which is incorporated in every fiber of our being*, and no one, not even the physician, can justly deprive a human being of that right.

NORTHWEST MEDICINE Vol. V. 291 (Jan. to Dec. 1907) (emphasis added).

In another article, Montgomery Russell, M.D., noted that criminal abortions had been "on the increase" since the 1840s due to "the spread of atrocious advertising by abortionists, and the open display and sale of alleged abortifcient [sic] nostrums by the druggist[.]" *Id*. at 300. Dr. Russell expressed that physicians widely knew "criminal abortion to be prominent among the great vices of the day." *Id*. However, he acknowledged the difficulty of discerning the true extent of the "problem" because statistics on criminal abortion "have never been, and never can be published showing the frequency of the crime . . . for the deed is done secretly; the woman cannot be compelled by law to testify against herself, and the abortionist takes good care that there shall be no interruption while he performs the operation." *Id*. In his closing remarks, Dr. Russell explained his view that "[c]riminal abortion is undoubtedly an abhorrent and villainous crime against the infant, the mother, the family circle, society and Nature." *Id*. at 304; *see also* NORTHWEST MEDICINE Vol. VI. 374 (Jan. to Dec. 1908)  (address from C. N. Suttner, M.D., President of the Washington State Medical Association, denouncing "abortionists" and stating that "[i]t is the solemn duty to give our united help to our boards of health and our state boards of medical examiners to revoke the licenses of these criminals.").

When Idaho's newspaper articles from 1879 to 1913, its criminal laws against abortion starting in 1864, and the statutory grounds for medical discipline starting in 1899 are considered

together—there is plainly no support for a conclusion that abortion is a fundamental right deeply rooted in Idaho's history and tradition. Instead, all of the evidence indicates that in the time preceding and following the adoption of the Inalienable Rights Clause, the people of Idaho, the framers of its constitution, the territorial assembly, the state legislature, and the physicians of Idaho widely viewed abortion as a criminal offense and as grounds for medical discipline except when necessary to preserve the life of the mother.

In addition, when we turn to the statutes and common law of Idaho in the time between the adoption of the Inalienable Rights Clause and today—there is plainly no support for a conclusion that a right to abortion is deeply rooted in Idaho's history and traditions. For example, in 1909, twenty years after the Inalienable Rights Clause was ratified, the criminal prohibitions against abortion in the Revised Statutes (R.S. §§ 6794, 6795 (1887)) were reenacted, through the people's elected representatives, with minor word changes, in the newly compiled Idaho Revised Code. *See* R.C. §§ 6794, 6795 (1909); 1909 Idaho Sess. Laws 3. Ten years after that, in 1919, the people of Idaho again, through their elected representatives, recodified and reenacted the same criminal prohibitions against procuring or submitting to an abortion in the Idaho Compiled Statutes. *See* C.S. §§ 8281, 8282 (1919); 1919 Idaho Sess. Laws 4. Thirteen years later, in 1932, the same criminal prohibitions against abortion were again recodified in the early version of the Idaho Code. *See* I.C. §§ 17-1810, 17-1811 (1932). Fifteen years after that, when the modern version of the Idaho Code was compiled in 1947, the same criminal prohibitions were again recodified. *See* I.C. §§ 18-601, 18-602 (1947). In these criminal laws, the only exception to performing an abortion was when it was "necessary" to "preserve" the life of the pregnant woman.

Idaho Code sections 18-601 and -602 remained in effect for the next twenty-five years and were only repealed after the United States Supreme Court announced a federal constitutional right to abortion in *Roe v. Wade*, 410 U.S. 113 (1973). Moreover, in the same Act that repealed those sections, the legislature enacted a trigger provision that would reinstitute the *same* historical criminal laws against procuring, or submitting to, an abortion if *Roe* were ever overturned or "the states [were] again permitted to safeguard the lives of unborn infants before the twenty-fifth week of pregnancy." *See* 1973 Idaho Sess. Laws 442, 448; *see also* I.C. 18-613 (1979) (providing that sections 18-604 to -611 in Title 18 would be repealed, and sections 18-613 to -615 would become effective, on the occurrence those events). The trigger laws were modeled nearly word for word

60

after those first enacted in 1887 (R.S. §§ 6794, 6795), and sat dormant for the next seventeen years until they were repealed in 1990. *See* 1990 Idaho Sess. Laws 464.

Turning to our common law, Petitioners are correct that our historical criminal abortions laws from 1864 to 1973 were never tested for constitutional validity in an appeal or direct action to the Idaho Supreme Court. However, Petitioners have pointed to nothing in this Court's decisions to warrant Petitioners' inference that had the historical criminal abortion laws been constitutionally challenged between 1864 and 1973, they would have been struck down as violative of an implicit "fundamental" right to abortion. On the contrary, the earliest decision of this Court touching on abortion, issued just twelve years after the Inalienable Rights Clause was ratified, acknowledged that Idaho had never followed the common law rule on abortion related to the "quickening" of a fetus, and further characterized abortion as "one of the worst" crimes "known to law" because it is "*destructive of a life unborn*" and "places in jeopardy the life" of the pregnant woman:

> At the common law an abortion could not be committed prior to the quickening of the fœtus [sic]. This is not the case under our statutes.
>
> [. . . .]
>
> *The crime for which appellant has been convicted is one of the worst known to the law. An unnatural abortion, brought about by means of drugs or instruments, violates decency, the best interests of society, the divine law, the law of nature, the criminal statutes of this state, and is not only destructive of a life unborn, but places in jeopardy the life of a human being,—the pregnant woman.* Both actors, when there are two, as in the case at bar, are guilty of felony, and ought to be punished by the law, if the woman survives; and, if she does not, then the person or persons participating in the abortion should be punished. This crime is one of grave consequences to society. The law prohibits it and prescribes severe penalties. The law ought to be strictly enforced. In a case of this kind, this court will not notice purely technical errors, which do not prejudice the substantial rights of the accused, for the purpose of reversing the verdict returned by the jury, especially, as in this case, where we are satisfied that substantial justice has been done.

*State v. Alcorn*, 7 Idaho 599, 606, 613-14, 64 P. 1014, 1016, 1019 (1901) (emphasis added) (affirming a conviction for "manslaughter" of a mother who died as a result of "a criminal operation performed by [the defendant] for the purpose of bringing about an abortion" (alteration added)).

In addition, in our decisions leading up to *Roe*—this Court again made no intimation that there was anything constitutionally suspect about the historical criminal abortion laws. *See State v. Sayer*, 23 Idaho 536, 537, 130 P. 458, 458 (1913) (reversing the conviction of John Sayer based on insufficiency of the evidence at trial); THE IDAHO REPUBLICAN (Blackfoot, Idaho), July 24,

61

1908, at 1 (reporting on the charges against John Sayer and George Kite for procuring a criminal abortion); *Nash v. Meyer*, 54 Idaho 283, 286-87, 31 P.2d 273, 274, 280 (1934) (holding that if a married couple consented to the performance of an "illegal" abortion, neither can recover damages against the surgeon on the ground of negligence and noting that laws criminalizing abortion are designed to "discourage abortions because thereby the life of a human being, the unborn child, is taken"); *State v. Proud*, 74 Idaho 429, 436–40, 262 P.2d 1016, 1020–23 (1953) (reversing a conviction under Idaho Code section 18-601 for procuring a criminal abortion based on the erroneous admission of hearsay evidence and remanding for a new trial); *State v. Rose*, 75 Idaho 59, 61, 267 P.2d 109, 110 (1954) (affirming a criminal conviction under Idaho Code section 18-601 for procuring an abortion not necessary to "preserve the life of the woman").

Petitioners' final salvo is to pivot from its position that abortion was illegal but generally tolerated in Idaho and argue that we should ignore our history of intolerance for abortion and "centuries-old laws" because these were a product of "antiquated views" on who "could participate in civic, social, and political life," such that *any* reliance on Idaho's history and traditions "would perpetuate the disenfranchisement and discriminatory treatment of women that existed circa 1890." In support of their argument, Petitioners rely heavily on *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 491 (Kan. 2019), where the Kansas Supreme Court declared a fundamental right to abortion as implicitly protected by the inalienable rights clause in the Kansas Constitution. *See* KAN. CONST. Bill of Rts. § 1 ("All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.").

In reaching that holding, the Kansas Supreme Court examined its *own* history (including multiple constitutional conventions and historical abortion laws); invented its *own* theory of "natural rights" under Kansas' inalienable rights clause, *see Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 740 n.19 (Iowa 2022) (noting that John Locke, a natural rights philosopher (and physician) relied on by the court in *Nauser*, "explicitly condemned abortion"); and pointed to its *own* precedent to hold Kansas' inalienable rights clause implicitly protected abortion as a fundamental right. *See Hodes & Nauser, MDs, P.A.*, 440 P.3d at 486–491 (rejecting the criminal laws against abortion in Kansas as "wholly unpersuasive" because they "reflect[ed] a paternalistic attitude" at that time that did not afford women "natural rights" as they are understood today).

Petitioners ask us to do the same here by giving little, if any, weight to the historic laws in Idaho that criminalized abortion from the first session of Idaho's territorial assembly to the date the Inalienable Rights Clause was ratified, and for the next 84 years leading up to *Roe*. However, as explained above, our duty is to interpret the Idaho Constitution based on its meaning at the time it was adopted by those who framed and adopted it. As discussed in Section VI.A.1, *supra*, if the meaning of a constitutional provision can be dismissed in favor of the policy preferences of a select few on the bench, "[w]ritten constitutions will be [no] more than useless." *George*, 3 Idaho at 81, 26 P. at 987 (Houston, J., concurring) (alterations added). Thus, we cannot ignore the historic laws criminalizing abortion in Idaho—or the other evidence discussed above that reveals Idaho's traditions and history regarding abortion at the time the Inalienable Rights Clause was framed and adopted.

Moreover, Petitioners' reliance on the reasoning of the Kansas Supreme Court in *Hodes & Nauser* is misplaced for at least two reasons. First, the history of Kansas, along with its jurisprudence, is not *Idaho*'s history or jurisprudence. Thus, the decision in *Hodes & Nauser* does not answer what Idaho's "deeply rooted" traditions and history are when it comes to the issue of abortion. Second, Petitioners' argument here, which echoes much of the same reasoning in *Hodes & Nauser* where the majority concluded Kansas' criminal abortion laws were nothing but historical "paternalism" towards women, is contravened by the inconvenient fact that many *women* in Idaho are—and always have been—against non-therapeutic abortions for reasons that have nothing to do with discriminating against, or animus towards, women as a class. The absurdity of Petitioners' argument here is demonstrated by the fact that, if we were to accept it, and incorporate it into our reasoning, *this Court* would be consigning the beliefs of many women in Idaho to nothing more than an invidious scheme foisted upon them to "perpetuate the disenfranchisement and discriminatory treatment of women that existed circa 1890[.]"

It is true that women were not afforded equal legal and political rights when the Inalienable Rights Clause was adopted. Indeed, even after petitions for it, the framers at the 1889 convention declined to guarantee women the right of suffrage. *See* PROCEEDINGS AND DEBATES 88–91, 164–74 (I. W. Hart, ed. 1912) (addresses of "Mrs. Skelton" and "Mrs. Duniway" petitioning the convention to guarantee the right of suffrage to women). However, unlike Kansas, which did not extend the right of suffrage to women until 1912 (nearly 51 years after the Kansas Constitution was adopted), the (male) voters of Idaho did so in 1896 through Idaho's second constitutional

63

amendment, adopted just seven years after the Idaho Constitution and the Inalienable Rights Clause were ratified. *See* 1895 Idaho Sess. Laws 232 (proposed amendment to Article VI, section 2 ratified at the general election on November 3, 1896).

Furthermore, and unlike Kansas whose voters never did so, the voters of Idaho (men and women)—shortly after women's right to suffrage was guaranteed—amended the Idaho Constitution to "reserve to themselves" the ability to legislate directly through the initiative and referendum power. *See* 1911 Idaho Sess. Laws 785–87 (amendments to Article III, section 1 ratified at the general election on November 5, 1912); *see also Reclaim Idaho*, 169 Idaho at 430, 497 P.3d at 184 (holding that these powers are "fundamental rights" protected by the Idaho Constitution). Although enabling legislation related to the exercise of these powers was not effectively passed until 1933, *id.* at 414, 497 P.3d at 168, from 1933 until *Roe* was announced in 1973, there is no evidence of any attempt by the voters of Idaho (women or men) to repeal the abortion laws then in effect (I.C. §§ 17-1810, 17-1811 (1932) *recodified in* I.C. §§ 18-601, 18-602 (1947)), that criminalized procuring and submitting to an abortion except when "necessary" to "preserve" the life of the mother. *See* Cathy R. Silak, *The People Act, the Courts React: A Proposed Model for Interpreting Initiatives in Idaho*, 33 IDAHO L. REV. 1, 63 (1996) (cataloging the history of approved and defeated voter referendums and initiatives in Idaho). Nor was there any attempt after *Roe* to put those same criminal laws against abortion, reenacted as trigger laws (I.C. §§ 18-614, -615 (1979)), to a referendum prior to their repeal in 1990. *See id*.

Thus, there simply is no support for Petitioners' suggestion that had women in Idaho participated in the 1889 constitutional convention, ratified the Idaho Constitution in 1889, or been guaranteed the right of suffrage earlier than 1896, *the majority of men and women in Idaho at that time*, i.e., the "people of Idaho," would have treated abortion any differently than it was for the 77 years leading up to *Roe* when women did have the right of suffrage.

Finally, Petitioners' "paternalistic" argument that the challenged laws "perpetuate the disenfranchisement and discriminatory treatment of women circa 1890" is logically belied by the fact that—when taken together—the majority of *women* who served in the legislature at the time voted to pass the three laws Petitioners now challenge. *See* Senate Bill 1385 (2020) (Total Abortion Ban), IDAHO LEGISLATURE, https://legislature.idaho.gov/sessioninfo/2020/legislation/S1385/ (passing with 5 out of 10 women state senators (27-7-1 overall), and 14 out of 25 women state representatives voting in favor (49-18-3 overall)); House Bill 366 (2021) (6-Week Ban and Fetal

Heartbeat                    Act),                    IDAHO                    LEGISLATURE, https://legislature.idaho.gov/sessioninfo/2021/legislation/H0366/ (passing with 5 out of 10 women senators voting in favor (1 absent) (25-7-3 overall), and 14 out of 21 women representatives voting in favor (53-16-1 overall)); Senate Bill 1309 (2022) (Civil Liability Law), IDAHO LEGISLATURE, https://legislature.idaho.gov/sessioninfo/2022/legislation/S1309/ (passing with 7 out of 11 women state senators voting in favor (28-6-1 overall), and 14 out of 21 women state representatives (1 absent) voting in favor (51-14-5 overall)).

We do not deny that women in Idaho have had to overcome substantial obstacles to obtain legal, political, and civic power since 1889. Our point is that contrary to Petitioners' framing of the challenged laws—and as the United States Supreme Court has explained when commenting on demonstrations outside abortion clinics—there are "common and respectable reasons" for opposing abortions that are unrelated to discriminatory or paternalistic views of women as a class:

> Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews. But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women. *Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both sides of the issue, just as men and women are on both sides of petitioners' unlawful demonstrations.*

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (emphasis added).

For the reasons above, there is nothing to support the conclusion that either the framers of the Inalienable Rights Clause, or the people of Idaho in 1889, intended that provision to implicitly enshrine abortion as a fundamental right. It is our "province and duty" to only "say what the law *is*[,]" *Marbury*, 5 U.S. at 177; thus, we reach this conclusion without comment on the wisdom of the policies underlying the Total Abortion Ban, Civil Liability Law, and 6-Week Ban. Importantly, our holding today does not mean a fundamental right to abortion cannot be added to the Idaho Constitution—if the people so choose. The Idaho Constitution, unlike the reputedly rigid United States Constitution, has been successfully amended 135 times by the people of Idaho since it was ratified in 1889. *See* IDAHO CONST. Art. XX, §§ 1–4 (outlining the amendment process through a constitutional convention or the legislature subject to approval by a majority of voters). And a survey of the session laws reflecting those 135 amendments shows that while some were for

structural or house-keeping purposes, many more touched on matters of policy across the political spectrum, including individual rights.

For example, as noted above, in 1895, six years after the Idaho Constitution was ratified, the legislature proposed an amendment to Article VI, section 2 to extend the right of suffrage to women. 1895 Idaho Sess. Laws 232. The next year, at the general election on November 3, 1896, the voters of Idaho ratified the amendment at the ballot box. Idaho was the fourth state to guarantee women the right to vote (following Wyoming, Colorado, and Utah, respectively), and did so twenty-four years before women achieved national suffrage through the Nineteenth Amendment to the United States Constitution on August 18, 1920.

In 1901, twelve years after the Idaho Constitution was ratified, the legislature proposed an amendment to Article XIII, section 2 that would require the legislature to pass laws to protect the health and safety of employees in factories, smelters, mines, and ore reduction works—industries that had been an economic lifeblood of Idaho since its territorial days. *See* 1901 Idaho Sess. Laws 311. The people of Idaho ratified the amendment at the general election on November 4, 1902.

In 1911, twenty-two years after the Idaho Constitution was ratified, the legislature proposed an amendment to Article III, section 1 that changed the nature of Idaho's representative government and injected principles of direct democracy. *See* 1911 Idaho Sess. Laws 785–87. At the general election on November 5, 1912, the people of Idaho ratified that amendment—and in doing so, reserved to themselves the initiative and referendum powers. *Reclaim Idaho*, 169 Idaho at 413, 497 P.3d at 167. Through these "fundamental rights," *Reclaim Idaho*, 169 Idaho at 428, 497 P.3d at 182, the voters of Idaho reserved the power to legislate directly by: (1) proposing laws and enacting the same at the polls (initiative power); or (2) putting laws passed by the legislature to a popular vote (referendum power). IDAHO CONST. Art. III, § 1. These amendments were "policies of the Populist wave of that era[,]" Silak, *The People Act*, 33 IDAHO L. REV. at 63, and to this day, only twenty-six states have some form of voter initiative or referendum powers like those reserved in the Idaho Constitution.

In 1978, the legislature proposed an amendment to Article I, section 11 to protect the "right to keep and bear arms," and to "prevent the confiscation, licensure, registration, or special taxation of firearms or ammunition[.]" 1978 Idaho Sess. Laws 1031. Prior to 1978, the text of Article I, section 11 provided a much more limited right, as it protected only the right to "bear arms" for "security and defense" subject to the legislature's regulatory power:

**Right to Keep and Bear Arms:** The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law.

IDAHO CONST. Art. I, § 11 (1890); *see* PROCEEDINGS AND DEBATES 2051 (I. W. Hart ed., 1912).

At the general election on November 7, 1978, the people of Idaho ratified the proposed amendment, and since that day, the right to keep and bear arms enjoys more expansive protections from the legislature's otherwise plenary power:

> **RIGHT TO KEEP AND BEAR ARMS.** *The people have the right to keep and bear arms, which right shall not be abridged*; but this provision shall not prevent the passage of laws to govern the carrying of weapons concealed on the person nor prevent passage of legislation providing minimum sentences for crimes committed while in possession of a firearm, nor prevent the passage of legislation providing penalties for the possession of firearms by a convicted felon, nor prevent the passage of any legislation punishing the use of a firearm. *No law shall impose licensure, registration or special taxation on the ownership or possession of firearms or ammunition. Nor shall any law permit the confiscation of firearms, except those actually used in the commission of a felony.*

IDAHO CONST. Art. I, § 11 (emphasis added).

In 1994, the legislature proposed an amendment to Article I, to add section 22, which would provide and protect the rights of crime victims, including a right to restitution, a right to be present at all criminal proceedings, and a right to be "treated with fairness, respect, dignity and privacy" throughout the criminal justice process. 1994 Idaho Sess. Laws 1498. At the general election on November 8, 1994, the people of Idaho ratified this amendment.

In 2012, the legislature proposed an amendment to Article I, to add section 23, which would enshrine the "rights to hunt, fish and trap, including by the use of traditional methods" as a "valued part of the heritage of the State of Idaho[.]" 2012 Idaho Sess. Laws 957. This new section would also require that these rights "forever be preserved for the people and managed through the laws, rules and proclamations" in a manner that "preserve[s] the future of hunting, fishing and trapping[.]" IDAHO CONST. Art. I, § 23 (alteration added). In other words, in Idaho, "[p]ublic hunting, fishing and trapping of wildlife shall be a preferred means of managing wildlife." *Id.* At the general election on November 6, 2012, the people of Idaho ratified this amendment, and in doing so, expressed the desire for protection of conduct that plays an undeniably deep role in Idaho's history and tradition.

The people of Idaho have not only amended the Idaho Constitution to *add* individual rights they thought worthy of protection from the plenary power of the legislature—they have also rejected two attempts by the legislature to overhaul the rights already protected *in* the Idaho Constitution. First, at the general election on November 5, 1918, the people of Idaho overwhelmingly rejected the legislature's call for a constitutional convention despite the senate's joint resolution requesting one while declaring that "[i]mportant changes have taken place in the social and economic life of the people of Idaho" since the Idaho Constitution was ratified in 1889. *See* 1917 Idaho Sess. Laws 505 (S.J.R. No. 2); *Historical Listings of Amendments and Initiatives (1892 through 1918)*, IDAHO SECRETARY OF STATE'S OFFICE, https://sos.idaho.gov/elect/inits/Hst 92_18.htm (reporting 68.9 percent of voters as voting "no").

Second, at the general election on November 3, 1970, the people of Idaho rejected—in another landslide—the legislature's full revision of the Idaho Constitution. *See* 1970 Idaho Sess. Laws 739 (S.J.R. 122) (explaining that the legislature "does not deem it necessary to call a Constitutional Convention for the purpose of submitting a revised Constitution to the electors" and including the proposed text of the revision in full); *see also Historical Listings of Amendments and Initiatives (1960 through 1978)*, IDAHO SECRETARY OF STATE'S OFFICE, https://sos.idaho.gov/elect/inits/hst60_70.htm (reporting 65.9 percent of voters as voting "no"). Notably, one of the revisions the people rejected was the legislature's proposal to add an *explicit* "right of privacy" to the Inalienable Rights Clause—the same overarching right Petitioners heavily rely on today to clothe their requested right to abortion:

> All men are by nature free and equal and have certain inalienable rights, among them to enjoy and defend life and liberty; to acquire, possess, and protect property; *and to enjoy the right of privacy*; to have the quality of their environment preserved and enhanced; to pursue happiness and secure safety.

1970 Idaho Sess. Laws 739, 740 (emphasis added). It was this right to privacy—formally rejected by the people of Idaho—that formed much of the legal basis of *Roe*, as well as the legal theories asserted by Petitioners in this case.

To compare, some states included, or later added, an explicit "privacy" clause to their state constitution, and from this, four states have interpreted that clause as implicitly protecting abortion as a fundamental right. *See, e.g.*, *Valley Hosp. Ass'n, Inc. v. Mat-Su Coalition for Choice*, 948 P.2d 963, 968–69 (Alaska 1997) (holding the express privacy clause in Article I, section 22 of the Alaska Constitution—adopted by the people in 1972—protects abortion as a fundamental right);

*People v. Belous*, 458 P.2d 194, 199 (Cal. 1969) (holding the explicit "right of privacy" in Article I, section 1, of the California Constitution protects abortion as a fundamental right); *Gainesville Woman Care, LLC v. State*, 210 So.3d 1243, 1254 (Fla. 2017) (holding the express privacy clause in Article I, section 23 of the Florida Constitution—added in 1980—protects abortion as a fundamental right); *Armstrong v. State*, 989 P.2d 364, 387–90 (Mont. 1999) (holding the Montana Constitution—fully revised and ratified by the people of Montana after a 1972 constitutional convention—protected abortion as a fundamental right through the express privacy clause in Article II, section 10, the "individual dignity" and "equal protection" clauses in Article II, section 4, the "inalienable rights" clause in Article III, section 3, the freedom of religion clauses in Article II, sections 5 and 7, and the "due process" clause in Article II, section 10).

Other states—which do not have an express privacy clause in their state constitutions, nevertheless declared abortion a fundamental right—but only after examining *their* state's history, criminal abortion statutes, and jurisprudence. S*ee, e.g.*, *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 472–498 (Kan. 2019) (walking through the history of Kansas, the history of the historical criminal abortion statutes in Kansas, a manufactured natural rights theory, and its own precedent, to then conclude the inalienable rights clause in the Kansas Constitution protects abortion as a fundamental right); *Pro-Choice Mississippi v. Fordice*, 716 So.2d 645, 650–51 (Miss. 1998) (pointing out that in 1890 abortion was legal in Mississippi up until the point of quickening, i.e., "some four to five months into pregnancy"—while relying on the analysis in *Roe v. Wade*, 410 U.S. 113 (1973) and Mississippi's own "right to privacy" case law to declare abortion a fundamental right).

On the other hand, six states have amended their state constitutions to unequivocally reject abortion as a fundamental right. *See* ALA. CONST. Art. I, § 36.06(c) ("Nothing in this constitution secures or protects a right to abortion or requires the funding of an abortion."); ARK. CONST. amend. LXVIII, § 2 ("The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the Federal Constitution."); LA. CONST. Art. I, § 20.1 ("To protect human life, nothing in this constitution shall be construed to secure or protect a right to abortion or require the funding of abortion."); R.I. CONST. Art. I, § 2 (applying to equal protection: "Nothing in this section shall be construed to grant or secure any right relating to abortion or the funding thereof."); TENN. CONST. Art. 1, § 36 (2014) ("Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion."); W. VA. CONST. Art.

VI, § 57 ("Nothing in this Constitution secures or protects a right to abortion or requires the funding of abortion.").

The point being, as the Supreme Court recognized in *Dobbs*, is that each state is different. Thus, whether a state's constitution recognizes abortion as a fundamental right will differ from state to state, based on the language of each state's respective constitution and their respective traditions, history, statutes, and precedent. Idaho has its *own* constitution, and along with it, its *own* traditions, history, statutes, and precedent, that we must look to and respect whenever we are tasked with deciding whether a fundamental right exists that cannot be found within the four-corners of the Idaho Constitution.

The dissents reject our holding today, eschewing over 130 years of Idaho judicial precedent holding that this Court interprets the Idaho Constitution in accordance with the intent of the framers *at the time the Constitution was adopted and ratified. See* Section VI.A.1, *supra* (citing 20 Idaho Supreme Court opinions dating from 1891 through 2022 which affirm and reaffirm this rule of law). Rather than examine the history and traditions of our state, the dissent (J. Stegner) would adopt a test that turns on whether the conduct sought to be protected as a fundamental right (i.e., abortion) is (1) "substantially . . . important"; (2) "implicates" one or more inalienable rights listed in Article I, section 1; and (3) is "inextricably linked" to one or more of those inalienable rights. The problem with this test is that it does not answer what conduct the framers *intended* Article I, section 1 to implicitly protect as "fundamental" and beyond the police power of the legislature. Instead, it would only answer what some members on this Court think Article I, section 1 *ought* to mean.

Importantly, abortion was a procedure known to the framers in 1889. Thus, determining their intent on this topic is neither difficult nor speculative, unlike more contemporary issues likely never envisioned in the nineteenth century, such as regulation of the Internet, airwaves, bitcoin, and drones. We can discern the framers' intent regarding abortion, not because we can read their minds, but because we can read the laws they passed before and after the 1889 convention, newspapers of the time, and medical journals. As a result, there is no reason for us to impose our own personal sensibilities as to what we think the Idaho Constitution should mean.

Like President Abraham Lincoln in his First Inaugural Address, *see* Section VI.A.1, *supra*, and Justice Holmes in his dissent in *Lochner*, *see* Section VI.A.3, *supra*, Justice Curtis, in his

powerful dissent in *Dred Scott v. Sandford*, warned of the dangers of abandoning fixed rules of constitutional interpretation in favor of the personal predilections of judges:

> [W]hen a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean.

60 U.S. 393, 621, 15 L. Ed. 691 (1857) (Curtis, J., dissenting) (emphasis added).

The dissent (J. Stegner) also takes aim at the majority's decision by contending we have disregarded the precedent set in *Murphy v. Pocatello School Dist. No. 25*, 94 Idaho 32, 38, 480 P.2d 878, 884 (1971) and *Berry v. Summers*, 76 Idaho 446, 451, 283 P.2d 1093, 1095 (1955). The dissent's position is that if the right to have long hair was a constitutionally protected liberty interest in *Murphy* and the right to pursue a particular occupation was a constitutionally protected liberty interest in *Berry,* then surely the right to abortion must be a constitutionally protected liberty interest because it is "substantially more important" than either of these rights. However, the dissent's reliance on these cases is misplaced, and its logic is flawed.

To begin with, *Murphy* and *Berry* are of dubious precedential value. In *Murphy*, the Court's analysis was focused solely on constitutional rights under the *federal* constitution:

> Finally, but probably the most relevant constitutional premise of all, is the Ninth Amendment: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.' Neither from the words themselves nor from the records and other contemporaneous material concerning the creation of the Ninth Amendment is it exactly clear what 'rights' are retained by the people. What is clear from an examination of the history and origin of the Ninth Amendment is that the absence of a specific constitutional provision dealing with the rights of privacy, personal teste [sic], the right to be left alone, and the like, does not compel the conclusion that no such right exists. On the contrary, the opposite conclusion is compelled. As in the Fifth and Fourteenth Amendment due process cases which have interpreted and necessarily expanded what life, liberty and pursuit of happiness mean, the determination of what rights exist and in which situations under the broad and general language of the Ninth Amendment is clearly, and again necessarily, left to judicial determination.

> Therefore, under both the Idaho Constitution, art. 1, §§ 1 and 21, and under the Ninth Amendment of the United States Constitution made applicable to the states by the Fourteenth Amendment (under *Griswold*, supra), we hold the right to wear one's hair in a manner of his choice to be a protected right of personal taste not to be interfered with by the state unless the state can meet the 'substantial burden' criteria similar to that set out in the cases holding in favor of the student,

supra. For example, if it is established that the exercise of personal taste, as manifested by personal appearance, has substantially impaired some societal interest, then the state may intervene.

94 Idaho at 37–38, 480 P.2d at 883–84. The Court's discussion of the Idaho Constitution consisted of nothing more than a passing reference to Article I, section 1 with no indication that the state constitution was actually at issue and no explanation of how the Court reached its holding.

Likewise, the *Berry* decision suffers from the same infirmities:

Any such educational requirement and licensing as a dentist, as a prerequisite for performance of such services so performed by appellants and others similarly situated, is not a reasonable regulation and is not reasonably necessary for the protection of the public. So far as such amendment affects, or is intended to affect such independent occupation of dental mechanic or technician in the performance of mechanical work upon inert matter in a dental laboratory, the act is unconstitutional and void. We do not infer that the legislature may not *reasonably regulate* such artisan calling, or *reasonably regulate* the dental mechanic or technician who desires to practice such artisanry in the future; *but we do hold that the legislature may not do away with the vested rights of appellants and others similarly situated by prohibiting them from following their chosen occupation, legislatively recognized as an independent calling for thirty-four years last past*; *Fourteenth Amendment to the Constitution of the United States; Article I, §§ 1 and 13 of the Constitution of the State of Idaho.*

76 Idaho at 452, 283 P.2d at 1096 (emphasis added).

Beyond their limited precedential value, *Murphy* and *Berry* also do not provide the springboard for the dissent's logical leap. So as long as the liberty interest at stake in a given case is "substantially more important" than the rights announced in *Murphy* or *Berry*, the dissent would have this Court declare the alleged interest to be a fundamental right. Ranking one liberty interest as more important than another calls for a normative judgment that many Idahoans would disagree with, not a legal conclusion, and is not a sound premise upon which to conclude an implicit fundamental right exists. More importantly, the right to abortion the dissent seeks to enshrine in our Constitution *is* different than the right to refuse a haircut or choose a profession, which only implicate the rights of the individual. Unlike making a personal decision as to one's hairstyle or occupation, when it comes to abortion, there is the inescapable fact that the choice necessarily concerns the rights of another because the life of the unborn must be ended for this "substantially more important right" to be realized.

To be clear, the dissent (J. Stegner) would declare a fundamental right to abortion that goes far beyond the holding of both *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Se.*

72

*Pennsylvania v. Casey*, 505 U.S. 833 (1992). In *Roe*, the Supreme Court held a woman's fundamental right to privacy protected an unfettered right to abortion only during the first trimester. *See* 410 U.S. at 164. After the first trimester, the state's ability to regulate was limited to "promoting its interest in the health of the mother" such that the state "may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health." *Id.*; *see also id.* at 163 (listing permissible examples that relate to the abortion procedure—but do not prohibit it). Once the pregnancy entered the third trimester, i.e., "the stage subsequent to viability"—at the time of *Roe*, the state, "in promoting its interest in the potentiality of human life" could "if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 164–65. In *Casey*, the Supreme Court rejected the "rigid trimester" framework of *Roe*, retained the "viability" line, and announced an "undue burden" test that would permit states to regulate abortion procedures pre-viability, but not prohibit it. 505 U.S. at 873.

Today, the dissent (J. Stegner) would have the Court declare a woman has a fundamental right to abortion on demand *at all stages of pregnancy* regardless of "viability" or any other framework. This would mean that any legislative effort to regulate abortion—even a law that only prohibited abortions during the ninth month of pregnancy—would be presumptively unconstitutional and subject to this Court's most exacting form of judicial review: strict scrutiny. *See Reclaim Idaho*, 169 Idaho at 431, 497 P.3d at 185.

While the other dissenting colleague (J. Zahn), gives a nod to considering Idaho's history and traditions in determining whether a fundamental right to abortion exists, she too contends that the meaning of Idaho's Constitution must change with the times. Building on this premise, the dissent reasons that because Idaho statutes historically contained an exception to the criminalization of abortion to "save" (later changed to "preserve") the life of a mother, this statutory exception warrants the conclusion that there is an implicit fundamental right to abortion to prevent the death of the mother and to protect her health from injury, harm, or destruction. In fact, the dissent contends: "We *must* give effect to the language [of the historical statutes] as written, and the word 'preserve' extends to both the life and the health of the mother." (Emphasis and alterations added.)

Beyond making the obvious point that no party to this litigation has advocated that the Court recognize such a fundamental right, the Court rejected this type of legal reasoning just three

73

years ago in *State v. Clarke*, when we made it clear that preexisting statutes and the common law may be used to help inform our interpretation of the Idaho Constitution, "but they are not the embodiment of, nor are they incorporated within, the Constitution":

> Recently, in [*State v. Green*, 158 Idaho 884, 888, 354 P.3d 446, 450 (2015)], this Court interpreted Idaho Code sections 19-603(6) and (7) and explained their relationship to Article I, Section 17 of the Idaho Constitution: "[b]ecause these subsequently enacted arrest standards did not exist at the time the Idaho Constitution was adopted, and because they were not incorporated by constitutional amendment, they cannot be considered part of the *constitutional* standard for what constitutes a reasonable seizure of the person." *Green*, 158 Idaho at 888–89, 354 P.3d at 450–51 (italics in original). As a corollary, *Green* held "[b]ecause the constitutional guarantee against unreasonable seizure of the person includes an arrest, the Idaho Constitution incorporated the principles regarding arrest in the Idaho statutory and common law in 1890 when the constitution was adopted." *Id.* at 888, 354 P.3d at 450.
>
> *However, we conclude that this statement in* Green *is overbroad.* Green *should stand for the principle that preexisting statutes and the common law may be used to help inform our interpretation of the Idaho Constitution, but they are not the embodiment of, nor are they incorporated within, the Constitution. To hold otherwise would elevate statutes and the common law that predate the Constitution's adoption to constitutional status.*

165 Idaho 393, 397, 446 P.3d 451, 455 (2019) (emphasis and alteration added).

Even more importantly, the logical inference made by the dissent (J. Zahn) does not hold. The legislature's decision to redefine an exception to the criminalization of abortion does not necessarily mean that the framers of our Constitution intended to enshrine the excepted conduct as a fundamental right. The more logical explanation is that the framers (some of whom were also legislators as explained previously) viewed abortion as a subject the legislature was free to regulate through its police powers like any other conduct. Thus, while the decision to change the word "save" to "preserve" was a policy decision within the plenary power of the legislative body, it does not equate to the recognition of a fundamental right that must be recognized by the judiciary.

Critically, the dissent's premise—that the change from "save" to "preserve" by the 1887 Territorial Legislature somehow represented a meaningful change of perspective about abortion in nineteenth century Idaho—is flawed. Ironically, the dissent attempts to make this point using a twenty-first century online dictionary. Still, if one reads further, the same modern dictionary similarly defines "save" as "to rescue or deliver from danger or harm" and "to preserve or guard from injury, destruction, or loss." *Save*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/save (last accessed on December 31, 2022). Even reference to a more

74

contemporary dictionary from the nineteenth century demonstrates that the two words were essentially synonymous in 1887. For example, "save" is broadly defined in the 1828 Webster's Dictionary as:

> To preserve from injury, destruction or evil of any kind; to rescue from danger; as, to save a house from the flames; to save a man from drowning; to save a family from ruin; to save a state from war.

*Save*, WEBSTER'S DICTIONARY (1828), https://webstersdictionary1828.com/Dictionary/save (last accessed on December 31, 2022). Yet, that same edition defines "preserve" much more narrowly as "[t]o keep or save from injury or destruction; to defend from evil." *Preserve,* WEBSTER'S DICTIONARY (1828), https://webstersdictionary1828.com/Dictionary/preserve (last accessed December 31, 2022). Thus, the territorial legislature's change to Idaho's abortion statute in 1887—from the word "save" to the essentially synonymous word "preserve"—does not provide a textual basis for assuming that the legislature intended to create or expand an existing right to an abortion.

Both dissents also raise the specter that if the Court were to interpret our Constitution as containing no fundamental right to abortion, a future legislature may eliminate all affirmative defenses and exceptions. What the legislature might do in the future does not drive our decisions. We issue opinions based on actual cases and controversies that come before us today—not the hypothetical fears of tomorrow. *Harris v. Cassia Cnty.*, 106 Idaho 513, 516, 681 P.2d 988, 991 (1984) ("The controversy must be definite and concrete, *touching on the legal relations of parties* having adverse legal interests.") (emphasis added) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241–42 (1937)). We do not issue advisory opinions. *Westover v. Idaho Ctys. Risk Mgmt. Program*, 164 Idaho 385, 390, 430 P.3d 1284, 1289 (2018). And, most importantly, we do not march into the political maelstrom by issuing opinions based on political party platforms or comments of elected officials. If the day comes that the legislature decides to prohibit abortion under all circumstances—without providing for legally justified abortions (i.e., the affirmative defenses) or exceptions—the Court may very well be called upon to take up the protections of the *express* right to enjoy life contained in Article I, section 1 of the Constitution or other arguments that may be advanced by a challenger. This, however, is not that day.

In sum, either dissent's articulation of *abortion* as a fundamental right would undoubtedly lead this Court down the same worn path the Supreme Court of the United States traversed between *Roe* and *Dobbs*, with a never-ending cycle of legislative enactment followed by protracted litigation. *See Dobbs*, 142 S. Ct. at 2271–75 (explaining the abandonment of *Roe*'s reasoning in

*Casey*, and the "long list" of Federal Circuit conflicts that arose after *Casey*'s "undue burden" test was "[p]lucked from nowhere[,]" perpetuating "give-it-a-try litigation" and leaving judges with "an unwieldly and inappropriate task." (citations omitted and alteration added)). If this were to occur, is not difficult to envision this Court being transformed into Idaho's "*ex officio* medical board with powers to approve or disapprove medical and operative practices and standards[,]" *Planned Parenthood v. Danforth*, 428 U.S. 52, 99 (1976) (White, J., concurring in part and dissenting in part), based on nothing other than an "unrestrained imposition of [our] own extraconstitutional value preferences." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 794 (1986) (White, J., dissenting) (alteration added), *overruled by Casey*, 505 U.S. 833 (1992), *overruled by Dobbs*, 142 S. Ct. 2228 (2022). That is not the role of the judiciary.

Instead, our role is to remain faithful to the fixed rule of law this Court has been following for over 130 years. To do otherwise usurps the policy-making role of the legislature and violates our obligation to maintain the separation of powers that forms the basis of our government. If the people of Idaho are dissatisfied with the policy choices the legislature has made or wish to enshrine a fundamental right to abortion in the Idaho Constitution, they can make these choices for themselves through the ballot box.

> 5. Because the Total Abortion Ban, 6-Week Ban, and Civil Liability Law are reasonably related to legitimate governmental purposes, they pass rational basis review.

When a law does not infringe on a fundamental right, we apply the rational basis standard of review to test whether it is a constitutionally permissible exercise of the legislature's plenary power to regulate the health, welfare, social, economic, and moral interests of the people. *See Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 69, P.3d 1006, 1012 (2011); *Koehler*, 84 Idaho at 176, 369 P.2d at 1013. Under rational basis review, the challenged law receives a "strong presumption of validity" and we will uphold the law if it "is rationally related to a legitimate governmental purpose." *Coghlan*, 133 Idaho at 396, 987 P.2d at 308. We agree with the United States Supreme Court that the following are legitimate governmental interests or purposes for regulating abortion:

> [R]espect for and preservation of prenatal life at all stages of development . . . ; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability.

76

*Dobbs*, 142 S. Ct. at 2284 (alteration added).

Here, the Total Abortion Ban, 6-Week Ban, and Civil Liability Law are all rationally related to many of the above legitimate governmental interests (and the Respondents and Intervenors have advanced many of the same). For example, the Total Abortion Ban is rationally related to the government's legitimate interest in respecting and preserving prenatal fetal life at all stages of development by banning all abortions subject to certain affirmative defenses. *See* I.C. § 18-622(2)–(3); *see also* I.C. § 18-601 ("Idaho hereby expresses the fundamental importance of that profound interest ["in preserving the life of preborn children,"] and it is hereby declared to be the public policy of this state[.]" (alteration added and quotations omitted)). It is also rationally related to the government's legitimate interest in protecting maternal health and safety where it requires that a "physician" perform any necessary abortion—and that abortions are permitted if they are, in the physician's "good faith medical judgment[,]" "necessary to prevent the death of the pregnant woman." *See* I.C. § 18-622(3)(a)(i)–(ii). Furthermore, the Total Abortion Ban advances the interest in protecting maternal health where it permits elective abortions when the woman reports to law enforcement or child protective services that her pregnancy is the product of an act of rape or incest. *See* I.C. §§ 18-622(3)(b)(ii)–(iii).

The Total Abortion Ban also rationally advances the government's legitimate interests in maternal health and safety, and fetal life, where it requires the physician to act while "provid[ing] the best opportunity for the unborn child to survive, unless . . . termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." *See* I.C. 18-622(3)(a)(iii). As the Intervenors point out, this last requirement will, in some second and third trimester pregnancies, "eliminat[e] . . . particularly gruesome or barbaric medical procedures" and "mitigat[e] fetal pain[.]" *See Dobbs*, 142 S. Ct. at 2284; *see* Section VI.C.1.c., *infra* (explaining this point further).

Although the Total Abortion Ban does not include any *exceptions* to prosecuting a physician who performs an abortion, I.C. § 18-622(2)—and it does not include the broader "medical emergency" exception for abortions present in the 6-Week Ban and Civil Liability Law, I.C. §§ 18-8801(5), -8804(1)—the government's method of achieving its above purposes need only be *rationally* connected to those purposes. The choice to use an affirmative defense in the Total Abortion Ban rather than an outright exception, is nothing unusual to the law. Idaho law has long recognized a number of familiar defenses including, but not limited to, alibi, entrapment,

77

necessity, and self-defense. Indeed, affirmative defenses are already employed in other types of criminal offenses where the government asserts its interest in protecting human life.

For example, the legislature criminally prohibits "[a]ll murder" perpetrated in certain ways or as a "willful, deliberate and premeditated killing" as "murder of the first degree." I.C. § 18-4003(a); *see also* I.C. § 18-4001 (defining "murder" as the "unlawful killing of a human including, but not limited to, *a human embryo or fetus*, with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being." (emphasis added)). Based on this blanket prohibition, whenever a person kills another human being, they could be charged with murder in the first degree, arrested, and confined until trial (if bail is not granted). While a person can claim self-defense at any time during a homicide investigation, it is only later—if the case proceeds to trial—that the person accused of murder must prove the *affirmative defenses* of justifiable homicide, I.C. § 18-4009 (e.g., self-defense (ICJI 1517)), or excusable homicide, I.C. § 18-4012 (e.g., "accident and misfortune" (ICJI 1516)), to finally be "fully acquitted and discharged." I.C. § 18-4013. This is because there are no *exceptions* to the criminal prohibition against first degree murder.

Here, the affirmative defense in the Total Abortion Ban would operate in a substantially similar way and would require a jury instruction like those tailored for self-defense and excusable homicide. In brief, a physician who performed an "abortion" as defined in Idaho Code section 18-604(1) and prohibited by section 18-622(2), could be charged, arrested, and confined until trial *even if* the physician initially claims they did it to preserve the life of the mother, or based on reported rape or incest. Only later, at trial, would the physician be able to raise the affirmative defenses available in the Total Abortion Ban (I.C. § 18-622(3)) to argue it was a *justifiable* abortion that warrants acquittal and release.

Critically, the Idaho Constitution does not require that the Total Abortion Ban employ the *wisest* or *fairest* method of achieving its purpose. *See Coghlan*, 133 Idaho at 396, 987 P.2d at 308 ("On rational basis review, courts do not judge the wisdom or fairness of the legislation being challenged."). Thus, we again emphasize the important "distinction between constitutionality and wise policy." *See New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring) (noting his "esteemed former colleague, Thurgood Marshall, remarking on numerous occasions: 'The Constitution does not prohibit legislatures from enacting stupid laws.' "). Nevertheless, and notwithstanding whether it was wise to use an affirmative defense

instead of an exception, the Total Abortion Ban is rationally related to the government's legitimate interests discussed above.

Next, the Civil Liability Law and 6-Week Ban are also rationally related to preserving and protecting fetal life, and to promoting maternal health and safety. Both laws protect fetal life by providing a civil cause of action (Civil Liability Law) and criminal penalties (6-Week Ban) for abortions performed "when a fetal heartbeat has been detected[.]" *See* I.C. §§ 18-8804(1), 18-8805(2), 18-8807(1). Both laws also promote maternal health and safety by providing exceptions to civil liability or criminal penalties when the abortion is performed in a "medical emergency," or after the woman has reported an act of rape or incest to law enforcement or child protective services. *See* I.C. § 18-8804(1).

In sum, we conclude that the Total Abortion Ban, 6-Week Ban, and Civil Liability Law are all rationally related to legitimate governmental purposes. Thus, these laws are a constitutionally permissible exercise of the legislature's plenary power to enact regulations relating to the health, safety, and morals of the people in Idaho.

## B. The Total Abortion Ban, 6-Week Ban, and Civil Liability Law do not violate the Equal Protection Clause in Idaho's Constitution.

Petitioners' next challenge the Total Abortion Ban, 6-Week Ban, and Civil Liability Law as violative of the Equal Protection Clause in the Idaho Constitution. Under this argument, Petitioners contend that the Total Abortion Ban, Civil Liability Law, and 6-Week Ban violate equal protection because: (1) the laws invidiously discriminate on the basis of sexual stereotypes, gender, and against medical providers who provide abortion services; and (2) the laws do not survive our heightened "means-focus" review, or our less demanding "rational basis" standard of review.

"The party asserting the unconstitutionality of a statute bears the burden of showing its invalidity and must overcome a strong presumption of validity." *Olsen*, 117 Idaho at 709, 791 P.2d at 1288; *see also Bradbury*, 136 Idaho at 68, 28 P.3d at 1011. "It is generally presumed that legislative acts are constitutional, that the state legislature has acted within its constitutional powers, and any doubt concerning interpretation of a statute is to be resolved in favor of that which will render the statute constitutional." *Olsen*, 117 Idaho at 709, 791 P.2d at 1288 (citing cases).

"This Court's equal protection analysis involves three steps: (1) identifying the classification under attack; (2) identifying the level of scrutiny under which the classification will be examined; and (3) determining whether the applicable standard has been satisfied." *Gomersall*, 168 Idaho at 318, 483 P.3d at 375. We recognize three standards of review for equal

79

protection challenges to a statute under the Idaho Constitution: strict scrutiny, means-focus, and rational basis. *Olsen*, 117 Idaho at 709, 791 P.2d at 1288; *Gomersall*, 168 Idaho at 318, 483 P.3d at 375.

Strict scrutiny applies if the statute discriminates on the basis of a "suspect classification[.]" *Johnson v. Sunshine Min. Co.*, 106 Idaho 866, 869, 684 P.2d 268, 271 (1984); *see Osick v. Pub. Emp. Ret. Sys. of Idaho*, 122 Idaho 457, 462, 835 P.2d 1268, 1273 (1992) (listing "nationality, race, or religion" as suspect classifications). Strict scrutiny will also apply when we review the constitutionality of a statute that involves a fundamental right. *Gomersall*, 168 Idaho at 318, 483 P.3d at 375; *Reclaim Idaho*, 169 Idaho at 430, 497 P.3d at 184. Here, we are not dealing with statutes that turn on suspect classifications, and as explained above, the Idaho Constitution does not contain an implicit fundamental right to abortion. Thus, the Total Abortion Ban, 6-Week Ban, and Civil Liability Law are not subject to strict scrutiny. Nor does, as explained below, the heightened "means-focus" test apply.

1. The "means-focus" test does not apply to the Total Abortion Ban, 6-Week Ban, or Civil Liability Law because they are not obviously and invidiously discriminatory.

The "means-focus" test only applies when "the discriminatory character of a challenged statutory classification is [1] apparent on its face and [2] where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute[.]" *Gomersall*, 168 Idaho at 318, 483 P.3d at 375 (alterations added) (quoting *Olsen*, 117 Idaho at 710, 791 P.2d at 1289); *see also Tarbox*, 107 Idaho at 960, 695 P.2d at 345 (noting that the "means-focus" scrutiny will only be applied if the challenged classification is "blatantly" discriminatory). In all other cases, the "rational basis" test is applied. *Gomersall*, 168 Idaho at 318, 483 P.3d at 375.

To satisfy the first prong, the classification created by the statute must be "obviously" and "invidiously" discriminatory. *Coghlan*, 133 Idaho at 396, 987 P.2d at 308. Importantly, "[n]ot every legislative classification which treats different classes of people differently can be said to be 'discriminatory,' much less 'obviously' 'invidiously discriminatory.' " *Id*. (alteration in original) (quoting *State v. Beam*, 115 Idaho 208, 212, 766 P.2d 678, 682 (1988)). For a classification to be "obviously" and "invidiously discriminatory" it "must distinguish between individuals or groups either odiously or on some other basis calculated to excite animosity or ill will." *Coghlan*, 133 Idaho at 396, 987 P.2d at 308.

One type of "invidious" discrimination occurs when a statute treats similarly situated individuals differently based on their sex alone. *See, e.g.*, *Harrigfeld v. Dist. Ct. of Seventh Jud. Dist. In & For Freemont Cnty.*, 95 Idaho 540, 545, 511 P.2d 822, 827 (1973) (invalidating a statutory scheme setting the age of majority for males at twenty-one and for females at eighteen as violative of the Equal Protection Clause in the Fourteenth Amendment); *see also Rudeen v. Cenarrusa*, 136 Idaho 560, 568, 38 P.3d 606 (2001) (explaining that the majority of Idaho cases treat the equal protection guarantees of the United States and Idaho Constitutions as "substantially equivalent" but not always "equivalent in [the] ultimate result" (alteration added)). Here, Petitioners argue that the Total Abortion Ban, 6-Week Ban, and Civil Liability Law obviously and invidiously discriminate on the basis of sex and gender stereotypes; thus, the heightened "means-focus" review should apply. We disagree.

Petitioners cannot satisfy the first prong required to trigger "means-focus" review because there is not an "obvious" and "invidious" discriminatory motive within the Total Abortion Ban, 6-Week Ban, and Civil Liability Law. Contrary to Petitioners' position, none of these statutes classifies on the basis of sex alone or sexual stereotypes because men and women are not similarly situated when it comes pregnancy and abortion. Only women are capable of pregnancy; thus, only women can have an abortion. This is not sex-based discrimination against women any more than a law regulating unlicensed vasectomies or prostate treatments would be discriminatory against men. Such laws are wholly unlike those challenged in *Harrigfeld*, 95 Idaho at 545, 511 P.2d at 827, where the statutory scheme facially discriminated against men but not women, *despite both being similarly situated*, when it comes to the age of majority. Thus, the prohibition and regulation of abortion by the Total Abortion Ban, 6-Week Ban, and Civil Liability Law do not create sex-based classifications that would warrant our heightened level of review. *See Dobbs*, 142 S. Ct. at 2245–46 (explaining that laws regulating abortion do not create sex-based classifications because they are based on biological differences).

In addition, there is no support for a conclusion that these laws are mere "pretext" for invidious discrimination against women. *See Dobbs*, 142 S. Ct. at 2245–46 ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the [law] "is mere "pretext" for invidious discrimination against members of one sex." (alteration added)). Here, the government's legitimate purposes in preventing abortion through these laws, *see supra*, does not amount to "animosity" or "ill will" towards one sex and

81

not the other. Instead, due to biological differences, the goal of preventing abortions to protect unborn children *necessarily requires* a regulation that affects the only sex who can become pregnant, i.e., women.

Furthermore, unlike Idaho's abortion statutes in effect before *Roe* was announced in 1973 (R.S. § 6795 (1887), R.C. § 6795 (1909), C.S. § 8282 (1919), I.C. § 17-1811 (1932), I.C. § 18-602 (1947)), and the dormant criminal ban in effect until its repeal in 1990 (I.C. § 18-615), the Total Abortion Ban, 6-Week Ban, and Civil Liability Law impose no criminal or civil penalties against the mother who submits to an abortion. *See* I.C. §§ 18-622(5), 18-8807, 18-8805. To the contrary, the Civil Liability Law provides the *mother* with a cause of action against medical providers who violate its provisions. *See* I.C. § 18-8807(1) ("Any female upon whom an abortion has been attempted or performed . . . may maintain an action for . . . ."). Thus, nothing about these laws evidences a "pretext" to invidiously discriminate against women based on their sex.

Next, and contrary to Petitioners' position, these laws are not "obviously" and "invidiously" discriminatory on the basis of "outdated stereotypes about women's role in society." Petitioners assert that these laws "requir[e]" women to "sacrifice their minds and bodies in service of the biologically bestowed obligation to remain 'the center of home and family life' " and prevent women from participating equally in the workplace, or other areas of civil, social, and political life. However, a plain reading of the Total Abortion Ban, Civil Liability Law, and 6-Week Ban shows these laws require or prevent no such thing.

Petitioners' argument here is not only meritless, but specious because *it* relies on gender-based stereotypes by assuming all fathers are misogynistic, absentee, disinterested, unwilling to support the mother through pregnancy, uninvolved in parenting, and unwilling to stay home if needed while the mother works. Certainly, there are cases where a mother raises a child without the support of the father—but this only demonstrates Petitioners' error because there are *also* cases where the father raises a child without the support of the mother. Whether this occurs, and how the mother and father of a child ultimately apportion their parental duties—while balancing work, social, and political life—has nothing to do with the Total Abortion Ban, 6-Week Ban, and Civil Liability Law. In sum, we find Petitioners' classification argument here wholly unpersuasive because *it* assumes the "outdated stereotypes" that (1) only mothers raise children—not fathers, and (2) all mothers who elect to stay home and raise their children do so against their will.

Instead, the Total Abortion Ban, 6-Week Ban, and Civil Liability Law are directed at the medical providers who perform unlawful abortions (regardless of whether the provider is male or female). This type of classification—medical providers who perform abortions versus those who do not—is not a classification which warrants heightened scrutiny. Under each law, medical providers who perform an abortion are treated equally. And the legislature's choice to provide a private cause of action through the Civil Liability Law against those medical providers who perform or assist in abortions is not "invidious" discrimination against the same. Contrary to Petitioners' suggestion, statutes that provide private causes of action against professionals and businesses for engaging in prohibited conduct are commonplace. *See, e.g.*, I.C. §§ 48-601, -608 ("Idaho Consumer Protection Act") (providing a private cause of action for consumers and businesses to protect against "unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce"); I.C. § 48-1007 ("Idaho Telephone Solicitation Act") (providing a private cause of action for any person who "suffers damages as a result of any act, conduct, or practice declared unlawful in this chapter"); I.C. § 48-1205 ("Idaho Charitable Solicitation Act") (providing a private cause of action for "[a]ny person who, pursuant to a charitable solicitation, suffers damages as a result of any act, conduct, or practice declared unlawful"); I.C. §§ 67-5907, -5909 ("Idaho Human Rights Act") (providing a private cause of action against certain employers for discrimination on the basis of "race, color, religion, sex or national origin").

Finally, as the Respondents point out, the type of classification these laws make—those who perform abortions unrelated to medical necessity, rape, or incest, and those who do not—is no different than the implicit classification every law makes between those who do—and do not—violate its provisions. *Compare* I.C. § 18-622(2) (Total Abortion Ban), I.C. § 18-8807(1) (Civil Liability Law), I.C. §§ 18-8804, 18-8805 (6-Week Ban) *with* I.C. § 18-1401 ("Burglary") ("Every person who enters . . . ."), I.C. § 18-1904 ("Illegal Dividends and Reductions of Capital") (criminally prohibiting "[e]very director of any stock corporation" from making certain dividends or reductions of capital), I.C. §§ 23-1328A, -1335 (prohibiting certain trade practices between vintners, wineries, importers or dealers and distributors and making any violation or failure to comply a misdemeanor).

For these reasons, "means-focus" review does not apply to Petitioners' equal protection challenges against the Total Abortion Ban, Civil Liability Law, or the 6-Week Ban. Instead, our "rational basis" test applies to Petitioners' equal protection challenges against these laws.

 2. The Total Abortion Ban, Civil Liability Law, and 6-Week Ban are rationally related to a legitimate governmental purpose.

Under our "rational basis" test, "a classification will pass scrutiny if it is rationally related to a legitimate governmental purpose." *Gomersall*, 168 Idaho at 320, 483 P.3d at 377. Only when a classification is based "solely on reasons totally unrelated to the pursuit of the state's goals" and "only if no grounds can be advanced to justify those goals" will we conclude the challenged statute violates the Equal Protection Clause. *Olsen*, 117 Idaho at 711, 791 P.2d at 1290.

Here, the classifications created by the Total Abortion Ban, 6-Week Ban, and Civil Liability Law are rationally related to legitimate governmental purposes for the same reasons explained in Section VI.A.5, *supra*. The only classification these laws create is between medical providers who perform or assist in abortions and medical providers who do not. That classification is not based on sex—both male and female doctors perform abortions—and there is nothing on the face of these laws that evidences an "invidious" discriminatory motive towards women or medical providers who perform abortions. As explained above, furthering the government's goal of protecting fetal life necessarily requires regulating the conduct of medical professionals no different than any other health, safety, and welfare focused statute or regulation. *See, e.g.*, I.C. §§ 39-4501 to -4516 ("The Medical Consent and Natural Death Act"); I.C. §§ 39-1301 to -1396 ("Hospital Licenses and Inspection"); I.C. §§ 39-5401 to -5408 ("Artificial Insemination"); IDAPA 16.03.02–.303 (regulating medical professionals in skilled nursing facilities); IDAPA 24.36.01–.704 (regulating the manufacture, distribution, and dispensing of controlled substances by licensees and registrants of the Idaho Board of Pharmacy).

In sum, the Idaho Constitution does not prohibit the legislature from attaching harsher consequences for violating the Total Abortion Ban, 6-Week Ban, or Civil Liability Law than contained in other regulations aimed at medical professionals. That choice is within the plenary power of the legislature, and we do not judge the wisdom of that choice on rational basis review. *See Coghlan*, 133 Idaho at 396, 987 P.2d at 308. Thus, we conclude the Total Abortion Ban, 6-Week Ban, and Civil Liability Law do not violate the Equal Protection Clause in the Idaho Constitution.

**C. The Total Abortion Ban, 6-Week Ban, and Civil Liability Law do not violate the Due Process Clause in the Idaho Constitution.**

Petitioners next lodge *facial* challenges against the Total Abortion Ban, 6-Week Ban, and Civil Liability Law under the Due Process Clause in the Idaho Constitution (Art. I, § 13). The thrust of Petitioners position is that the Total Abortion Ban and 6-Week Ban are void for vagueness *in toto* because no person of reasonable intelligence is capable of understanding what conduct is prohibited, and the Civil Liability Law is void *in toto* because it improperly imposes excessive or vague penalties. However, for the reasons below, Petitioners' facial challenges are meritless.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *State v. Bitt*, 118 Idaho 584, 585, 798 P.2d 43, 44 (1990) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972)). In general, a law is void for vagueness under our Due Process Clause when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute and permits arbitrary or discriminatory enforcement." *Bitt*, 118 Idaho at 585, 798 P.2d at 44 (internal quotations omitted); *see Cootz*, 117 Idaho at 40, 785 P.2d at 165 (explaining that the scope of our Due Process Clause is "substantially the same" as that of the Fourteenth Amendment but we are not "necessarily bound" by United States Supreme Court's interpretation of the Due Process Clause in the Fourteenth Amendment).

"A void for vagueness challenge is more favorably acknowledged and a more stringent vagueness test will be applied where a statute imposes a criminal penalty[.]" *State v. Cobb*, 132 Idaho 195, 198, 969 P.2d 244, 247 (1998). "Due process requires that a statute defining a crime be sufficiently explicit so all persons may know what conduct will subject them to penalties." *Leferink*, 133 Idaho at 783, 992 P.2d at 778 (quoting *State v. Lenz*, 103 Idaho 632, 634, 651 P.2d 566, 568 (Ct. App. 1982)). However, "[i]n most English words and phrases there lurk uncertainties," *Bitt*, 118 Idaho at 585, 798 P.2d at 44 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975)), and because of this, "[a] statute should not be held void for vagueness if any practical interpretation can be given it." *Leferink*, 133 Idaho at 783, 992 P.2d at 778. Only when a law is written in terms "so ambiguous that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application' " is it "unconstitutionally vague." *Bitt*, 118 Idaho at 585, 798 P.2d at 44 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

When the challenged law "does not regulate constitutionally protected conduct, or a significant amount of such conduct," then our inquiry is whether (1) the law "gives notice to those

who are subject to it," and (2) "contains guidelines and imposes sufficient discretion on those who must enforce" the law. *Cobb*, 132 Idaho at 198, 969 P.2d at 247; *Bitt*, 118 Idaho at 588, 798 P.2d at 47. Here, the Total Abortion Ban, 6-Week Ban, and Civil Liability Law do not regulate constitutionally protected conduct because the Inalienable Rights Clause does not contain an implicit fundamental right to abortion. Thus, the two-step inquiry above applies to Petitioners' challenges.

Under this inquiry, we emphasize the difference between an *as-applied* challenge and the "pre-enforcement" *facial* challenges Petitioners have brought. "A facial challenge to a statute or rule is 'purely a question of law.' " *Am. Falls Reservoir Dist. No.*, 143 Idaho at 870, 154 P.3d at 441 (quoting *Cobb*, 132 Idaho at 197, 969 P.2d at 246). And we have explained that "[f]or a facial constitutional challenge to succeed, the party must demonstrate that the law is unconstitutional in *all* of its applications." *Am. Falls Reservoir Dist. No. 2*, 143 Idaho at 870, 154 P.3d at 441 (emphasis in original); *see also Leferink*, 133 Idaho at 784, 992 P.2d at 779 ("It must be shown that the enactment is invalid *in toto*." (emphasis in original)).

In other words, for a law to be impermissibly vague in all its applications, the challenging party must show there is no "core of circumstances" to which the law "unquestionably could be constitutionally applied." *Cobb*, 132 Idaho at 198–99, 969 P.2d at 247–48; *see also Bitt*, 118 Idaho at 588, 798 P.2d at 47 (explaining the related doctrine of overbreadth: "[I]f the statute or ordinance is broad enough to catch everyone, it has no core of circumstances to which it applies and is therefore unconstitutionally vague."). Furthermore, in these challenges, we may avoid "possible infirmity for vagueness" by giving a "limiting judicial construction, consistent with the apparent legislative intent and comporting with constitutional limitations." *Cobb*, 132 Idaho at 198–99, 969 P.2d at 247–48; *Leferink*, 133 Idaho at 784, 992 P.2d at 779.

"In contrast, to prove a statute is unconstitutional 'as applied', [sic] the party must only show that, as applied to the *defendant's conduct*, the statute is unconstitutional." *Am. Falls Reservoir Dist. No. 2*, 143 Idaho at 870, 154 P.3d at 441 (emphasis added). Here, much of Petitioners' arguments point to "uncertainties at the margin" when it comes to the application of these laws. *See Planned Parenthood of Indiana & Kentucky, Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 605 (7th Cir. 2021). Such arguments are only appropriate in as-applied challenges—not facial attacks. *See Am. Falls Reservoir Dist. No.* 2, 143 Idaho at 870, 154 P.3d at 441. Instead, our focus is whether these laws have a "core of circumstances" from which a person of ordinary

86

intelligence could understand what conduct is prohibited and, in the case of a criminal law, whether the law is "sufficiently explicit so all persons may know what conduct will subject them to penalties." *Leferink*, 133 Idaho at 783, 992 P.2d at 778.

For the reasons explained below, the Total Abortion Ban and 6-Week Ban satisfy this requirement. In addition, we also conclude that the Civil Liability Law does not impose excessive or vague "penalties" in violation of our Due Process Clause.

1. <u>Petitioners' facial challenge to the Total Abortion Ban fails because there is a core of circumstances to which the law unquestionably applies.</u>

a. *"Clinically diagnosable pregnancy"*

Petitioners' first facial vagueness challenge under the Total Abortion Ban is to the term "clinically diagnosable pregnancy." Contrary to Petitioners' position, there is a core of circumstances to which this term unquestionably applies.

The challenged term is found within the statutory definition of "abortion" under the Total Abortion Ban. That provision provides in full:

> "Abortion" means the use of any means to intentionally terminate *the clinically diagnosable pregnancy* of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulations, fertilization or the implantation of a fertilized ovum within the uterus.

I.C. § 18-604(1) (emphasis added).

As the Respondents point out, this definition of "abortion" has remained unchanged since the legislature adopted it sixteen years ago. *See* 2006 Idaho Sess. Laws 1322 (amending I.C. § 18-604(1) to the above definition). Since that time, this definition of "abortion" and its component term "clinically diagnosable pregnancy" has applied to reporting requirements for induced abortions in Idaho. *See* I.C. § 39-261. A brief review of the Induced Abortion Annual Reports from 2014 to 2020 plainly shows physicians have no difficulty in understanding the definitions of "abortion" and "clinically diagnosable pregnancy" in Idaho Code section 18-604(1). *See, e.g.*, *2020 Induced Abortion Annual Report*, IDAHO DEP'T OF HEALTH AND WELFARE (January 2022), https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=22665&dbid=0&repo=PUBLIC-DOCUMENTS.

Petitioners' protest that Idaho Code section 18-604(1) does not specify *how* to clinically diagnose a pregnancy misses the point. The term "clinically diagnosable pregnancy" has a

"core of circumstances" that a person of ordinary intelligence could unquestionably understand, e.g., by confirming a gestational sac or heartbeat using an ultrasound or detecting a fetal heartbeat with a fetoscope or handheld Doppler. Moreover, the definition of "abortion" uses the term "clinically diagnosable pregnancy"—it does not include the term "*chemically*" diagnosable pregnancy. *See* I.C. § 18-604(1). Thus, Petitioners' concerns over the methods of diagnosing a pregnancy through chemical means, e.g., by elevated hormones or home pregnancy tests, are also irrelevant under a facial challenge.

Finally, Petitioners' concern over the Total Abortion Ban prohibiting ectopic and non-viable pregnancies from being terminated does not render the entire statute void-for-vagueness. The Total Abortion Ban only prohibits "abortion[s] as defined in [Title 18, Chapter 6]," I.C. § 18-622(2)—and ectopic and non-viable pregnancies do not fall within that definition. For purposes of the Total Abortion Ban, the only type of "pregnancy" that counts for purposes of prohibited "abortions" are those where the fetus is "developing[.]" *See* I.C. §§ 18-622(2), -604(11) (defining "pregnancy" as "the reproductive condition of having a *developing fetus in the body* and commences with fertilization." (emphasis added)). In the case of ectopic pregnancies, any "possible infirmity for vagueness" over whether a fetus could properly be deemed a "developing fetus" (when the fallopian tube, ovary, or abdominal cavity it implanted in *necessarily cannot support its growth*) can be resolved through a "limiting judicial construction, consistent with the apparent legislative intent[.]" *See Cobb*, 132 Idaho at 198–99, 969 P.2d at 247–48.

Consistent with the legislature's goal of protecting prenatal fetal life at all stages of development where there is *some* chance of survival outside the womb, we conclude a "developing fetus" under the definition of "pregnancy" in Idaho Code section 18-604(11), does not contemplate ectopic pregnancies. Thus, treating an ectopic pregnancy, by removing the fetus is plainly not within the definition of "abortion" as criminally prohibited by the Total Abortion Ban (I.C. § 18-622(2)). In addition, because a fetus must be "developing" to fall under the definition of "pregnancy" in Idaho Code section 18-604(11), non-viable pregnancies (i.e., where the unborn child is no longer developing) are plainly not within the definition of "abortion" as criminalized by the Total Abortion Ban (I.C. § 18-622(2)).

Of note, we cannot use the same reasoning when it comes to the 6-Week Ban or the Civil Liability Law because the definition of "abortion" as applied to those laws, I.C. § 18-8801(1), does not contain a definition of "pregnancy" like that found under the Total Abortion Ban. *See* I.C. §

18-8801(1)–(5) (not defining "pregnancy"). Nevertheless, applying a limiting judicial construction, we conclude that ectopic, and non-viable pregnancies plainly fall within the "medical emergency" exception under the 6-Week Ban and Civil Liability Law (an exception the Total Abortion Ban does *not* contain). *See* I.C. § 18-8801(5).

Otherwise, and for the above reasons, Petitioners' facial challenge to the term "clinically diagnosable pregnancy" in the Total Abortion Ban is meritless.

b. *"Necessary to prevent the death of the pregnant woman"*

Petitioners' next facial challenge argues the phrase "necessary to prevent the death of the pregnant woman" is unconstitutionally vague. The challenged phrase is found within the requirements for asserting an affirmative defense to an "abortion" committed in violation of the Total Abortion Ban. That provision provides that an affirmative defense is available to a physician when, among other things, the physician determined

> *in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman.* No abortion shall be deemed necessary to prevent the death of the pregnant woman because the physician believes that the woman may or will take action to harm herself; and
>
> [. . . .]

I.C. § 18-622(3)(a)(ii) (emphasis added).

Petitioners argue that the phrase "necessary to prevent the death of the pregnant woman" is unconstitutionally vague because it gives no guidelines on whether the risk of death must be "imminent" or "substantial" in order to perform the abortion and allow the physician to assert this affirmative defense. However, Petitioners' argument misses the mark. The plain language of the above provision leaves wide room for the physician's "good faith medical judgment" on whether the abortion was "necessary to prevent the death of the pregnant woman" based on those facts known to the physician at that time. This is clearly a subjective standard, focusing on the particular physician's judgment. Contrary to Petitioners' arguments, the statute does not require *objective* certainty, or a particular level of immediacy, before the abortion can be "necessary" to save the woman's life. Instead, the statute uses broad language to allow for the "clinical judgment that physicians are routinely called upon to make for proper treatment of their patients." *See Spears v. State*, 278 So.2d 443, 445 (Miss. 1973) ("This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman.").

Importantly, unlike the other affirmative defenses noted in Section VI.A.5, *supra*, this means that the affirmative defense permitted by 18-622(3)(ii), does not place an objective reasonableness standard on the physician asserting the defense. For example, when asserting self-defense, Idaho Criminal Jury Instruction 1517 requires the defendant to prove:

> 1. The defendant must have believed that [the defendant] [another person] was in imminent danger of [death or great bodily harm] [bodily harm].
>
> 2. In addition to that belief, the defendant must have believed that the action the defendant took was necessary to save [the defendant] [another person] from the danger presented.
>
> 3. The circumstances must have been such that *a reasonable person, under similar circumstances, would have believed* that [the defendant] [another person] was in imminent danger of [death or great bodily injury] [bodily injury] and believed that the action taken was necessary.

(Emphasis added.) In other words, it is not enough for the defendant alone to believe that self-defense was necessary; he must prove that an objective review of the same circumstance would cause a reasonable person to reach the same conclusion. The Total Abortion Ban does not impose such a high standard. Instead, it imposes a subjective standard based on the individual physician's good faith medical judgment, that the abortion was necessary to prevent the death of the woman. I.C. § 18-622(3)(ii).

Petitioners' objection that the phrase "necessary to prevent the death of the pregnant woman" should include more guidelines would not only necessarily *limit* the subjective nature of the affirmative defense, but it also improperly plucks the phrase from the sentence that gives it broad meaning. Contrary to Petitioners' position, there is a "core of circumstances" that a person of ordinary intelligence could unquestionably understand when it comes to whether his or her conduct satisfies the above affirmative defense requirement in Idaho Code section 18-622(3)(a)(ii). That "core of circumstances" includes every situation where, in the physician's good faith medical judgment, an abortion was "necessary" to prevent the death of the pregnant woman. *See Doe v. Bolton*, 410 U.S. 179, 192 (1973) (rejecting a vagueness challenge to the term "necessary" in a similar Georgia abortion statute) *abrogated on other grounds by Dobbs*, 142 S. Ct. 2228 (2022)). Thus, a "medical consensus" on what is "necessary" to prevent the death of the woman when it comes to abortion is not required for a physician to satisfy this affirmative defense.

Moreover, there is no "certain percent chance" requirement that death will occur under the term "necessary"—and to impute one would only add an objective component to a wholly

subjective defense. Of course, a prosecutor may attempt to prove that the physician's subjective judgment that an abortion was "necessary to prevent the death of the pregnant woman" was not made in "good faith" by pointing to other medical experts on whether the abortion was, in their expert opinion, medically necessary. However, this does not make the affirmative defense requirement under Idaho Code section 18-622(3)(a)(ii) so vague that no person of ordinary intelligence could understand whether the physician exercised his medical judgment in "good faith." For these reasons, we conclude that Petitioners' facial challenge to the term "necessary to prevent the death of the pregnant woman" is meritless.

> c. "[I]n the manner that . . . provides the best opportunity for the unborn child to survive[.]"

Petitioners' next facial challenge argues that the requirement an "abortion" be performed "in the manner that . . . provides the best opportunity for the unborn child to survive" is unconstitutionally vague. The challenged phrase is also found within the requirements for asserting an affirmative defense to an "abortion" committed in violation of the Total Abortion Ban. The relevant provision provides in full:

> The physician performed or attempted to perform the *abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman.* No such greater risk shall be deemed to exist because the physician believes that the woman may or will take action to harm herself[.]

I.C. § 18-622(3)(a)(iii) (emphasis added); *see also* I.C. § 18-622 (3)(b)(iv) (requiring compliance with the same).

In other words, when a physician asserts the affirmative defense to an "abortion" based on saving the woman's life, rape, or incest, the physician must also have performed the abortion in the *manner* that "provided the best opportunity for the unborn child to survive" except when "termination of the pregnancy in that manner would have posed a greater risk of the death of the woman." I.C. § 18-622(3)(a)(iii). Petitioners contend this requirement is impermissibly vague in multiple ways, but most fundamentally, the "entire premise of performing an abortion in which the unborn child survives is flawed." Petitioners further argue there is no limiting construction we can place on the requirement to save the statute.

We agree that a plain reading of the affirmative defense requirement in Idaho Code section 18-622(3)(a)(iii) is inconsistent with the definition of "abortion" in Idaho Code section

18-604(1). The affirmative defense provision requires, among other things, that the "abortion" be performed in a manner that provides "the best opportunity for the unborn child to survive." I.C. § 18-622(3)(a)(iii). However, by definition, an "abortion" is the "use of any means to *intentionally terminate* the clinically diagnosable pregnancy . . . with knowledge that the termination by those means will, with reasonable likelihood, *cause the death of the unborn child*[.]" I.C. § 18-604(1) (emphasis added).

Despite that, this textual difficulty does not require us to conclude the entire Total Abortion Ban is impermissibly vague. Section 18-622(3)(a)(iii) simply requires that if a physician decides an abortion is necessary to save the life of the mother (I.C. § 18-622(3)(a)(ii)) or rape or incest has been reported (I.C. § 18-622(3)(b)(ii)–(iii)), the physician cannot *automatically* proceed to terminate the pregnancy in a manner that would necessarily end the life of the unborn child. Instead, the physician must first, using his "good faith medical judgment" and "the facts known" to him at the time, provide "the best opportunity for the unborn child to survive, unless, in his good faith medical judgment" using that method will pose "a greater risk of the death of the pregnant woman." *See* I.C. § 18-622(3)(a)(iii).

In other words, this means that if a woman is to have an unborn child removed from her body based on the preservation of her life, having been raped, or the victim of incest requirements—when the unborn child is viable outside of her womb—the physician must remove that unborn child in a manner that provides the best opportunity for survival (e.g., vaginal delivery or cesarean delivery) and cannot remove the child using a method which will necessarily end its life (e.g., dilation and extraction, or partial-birth abortions). The exception to this is when, in the physician's "good faith medical judgment," a method that would save the unborn child's life poses a "greater risk of the death of the pregnant woman." *See* I.C. § 18-622(3)(a)(iii). This reading comports with the legislature's apparent attempt, when crafting the Total Abortion Ban, to protect the life of the unborn child *where it is possible*. And it plainly has a "core of circumstances" to which any ordinary person would unquestionably understand it applies (e.g., late term pregnancies). In addition, like the "necessary" to save the life of the mother requirement, this requirement is purely subjective and merely requires a good faith judgment call by the physician without needing to be objectively "correct."

Thus, because the "best opportunity for the unborn child to survive" affirmative defense has a "core of circumstances" to which it applies, Petitioners' facial challenge here is unavailing.

d. *Petitioners' argument that the Total Abortion Ban and 6-Week Ban are facially vague because they are "impossible to parse" when read together is impermissibly raised for the first time in reply.*

Petitioners argue, for the first time in their reply briefs (Dkt. Nos. 49817, 49899), that the Total Abortion Ban—when read in conjunction with the 6-Week Ban—renders these laws "unconstitutionally vague" because a person of ordinary intelligence cannot discern which provisions of which laws are currently in effect and govern medical providers. As explained above, a federal preliminary injunction was issued against enforcement of the Total Abortion Ban where it allegedly conflicts with EMTALA. *See United States v. Idaho*, No. 1:22-CV-00329-BLW, 2022 WL 3692618, at *15 (D. Idaho Aug. 24, 2022). However, the preliminary injunction does not apply to the 6-Week Ban. Based on this, Petitioners raise a new vagueness argument, and maintain that it is unclear whether the 6-Week Ban is no longer "supersed[ed]" by the Total Abortion Ban such that it could be enforced criminally, or before a professional licensing board, even when EMTALA applies to bar enforcement of the Total Abortion Ban. The "supersed[es]" language relevant to the 6-Week Ban is found in the "Penalties for Violations" section of the Heartbeat Act. *See* I.C. § 18-8805(4) ("In the event both this section and [the Total Abortion Ban], are enforceable, [the Total Abortion Ban], shall supersede this section."). This argument was not raised in the original petitions and no motion to augment the authority and argument supporting them has been made.

Under Idaho Appellate Rule 32(c), a party may make a motion permitted under the Idaho Appellate Rules at any time before or after oral argument. The Idaho Appellate Rules permit a party to file a motion to "augment the authority and argument" presented in their brief in an appeal. I.A.R. 34(e)(2). However, there is no provision in our rules that addresses how a party may move to augment the authority and argument in an original action, such as the petitions before us. In such circumstances, we adopt "the practice usually followed in such or similar cases, or as may be prescribed by the Court or a Justice thereof." I.A.R. 48. When a litigant wants to add a new argument, not in their original pleading, the practice usually followed is to allow, before trial, one amendment as a matter of right within a certain time period, I.R.C.P. 15(a)(1), and if that time period has lapsed, an amendment with the written consent of the opposing party or the court's leave, I.R.C.P. 15(a)(2). "The court should freely give leave when justice so requires." *Id*.

During and after a trial, amendment may be permitted when a party objects that evidence is not within the issues raised in the pleadings, or when an issue is "tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." I.R.C.P. 15(b)(1),

93

(2). At the trial level, "[a] party may move, at any time, even after judgment, to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." I.R.C.P. 15(b)(2). However, on appeal, the usual practice is not so forgiving. In appeals, issues omitted from the appellant's opening brief and raised for the first time in a reply brief are not considered. *Myers v. Workmen's Auto. Ins. Co.*, 140 Idaho 495, 508, 95 P.3d 977, 990 (2004). In addition, a party is only allowed to "augment the authority and argument" presented in their brief *before* the issuance of an opinion, and upon "a showing of good cause why the material had not been included" in the prior briefing. I.A.R. 34(e)(2). When a motion to augment is granted, the Idaho Appellate Rules require us to provide "time within which any reply brief of an adverse party can be filed." *Id.*

Here, before this opinion issued, Petitioners never filed a motion to augment the authority and argument in any of their original petitions to add the "impossible to parse" vagueness argument they raise for the first time in their reply briefs. Because of this, Respondents and Intervenors have not had an opportunity to respond to Petitioners' new argument, and without that opportunity, Petitioners' argument is not properly before this Court. Therefore, we decline to address it.

2. <u>Petitioners' facial challenge to the 6-Week Ban fails because there is a core of circumstances to which the law unquestionably applies.</u>

*a. The "medical emergency" exception*

Moving to the 6-Week Ban, Petitioners bring a facial challenge against its "medical emergency" exception as impermissibly vague, arguing it "force[s] a physician to guess at the meaning" of its contents and risk both professional and criminal sanctions if "he or she guesses wrong." In addition, Petitioners argue that the law imposes criminal penalties without any "scienter" because the "medical emergency" exception is objective and not based on the physician's good faith medical judgment. In other words, even if the physician, in good faith, believed an abortion fell under the "medical emergency" exception, he would still be liable under the 6-Week Ban if it was later determined his judgment was not objectively "reasonable."

The language Petitioners challenge relates to the definition of "medical emergency" under the 6-Week Ban where abortions that are, "in reasonable medical judgment," necessary "to avert" the death of the woman "or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function" are exempted from criminal (and civil) liability. *See* I.C. § 18-8804(1) ("A person may not perform an abortion on a pregnant woman when a fetal heartbeat

94

has been detected, *except* in the case of a *medical emergency* . . . ." (emphasis added)). The full definition of "medical emergency" is as follows:

> "Medical emergency" means a condition that, in reasonable medical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

I.C. § 18-8801(5).

Looking first at the phrases—"neccess[ary] . . . to avert [the patient's] death" and "for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function[,]"—each easily has a set of "core circumstances" to which a person of ordinary intelligence would unquestionably understand they apply. As Respondents point out, the same phrases are commonly found within many "medical emergency" definitions past and present. *See, e.g.*, I.C. § 604(9) (2005); *see also* Ala. Stat. § 26-23G-2(6); Ga. Code § 16-12-141(a)(3); N.C. Gen. Stat. § 90-21.81(5); N.D. Cent. Code Ann. § 14-02.1-02.12. Indeed, EMTALA uses language *substantially similar* to the phrases challenged here, *see* 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii) ("placing the health of the individual . . . in serious jeopardy[,]" "serious impairment to bodily functions[,]" and "serious dysfunction of any bodily organ or part"), and that language in EMTALA explains to medical providers, under the current federal preliminary injunction, when the Total Abortion Ban cannot be enforced. *See also Dobbs*, 142 S. Ct. at 2243, 2284 (upholding Mississippi's abortion law—Miss. Code Ann. § 41-41-191 (2018)—that contains an exception for "medical emergenc[ies]" which tracks the language of EMTALA).

Moreover, these phrases have been used in Idaho for roughly seventeen years without being challenged as impermissibly vague. *See* 2005 Idaho Sess. Laws 1318, 1320. And a physician's understanding of these phrases, during that time, was necessary, for example, when deciding whether parental consent or judicial authorization was required to perform an abortion on a pregnant unemancipated minor. *See* I.C. § 18-609A(7)(b) (directing that parental consent or judicial authorization are not required in a "medical emergency" as defined in I.C. § 18-604(9) (the same definition as the one challenged here)). For these reasons, Petitioners cannot seriously contend that for the past seventeen years, and under EMTALA, physicians—or any person of ordinary intelligence—cannot understand the "core circumstances" to which these phrases definitively apply.

Next, looking at the objective "reasonable medical judgment" requirement for judging when there is a "medical emergency"—our conclusion is no different. Although this standard is not as broad as the subjective "good faith" standard under the Total Abortion Ban, *see supra*, it is not so vague that there is no set of "core circumstances" to which it unquestionably applies. This standard simply requires the physician to exercise "reasonable medical judgment" when determining whether the medical condition of the pregnant mother necessitates an abortion "to avert" her death or avoid a "serious risk of substantial and irreversible impairment of a major bodily function." *See* I.C. § 18-8801(5). There is nothing unusual about holding physicians to a clear standard of objective "reasonableness" when exercising medical judgment. This standard is not ambiguous. *See, e.g.*, *Colautti v. Franklin*, 439 U.S. 379, 391 (1979) (holding an abortion statute that imposed strict liability was impermissibly vague where it was "unclear whether the statute imports a purely subjective standard, or whether it imposes a *mixed* subjective and objective standard." (emphasis added)), *abrogated on other grounds by Dobbs*, 142 S. Ct. 2228 (2022). And it provides "more than fair warning as to what conduct is expected" in order to avoid liability because "this is the same standard by which all . . . medical decisions are judged under traditional theories of tort law." *See Karlin v. Foust*, 188 F.3d 446, 464 (7th Cir. 1999) (explaining that merely because one physician would choose "to perform an emergency abortion" under certain circumstances, while others would not, does not necessarily mean the physician who performed the abortion exercised *unreasonable* medical judgment). In other words, the "reasonable medical judgment" standard under the 6-Week Ban is merely a standard for *minimum competency* that physicians are routinely expected to satisfy. *See U.S. Vuitch*, 402 U.S. 62, 72 (1971) ("[W]hether a particular operation is necessary . . . is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered.").

Finally, the Petitioners' contention that the objective "reasonable medical judgment" standard obviates any "scienter" requirement for the 6-Week Ban is meritless. Contrary to Petitioners' position, the 6-Week Ban does not impose strict liability. Instead, to be criminally liable under the 6-Week Ban, the medical provider must "knowingly or recklessly" perform or induce an "abortion" in violation of the Fetal Heartbeat Act. I.C. § 18-8805(2). In addition, when it comes to the professional licensing penalty, I.C. § 18-3305(3), the definition of "abortion" in the Act provides a scienter requirement where it requires the medical provider to have acted "intentionally" to terminate the "clinically diagnosable pregnancy of a woman with knowledge

96

that the termination . . . will, with reasonable likelihood, cause the death of the preborn child." I.C. § 18-8801(1). For the above reasons, we conclude the "medical emergency" exception in the 6-Week Ban is not impermissibly vague because it provides fair notice of what it requires.

### b. The exceptions for rape and incest

Petitioners argue that the rape and incest exceptions in the 6-Week Ban are impermissibly vague because they require medical providers to "guess" about whether a given police report sufficiently alleges rape or incest as defined by law. Contrary to Petitioners' argument, these exceptions do no such thing. The challenged exceptions are within the provision of the Fetal Heartbeat Act that proscribes certain abortions, and provides in relevant part as follows:

> (1) A person may not perform an abortion on a pregnant woman when a fetal heartbeat has been detected, *except* in the case of a medical emergency*, in the case of rape* as defined in section 18-6101, Idaho Code, *or in the case of incest* as described in section 18-6601, Idaho Code. *In the case of rape or incest*:
>
> > (a) If the woman is not a minor or subject to guardianship, then, prior to the performance of the abortion, the woman has *reported the act of rape or incest* to a law enforcement agency and *provided a copy of such report* to the physician who is to perform the abortion; or
> >
> > (b) If the woman is a minor or subject to guardianship, then, prior to the performance of the abortion, the woman or her parent or guardian has *reported the act of rape or incest* to a law enforcement agency or child protective services *and a copy of such report have been provided* to the physician who is to perform the abortion.
>
> [. . . .]

I.C. § 18-8804 (emphasis added).

A plain reading of these exceptions demonstrates the "core circumstances" to which a person of ordinary intelligence would unquestionably understand they apply. Neither exception requires a physician to "guess" whether the narrative in a police or child protective services report legally constitutes "rape" or "incest" sufficient to secure a later conviction under Idaho Code sections 18-6101 or -6601. Instead, each exception merely requires, in the "core" set of circumstances, that the woman (or her parent or guardian if she is a minor or subject to guardianship), prior to obtaining the abortion, previously reported the alleged rape or incest to the police or child protective services, and tendered a copy of that report to the medical provider. The statute does not require the physician to judge the legal sufficiency of the report. The statute only requires that the report be made. Therefore, whether a narrative in a *particular* report is so facially inadequate that no reasonable person would think its contents amount to any definition of "rape"

97

or "incest" is at most, an "uncertain[y] at the margin[,]" *Planned Parenthood of Indiana & Kentucky, Inc.*, 7 F.4th at 605 (alterations added), only appropriate in an as-applied challenge. Here, Petitioners have brought a facial challenge. Thus, for the reasons stated above, the "rape" and "incest" exceptions are sufficiently explicit because there is a set of "core circumstances" to which they unquestionably apply.

3.  The Civil Liability Law does not impose excessive or vague penalties in violation of the Due Process Clause.

Moving to the Civil Liability Law, Petitioners argue that it facially violates the Due Process Clause because it contains "excessive and vague penalties." Petitioners further argue that we should apply the more stringent review we afford criminal laws because the Civil Liability Law imposes statutory penalties that are "quasi-criminal" in nature. Petitioners' challenges here invoke two separate principles under the Due Process Clause—proportionality and vagueness—and for the reasons discussed below, we conclude that the Civil Liability Law violates neither.

As a preliminary matter, the Civil Liability Law only allows certain private individuals to recover civil damages, statutory damages, and costs and attorney fees. *See* I.C. § 18-8807(1)(a)– (c). Unlike juvenile delinquency proceedings, *Int. of Doe*, 168 Idaho 389, __, 483 P.3d 932, 935 (2020), and contempt proceedings, *Matter of Williams*, 120 Idaho 473, 476, 817 P.2d 139, 142 (1991), litigants pursuing a cause of action under the Civil Liability Law are only entitled to monetary relief; they cannot place a medical provider's "liberty" interest at stake through penalties that closely resemble criminal sanctions. Moreover, because abortion is not a fundamental right, the Civil Liability Law is not a "punitive" scheme to limit and infringe the exercise of a protected constitutional right. Thus, the Civil Liability Law is not "quasi-criminal" in nature, and we decline to apply our criminal standard for Petitioners' vagueness challenge to it.

Next, as to the merits of Petitioners' vagueness challenge, to the extent Petitioners argue the statutory damages remedy in the Civil Liability Law is impermissibly vague because it "gives no guidance as to how its limitless statutory damages are to be calculated[,]" Petitioners' argument misses the mark. Vagueness challenges are concerned with whether a law gives sufficient notice of what *conduct* it requires or prohibits. *See Olsen*, 117 Idaho at 716, 791 P.2d at 1295 ("This Court has held that a statute which either forbids or requires the doing of an *act* in terms so vague that men of common intelligence must necessarily guess at its meaning, and differ as to its application, violates the first essential of due process of law." (emphasis added)). The Civil Liability Law, using the same standard as the 6-Week Ban, plainly and unambiguously sets out a

98

standard of prohibited conduct that has a set of "core circumstances" to which a person of ordinary intelligence would unquestionably understand it applies. *See* I.C. § 18-8804. Thus, Petitioners' vagueness challenge against the Civil Liability Law is meritless.

Next, Petitioners argue that the statutory damages provision is a "penalty" or "punitive" and as such, violates Idaho's Due Process Clause because the $20,000 minimum is "wholly disproportionate" and "obviously unreasonable" when compared to the offense the law proscribes. Petitioner's "no guidance" argument appears entwined in this sentiment. To support their position, Petitioners rely on *State Farm Mutual Auto Insurance Co. v. Campbell*, where the United States Supreme Court, in dealing with *punitive damages*, set out a proportionality requirement under the Due Process Clause of the Fourteenth Amendment as forbidding "grossly excessive or arbitrary punishments on a tortfeasor." 538 U.S. 408, 416 (2003); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) (dealing with the same).

Petitioner's argument here relies on a faulty premise. The $20,000 minimum statutory damages provision in the Civil Liability Law is not a "punishment" or a "penalty" like a punitive damages remedy. *See* I.C. § 18-8807(1)(b). Indeed, the Civil Liability Law does not even contain a punitive damages remedy. *See* I.C. § 18-8807(1)(a)–(c). Instead, the minimum statutory damages provision is *compensatory* in nature. Thus, we do not need to decide how the "proportionality" rule in *Campbell* operates under Idaho's Due Process Clause to reject Petitioners' challenge.

To explain, punitive and compensatory damages serve distinct purposes. "Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Campbell*, 538 U.S. at 416. "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution[,]" i.e., they do not *compensate* the plaintiff for a loss. *Id*. The "proportionality" requirement under *Campbell* only applies to remedies aimed at punishment, deterrence, and retribution (i.e., punitive damages)—not compensatory remedies that seek to make a plaintiff whole. *See id*. Here, the statutory damages remedy in the Civil Liability Law sets a *compensatory* baseline.

Indeed, the $20,000 minimum statutory damages provision, I.C. § 18-8807(1)(b), when read in conjunction with the general "damages" provision, I.C. § 18-8807(1)(a), is plainly aimed at, although not exclusively, those types of intangible damages that are inherently difficult to quantify (i.e., noneconomic damages that account for pain, suffering, emotional distress, etc.). The legislature's authority to enact this type of statutory remedy, notwithstanding the common law

99

which does not provide automatic "minimums" for noneconomic damages, is well within its purview. *See* IDAHO CONST. Art. XXI, § 2 (providing that the legislature may alter or repeal the common law); I.C. § 73-116 (same). Through this same authority, the legislature can place a statutory cap on the amount of noneconomic damages otherwise available at common-law. *See Kirkland v. Blaine Cnty. Med. Ctr.*, 134 Idaho 464, 468, 4 P.3d 1115, 1119 (2000); *see also* I.C. § 6-1603 ("Limitation on noneconomic damages"). And if the legislature can use this authority to set a ceiling for noneconomic damages—they can certainly use it to set a floor.

Moreover, this floor is not arbitrary, as it is easy to conceive of a mother, father, sibling, or grandparent who would suffer severe emotional distress at the loss of an unborn child in violation of the Civil Liability Law. Indeed, allowing compensatory damages in the case of an unborn fetus is not unprecedented. For example, we already recognize a cause of action for the wrongful death of a viable unborn fetus under Idaho Code section 5-310. *See Volk v. Baldazo*, 103 Idaho 570, 572–74, 651 P.2d 11, 13–15 (1982). Additionally, a private cause of action, similar to the Civil Liability Law, has existed since 2011, and it allows the mother or father of an unborn child to sue a medical provider for "actual damages" related to an abortion performed in violation of the Pain-Capable Unborn Child Protection Act. *See* I.C. § 18-508 (1). As to the proper "guidelines" for discerning the upper limits of the minimum statutory damages provision, one only need turn to the many tomes on compensatory damages. *See, e.g.*, Restatement (Second) of Torts §§ 901–917 (1979) (explaining types of damages and how to calculate each). Thus, for these reasons, we conclude that the Civil Liability Law is not facially violative of the Due Process Clause. Whether an award of statutory damages to a more remote relative like an aunt or uncle violates the Idaho Constitution will have to wait for another day when an "as applied" challenge is made.

### D. The Idaho Human Rights Act does not limit the legislature's ability to regulate abortion through the Total Abortion Ban and 6-Week Ban.

Petitioners contend the Idaho Human Rights Act, which prohibits certain forms of discrimination on the basis of sex, I.C. § 67-5909(1)–(11), limits the legislature's ability to regulate abortion through the Total Abortion Ban and 6-Week Ban. However, we may quickly dismiss Petitioners' argument as meritless. Not only do the Total Abortion Ban and 6-Week Ban *not* turn on the basis of sex alone, *see* Section VI.B, *supra*—no present legislature can bind a future legislature through ordinary legislation. *State v. Gallet*, 36 Idaho 178, 179, 209 P. 723, 724 (1922) (explaining that the "latest expression of the legislative intent [will] prevail" in the event of a

conflict (alteration added)); *see also Fletcher v. Peck*, 6 Cranch 87, 135 (1810) (John Marshall, C.J.) ("[O]ne legislature is competent to repeal any act which a former legislature was competent to pass; and . . . one legislature cannot abridge the powers of a succeeding legislature. The correctness of this principle, so far as respects general legislation, can never be controverted.").

Instead, the legislature "may enact any law not expressly or inferentially prohibited by the state or federal constitutions." *Standlee v. State*, 96 Idaho 849, 852, 538 P.2d 778, 781 (1975). Here, the legislature that enacted the Idaho Human Rights Act, as ordinary legislation, did not bind the future legislature that enacted the Total Abortion Ban and 6-Week Ban. To the extent there is any conflict (which we need not decide), the Total Abortion Ban and 6-Week Ban would control as the "more recent expression of legislative intent[.]" *See State v. Betterton*, 127 Idaho 562, 564, 903 P.2d 151, 153 (1995). Thus, we conclude the Total Abortion Ban and 6-Week Ban do not violate the Idaho Human Rights Act because they cannot be limited by it.

### E. Petitioners' remaining facial challenges to the Civil Liability Law under the Idaho Constitution are meritless.

#### 1. The Civil Liability Law does not violate the separation of powers doctrine enshrined in Article II, section 1.

Petitioners next challenge the Civil Liability Law as violating the separation of powers doctrine enshrined in Article II, section 1, because its private cause of action "attempts to deputize private citizens to do what fifty years of precedent [under *Roe*] has reaffirmed a State itself may not—enforce a pre-viability ban on abortion." However, as we explained in our August 12 Opinion denying Petitioners' request for a preliminary injunction, the constitutional landscape of abortion has changed since *Roe* and its lineage were overruled by *Dobbs*. Petitioners' argument here hinges on the pre-*Dobbs* reality that the Civil Liability Law appeared to be an attempt by the legislature to circumvent the executive branch's inability to enforce pre-viability abortion regulations (pre-*Dobbs*) by placing the executive power to "see that the laws are faithfully executed[,]" IDAHO. CONST. Art. IV, § 5, in the hands of private citizens armed with a civil cause of action. *See Sweeney*, 119 Idaho at 139, 804 P.2d at 312 (explaining the separation of powers doctrine).

Nevertheless, post-*Dobbs*, the state *can* prohibit and regulate abortions pre-viability. As explained above, neither the federal constitution, nor the Inalienable Rights Clause in the Idaho Constitution protects abortion as a "fundamental" right. Thus, Petitioners' argument here falls apart because the decision in *Dobbs*, and our decision in Section VI.A of this opinion, *supra*, remove any constitutional infirmity the Civil Liability Law might have previously contained. The

101

Civil Liability Law is now like any other civil statutory cause of action—and does not violate the separation of powers doctrine because it in no way implicates an improper usurping or delegation of the executive branch's power to regulate abortion after *Dobbs*. *See Tucker v. State*, 162 Idaho 11, 29, 394 P.3d 54, 72 (2017).

Indeed, it is well within the power of the legislature to create civil causes of action. *Stuart*, 149 Idaho at 45, 232 P.3d at 823; *Kirkland*, 134 Idaho at 471, 4 P.3d at 1122. Here, the Civil Liability Law now creates a private cause of action against medical providers who engage in abortion related conduct that the legislature has prohibited. This is no different than the Idaho Consumer Protection Act, which creates a private cause of action for consumers against prohibited trade practices (I.C. § 48-609), the Idaho Human Rights Act, which creates a private cause of action for persons against certain forms of discrimination (I.C. § 67-5909), or the Wrongful Death statute, which provides a private cause of action for heirs or personal representatives of a person whose death was "caused by the wrongful act or neglect of another" (I.C. § 5-311). Thus, we conclude Petitioners' separation of powers challenge is meritless.

2. The Civil Liability Law does not violate the prohibition against "special" laws in Article III, section 19.

Petitioners next argue that the Civil Liability Law violates the prohibition against "special" laws set out in Article III, section 19, because it specially treats medical providers who perform prohibited abortions in an "unreasonable" or otherwise impermissible manner. The relevant provision in the Idaho Constitution is as follows: "The legislature shall not pass local or *special laws* in any of the following enumerated cases, that is to say: . . . Regulating the practice of the courts of justice." IDAHO CONST. Art. III, § 19 (emphasis added). In 1962, "courts of justice" were replaced by constitutional amendment in favor of the current integrated system of the judicial branch under this Court. *See* 1961 Idaho Sess. Laws 1077 (ratified on Nov. 6, 1962). Thus, the same provision in Article III, section 19 applies to our current judicial system.

The "general purpose" of the "special laws" prohibition in Article III, section 19, as intended at its ratification in 1889, was to "prevent legislation bestowing favors on preferred groups or localities." *Jones*, 97 Idaho at 876, 555 P.2d at 416 (explaining that this provision was patterned after similar provisions in other state constitutions as a response to a "proliferation of special and local" laws in "post-Civil War legislatures"). The three characteristics of "special laws" are well established:

First, a special law applies only to an individual or number of individuals out of a single class similarly situated and affected or to a special locality. It is important to note that a law is not special simply because it may have only a local application or apply only to a special class if, in fact, it does apply to all such cases and all similar localities and to all belonging to the specified class to which the law is made applicable. Second, we have found that when the Legislature pursues a legitimate interest in protecting citizens of the state in enacting a law, then it is not special. Lastly, courts must determine whether the [statute's] classification is arbitrary, capricious, or unreasonable. If a law's classification is arbitrary, capricious, or unreasonable, it is a special law. In assessing the legitimacy of a particular law, as well as whether it is arbitrary, capricious, or unreasonable, this Court has on occasion examined not just the law itself, but its legislative history.

*Jones v. Lynn*, 169 Idaho 545, 562, 498 P.3d 1174, 1191 (2021) (quoting *Citizens Against Range Expansion v. Idaho Fish And Game Dep't*, 153 Idaho 630, 636, 289 P.3d 32, 38 (2012) (internal citations and quotations omitted)).

To contrast, "[g]eneral laws are those laws that apply to all persons and subject matters in a like situation, and they are constitutional for purposes of Article III, § 19 of the Idaho Constitution." *Citizens Against Range Expansion*, 153 Idaho at 636, 289 P.3d at 38.

Here, the Civil Liability Law is a general law and not a "special law" because it applies to all medical providers in like situations. *See* I.C. § 18-8807(1)(a) (imposing liability on "the medical professionals" who violate the abortion prohibition in I.C. 18-8804). To illustrate, the Civil Liability Law does not apply only to a *particular* medical provider or group of named providers. Instead, any medical provider who violates the prohibition in the Civil Liability Law is subject to liability. Petitioners protest that the Civil Liability Law creates "special" procedures because it confers standing not just on the mother and father, but also on the grandparents, aunts, uncles, and siblings of the unborn child, I.C. § 18-8807(1); it has a $20,000 minimum statutory damages provision, I.C. § 18-8807(1)(b); and the four-year statute of limitations is twice as long as the period of limitations for personal injury suits, I.C. § 18-8807(2). Yet, these provisions do not render the Civil Liability Law a "special" law because each of them applies *equally* to all medical providers. In other words, these procedures do not disproportionately affect one member of a *similarly situated class. See Citizens Against Range Expansion*, 153 Idaho at 637, 289 P.3d at 39.

Furthermore, the procedures Petitioners complain of do not have an illegitimate purpose and are not so "arbitrary, capricious, or unreasonable" as to render the Civil Liability Law a "special law" targeted against medical providers. *See Lynn*, 169 Idaho at 562, 498 P.3d at 1191. As explained above, the Civil Liability Law has a legitimate purpose in protecting prenatal fetal

103

life, and in promoting maternal health and safety—and the challenged procedures here are rationally related to these purposes. First, conferring standing to grandparents and siblings is not irrational as it is easy to conceive of situations where a person would suffer an injury-in-fact from the unlawful abortion of an unborn child who stood to be their grandson, granddaughter, brother, or sister. Second, as explained above, the $20,000 minimum statutory damages provision is rationally related to these purposes because it provides compensatory damages for a loss that is inherently difficult to quantify. Third, although the general statute of limitations for personal injuries is two years, I.C. § 5-219, there is nothing "arbitrary" or "capricious" about making the statute of limitations under the Civil Liability Law four years when the "catch-all" for causes of action with no specific period of limitations is already four years. *Compare* I.C. § 18-8807(2) *with* I.C. §§ 5-201 to -224.

In sum, the Civil Liability Law does not have any of the "hallmarks of special laws[,]" *Citizens Against Range Expansion*, 153 Idaho at 637, 289 P.3d at 39; thus, we conclude it does not violate Article III, section 19.

### 3. The Civil Liability Law does not offend any "informational privacy" right within the Idaho Constitution.

Petitioners' final argument is that the Civil Liability Law violates an implicit right to "informational privacy" under a broader "zone of privacy" protected by the Idaho Constitution. Petitioners contend that the Civil Liability Law violates this implicit right by putting the "highly personal and sensitive" medical information related to a woman's pregnancy and abortion "in public litigation against the patient's will."

Petitioners' argument here is premised on the "zone of privacy" recognized under the United States Constitution and derived from no particular amendment or language. *See Paul v. Davis*, 424 U.S. 693, 712–13, 96 S. Ct. 1155, 1166, 47 L. Ed. 2d 405 (1976) ("While there is no 'right of privacy' found in any specific guarantee of the Constitution, the Court has recognized that 'zones of privacy' may be created by more specific constitutional guarantees and thereby impose limits upon government power."). However, within that "zone of privacy," the United States Supreme Court has never recognized a right to "informational privacy." *See Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147–59 (2011) (assuming—without deciding—that there is a constitutional right to "informational privacy," the challenged governmental employment questionnaire did not violate this right), *see also id.* at 160 (Scalia, J.,

104

concurring in the judgment) ("A federal constitutional right to 'informational privacy' does not exist."), *id.* at 169 (Thomas, J., concurring in the judgment) (same).

Moreover, Petitioners' challenge here is under the Idaho Constitution—not the United States Constitution. And in the Idaho Constitution, there is no explicit right of "privacy." *See* IDAHO CONST. Art. I–XXI. Additionally, as explained above, we disavow our prior decision in *Murphy v. Pocatello Sch. Dist. No. 25*, 94 Idaho 32, 37–38, 480 P.2d 878, 883–84 (1971), to the extent it can be interpreted as recognizing a "zone of privacy" as implicitly guaranteed by the Idaho Constitution without analyzing the issue. Thus, as our starting point, it is unsettled whether the alleged right of "informational privacy" is so "deeply rooted" in Idaho's traditions and history that it could be deemed "fundamental" and implicitly protected by the Inalienable Rights Clause.

However, we merely clarify this point, and do not decide it. We recognize that our decision today settles the appropriate test for determining the existence of implicit fundamental rights under the Inalienable Rights Clause. Nonetheless, just as the burden is on the appellant to show error when we exercise appellate jurisdiction, *State v. Cofer*, 73 Idaho 181, 190, 249 P.2d 197, 202 (1952), the burden is on the petitioner to show they are entitled to relief when we exercise original jurisdiction. And when it comes to constitutional questions, "there is always a risk of bad decision-making" when the briefing is "inadequate" or "unhelpful." *See Miller v. Idaho State Patrol*, 150 Idaho 856, 864–65, 252 P.3d 1274, 1282–83 (2011).

Here, Petitioners made no attempt to argue the right to "informational privacy" is a "fundamental" right using either the undeveloped "ordered liberty" test from *Evans,* 123 Idaho at 581–82, 850 P.2d at 732–33, the "deeply rooted" test as articulated in *Glucksberg*, 521 U.S. at 720–21, or any other proposed test. Indeed, Petitioners merely point to the United States Constitution, and then proclaim a "right to informational privacy" exists under the Idaho Constitution—without arguing whether that right is "fundamental" or merely a right the legislature may regulate subject to rational basis review. Thus, because Petitioners briefing is inadequate and unhelpful on this far-reaching question, we decline to decide whether the Inalienable Rights Clause implicitly protects "informational privacy" as "fundamental."

In any event, we can dispose of Petitioners' challenge on non-constitutional grounds because it is overstated and based on a faulty assumption. *State ex rel. Kempthorne v. Blaine Cnty.*, 139 Idaho 348, 350, 79 P.3d 707, 709 (2003) ("[W]hen a case can be decided upon a ground other than a constitutional basis, the Court will not address the constitutional issue unless it is necessary

105

for a determination of the case."). As a preliminary matter, "we recognize the serious potential for great harm when certain personal information is indiscriminately released to the public." *Nation v. State, Dept. of Correction*, 144 Idaho 177, 187, 158 P.3d 953, 963 (2007). Indeed, our common-law recognizes a cause of action for "invasion of privacy." *See Berian v. Berberian*, 168 Idaho 394, __, 483 P.3d 937, 949 (2020) (explaining there are four categories of "invasion of privacy" including "[i]ntrusion upon the plaintiff's seclusion or solitude, or into his private affairs[,]" and "[p]ublic disclosure of embarrassing private facts about the plaintiff").

However, contrary to Petitioners' position, nothing in the Civil Liability Law *requires* confidential or sensitive medical information be "indiscriminately released to the public" or placed in "public view." *See* I.C. § 18-8807. The Civil Liability Law does provide a cause of action that could place sensitive or confidential information of the mother into evidence, but this is no different than when a third-party's confidential or sensitive information is placed at issue in proceedings related to a medical malpractice case, child protection actions, I.C. §§ 16-1601 to -1647 ("Child Protection Act"), divorce and custody actions, I.C. §§ 32-701 to -720, or actions for guardianship of incapacitated persons, I.C. §§ 15-5-301 to -5-318. Where this does occur, the judicial system is well equipped, and has much experience, in handling confidential and sensitive information through protective orders, filings under seal, and *in camera* review. *See* I.R.C.P. 26(c); I.C.A.R. 32(i). Thus, Petitioners' claim that the Civil Liability Law "forces" women to put sensitive, personal information into "public view" is meritless. Accordingly, with this premise removed, Petitioners' claim that the Civil Liability Law violates an alleged right of "informational privacy" by putting information in the "public view" is without foundation.

## VII. CONCLUSION

For the reasons set forth herein, the three petitions in Docket Nos. 49615, 49817, 49899, requesting the issuance of extraordinary writs of prohibition and declaratory judgments are DENIED and the petitions are DISMISSED WITH PREJUDICE.

Chief Justice BEVAN, and Justice MOELLER CONCUR.

**ZAHN, J., dissenting.**

The framers of Idaho's Constitution promised its citizens inalienable rights, including the rights to life and safety. Since before statehood, Idaho has protected the life and health of pregnant women by permitting them to obtain an abortion to preserve their life or health. Today's decision

disregards the plain language of Idaho's Constitution and fails to respect its history and traditions. I therefore respectfully dissent.

> **A. A pregnant woman has a fundamental right to obtain an abortion to preserve her life or health.**

Petitioners point to sections 1, 17, and 21 in Article I as potential textual bases for an implicit fundamental right to abortion. Passing on the constitutionality of statutory enactments is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 583, 850 P.2d 724, 734 (1993); *see also Miles v. Idaho Power Co.*, 116 Idaho 635, 640, 778 P.2d 757, 763 (1989). When we are called on to perform this duty under the Idaho Constitution, "the primary object is to determine the intent of the framers." *State v. Clarke*, 165 Idaho 393, 397, 446 P.3d 451, 455 (2019) (quoting *Idaho Press Club, Inc. v. State Legislature*, 142 Idaho 640, 642, 132 P.3d 397, 399 (2006)). Thus, any implicit fundamental rights the framers intended to protect from that "broad field of police power" to "enact laws concerning the health, welfare and morals of the people[,]" must be based on the plain language of the Idaho Constitution. *Berry v. Koehler*, 84 Idaho 170, 176, 369 P.2d 1010, 1013 (1961). "Fundamental rights" in our state constitution are those that are either "expressed as a positive right" or "implicit in our State's concept of ordered liberty." *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 581-82, 850 P.2d 724, 732-33 (1993).

I agree that when interpreting Idaho's Constitution to determine whether a right was implicit in Idaho's concept of ordered liberty, we cannot ignore Idaho's history and tradition. It is impossible to determine the framers' intent and whether a right is implicit in Idaho's concept of ordered liberty without considering Idaho's history and traditions.

However, because we are interpreting our state Constitution, we are not bound to the same test that the United States Supreme Court applies to interpret the federal constitution. While history and tradition are important and often controlling considerations, they should not always be the sole consideration. This Court has repeatedly recognized that Idaho's Constitution was not "frozen in time." *See J.C. Penney Co. v. Diefendorf*, 54 Idaho 374, 385, 32 P.2d 784, 795 (1934) ("It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means today, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them,

107

the statement carries its own refutation."); *see also McDonald v. Doust*, 11 Idaho 14, 17, 81 P. 60, 63 (1905) ("The thoughts and hopes of the people who adopted that document were centered on a future filled with the progress and development time is bringing us."); *State v. Bennion*, 112 Idaho 32, 37, 730 P.2d 952, 957 (1986) ("The [f]ramers did not intend to *literally* freeze the law precisely as it existed in 1890. To do so would yield the absurd result of affording no right to jury trial to those accused of crimes that happened not to be in statutory or common law existence at that arbitrary point in history." (alteration added)); *State v. Kouni*, 58 Idaho 493, 497, 76 P.2d 917, 921 (1938) ("The police power is broad and must be given an interpretation in keeping with changing times and conditions, which rule this court has from its inception adhered to with progressive foresight.").

Considering this history, and the inescapable reality that time brings developments that our founders could not have contemplated, we should look to Idaho's history and traditions to determine the framers' intent but not be locked into examining those rights only according to the circumstances in which they existed circa 1890. Rather, we must follow our precedent that Idaho's Constitution did not freeze rights as they existed in 1890. The deeply rooted test locks this Court into determining whether a constitutional right exists based on whether it was litigated or written about in 1890. There may well be rights that were not litigated or written about, but which the framers still intended to include within our constitution. There may also be rights that were written about in 1890, but the then-existing circumstances have since changed. The fact that a situation we confront today was not discussed circa 1890, should not prevent this Court from determining whether our Constitution speaks to that situation today. Setting Idaho's history and traditions as our guidepost when determining the framers' intent ensures we do not stray from the requirement that we interpret our constitution according to the framers' intent. Limiting our interpretation to conditions as they existed in 1890 runs the risk of reading rights out of our constitution, particularly the inalienable rights.

Petitioners' argument that Idaho's constitution includes an implied right to obtain an abortion primarily focuses on Article I, sections 1 and 21. Our founders adopted Article I, section 1, without debate. PROCEEDINGS AND DEBATES 127–28, 1589 (I. W. Hart ed., 1912). When considering section 21, a motion carried to strike the word "popular" from the title, but the content of section 21 was likewise adopted without debate. *Id.* at 392, 1636. A plain reading of sections 1 and 21 show that they are broadly written: Section 1 sets forth a non-exhaustive list of inalienable

108

rights that are retained by the people of Idaho, and section 21 makes clear that the drafters of the constitution did not intend that the rights listed in Article I would be the *only* rights so retained.

The historical and legal backdrop against which the Idaho Constitution was adopted supports a broad interpretation of the individual rights protected by these sections. "Because many of the delegates to the Constitutional Convention were outstanding lawyers in their day, we generally presume that they knew and acted on such prior and contemporaneous interpretations of constitutional words which they used." *Clarke*, 165 Idaho at 397, 446 P.3d at 455 (quoting *Paulson v. Minidoka Cnty. Sch. Dist. No. 331*, 93 Idaho 469, 472 n.3, 463 P.2d 935, 938 n.3 (1970)). During the era in which our constitutional convention was held, individual rights were broadly recognized and protected. For example, in 1886—just a few years before the convention—the United States Supreme Court explained:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*

*Boyd v. United States*, 116 U.S. 616, 635 (1886). The United States Supreme Court's statement that a court's "motto should be *obsta principiis*" is telling. The Latin phrase means "[w]ithstand beginnings; resist the first approaches or encroachments." *Id.*; *Obsta principiis*, BLACK'S LAW DICTIONARY (10th ed. 2014). In other words, the U.S. Supreme Court in *Boyd* cautioned against allowing even tiny governmental encroachments on individual rights, lest those small encroachments lead to ever larger ones. Such an encroachment could "*only* be obviated" by broadly interpreting constitutional provisions that protected individual rights. *Boyd*, 116 U.S. at 635 (italics added).

When the drafters met in the summer of 1889 to discuss the provisions they wished to include in the Idaho Constitution they would have obviously been aware of the United States Supreme Court's discussion of individual rights in *Boyd* and that it was the practice of courts to broadly construe guarantees of individual rights and liberties. Had the drafters deemed this broad construction inappropriate, they could have drafted the Idaho Constitution in a way that disclaimed it. They did not do so. Rather, they did the opposite: Article I, section 1 lists many rights retained

109

by the people of Idaho and further provide that the enumerated rights are "among" the rights so retained. Article 1, section 21 further makes clear that the enumeration of rights in the entirety of Article 1 "*shall not* be construed to impair or deny other rights retained by the people." IDAHO CONST. art. I, § 21 (italics added). As they were aware of court precedent, the drafters were also aware of the mandate they set forth in section 21 by using the phrase "shall not." *See e.g.*, *Pentico v. Comm'n for Reapportionment*, 169 Idaho 840, 848, 504 P.3d 376, 384 (2022) ("Usually, the word 'shall' is mandatory."). Article I, sections 1 and 21 of the Idaho Constitution, as written, adopted the broad construction set forth in *Boyd*.

The expansive retention of rights set forth in Article I, sections 1 and 21, are a limitation on the power of the state government, not simply in 1889, but today as well. *See, e.g.*, *State v. Thiel*, 158 Idaho 103, 110, 343 P.3d 1110, 1117 (2015) ("Our State Constitution is a limitation, not a grant of power, and the [l]egislature has plenary powers in all matters, except those prohibited by the Constitution." (quoting *Rich v. Williams*, 81 Idaho 311, 323, 341 P.2d 432, 439 (1959)) (alteration in original)). As the late Justice Brennan aptly explained:

> [T]here exists in modern America the necessity for protecting all of us from arbitrary action by governments more powerful and more pervasive than any in our ancestors' time. Only if the amendments are construed to preserve their fundamental policies will they ensure the maintenance of our constitutional structure of government for a free society. For the genius of our Constitution resides not in any static meaning that it had in a world that is dead and gone, but in the adaptability of its great principles to cope with the problems of a developing America. A principle to be vital must be of wider application than the mischief that gave it birth. Constitutions are not ephemeral documents, designed to meet passing occasions. The future is their care, and therefore, in their application, our contemplation cannot be only of what has been but of what may be.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 495 (1977) (hereafter "Brennan, *State Constitutions*"). *See also State v. Guzman*, 122 Idaho 981, 987, 842 P.2d 660, 666 (1992) (noting that Justice Brennan's article "helped to spark greater interest in independent state constitutional analysis").

The plain language of Article I, sections 1 and 21, the historical legal context at the time of the constitutional convention, and the framers' placement of the inalienable rights provision as the first, most prominent, provision of our constitution demonstrates that the framers intended the inalienable rights provision to be a broad retention of personal rights enjoyed by Idahoans. The provision expressly protects the rights to enjoy and defend life and liberty, pursue happiness and

secure safety. The rights to both enjoy and defend life, and the right to secure safety were promised to *all* of Idaho's citizens.

Petitioners also contend that Article I, section 17 and its protections against unreasonable searches and seizures give rise to a fundamental right to bodily privacy that includes the right to obtain an abortion. While there was some debate about this section, none of it concerned a right to bodily privacy or abortion. *See* Proceedings and Debates 372, 1635–36 (I. W. Hart ed., 1912). It is true that in some instances we have determined that our Constitution provides greater protections against arrest and searches than the Fourth Amendment to the federal constitution. *See State v. Donato*, 135 Idaho 469, 471, 20 P.3d 5, 7 (2001) (explaining that Idaho's Search and Seizure Clause has provided greater protections than the Fourth Amendment based on "the uniqueness of our state, our Constitution, and our long-standing jurisprudence."); *State v. Thompson*, 114 Idaho 746, 748–51, 760 P.2d 1162, 1164–67 (1988) (explaining that Article I, section 17 foreclosed the use of "pen registers," which were otherwise lawful under the Fourth Amendment). However, I have not found evidence to support the contention that the framers intended to include a broad right to bodily privacy that would include an implicit right to obtain an abortion in section 17. The plain language of the clause limits its application to "unreasonable" searches and seizures. I find no evidence to indicate that the framers believed the criminalization of abortion constituted an unreasonable seizure of a pregnant woman or otherwise intended section 17 to create a broad right to bodily privacy. As a result, I cannot find that the framers intended the prohibition on unreasonable searches and seizures to give rise to an implicit fundamental right to obtain an abortion.

Thus, the only possible sources of an implicit right to obtain an abortion are found in Article I, sections 1 and 21. In analyzing whether the right to obtain an abortion was implicit in Idaho's concept of ordered liberty, I remain mindful that our duty is to faithfully interpret the Idaho Constitution through the framers' intent. *Miles*, 116 Idaho at 640, 778 P.2d at 762. I agree that when interpreting our constitution we must avoid subjective injections of what we think "fair," "just," or "good policy" to reach a desired outcome. Relying on Idaho's history and traditions to inform our analysis of whether a fundamental right is implicit in Idaho's concept of ordered liberty ensures we do not unwittingly substitute our judgment for that of the framers.

Idaho's history and traditions demonstrate that Idaho has historically permitted pregnant women to obtain an abortion to preserve their life or health. During the territorial assembly's *first*

111

session, less than a year after the Territory of Idaho was created in 1863, the Territorial Legislature made procuring an abortion a criminal offense:

> [E]very person who shall administer or cause to be administered, or taken, any medicinal substance, or shall use or cause to be used, any instruments whatever, with the intention to procure the miscarriage of any woman then being with child, and shall thereof be duly convicted, shall be punished by imprisonment in the territorial prison for a term not less than two years, nor more than five years: *Provided*, That [sic] no physician shall be effected by the last clause of this section, who in the discharge of his professional duties, deems it necessary to produce the miscarriage of any woman in order to save her life.

Act of Feb. 4, 1864, ch. IV, § 42, 1863–64 Idaho Terr. Sess. Laws 443 (emphasis original) (alterations added).

Next, and only two years before the constitutional convention in 1889, the laws and statutes of Idaho were compiled, revised, and reenacted at the fourteenth territorial session. *See* R.S. §§ 6794, 6795 (1887). Notably, while many of the criminal prohibitions against many abortions remained, the revised statutes changed the language of the exception from "save" to "preserve" the life of the woman:

> **Sec. 6794.** Every person who provides, supplies or administers to, any pregnant woman, or procures any such woman to take, any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the Territorial prison not less than two nor more than five years.
>
> **Sec. 6795.** Every woman who solicits of any person any medicine, drug, or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, *unless the same is necessary to preserve her life*, is punishable by imprisonment in the Territorial prison not less than one nor more than five years.

Idaho Rev. Stat. (R.S.) §§ 6794, 6795 (1887) (emphasis added). This compilation was subsequently approved by the Territorial Legislature. *See* Council [Senate] Journal Idaho Terr., 14th Sess. (Dec. 13, 1886, to Feb. 10, 1887), at 43–44, 58. Idaho's legislature repeatedly reaffirmed the criminal prohibitions in substantially the same form and always with the same exception for abortions "necessary to preserve" the woman's life. Idaho Rev. Code (R.C.) §§ 6794, 6795 (1909); Idaho Comp. Stat. (C.S.) §§ 8281, 8282 (1919); I.C. §§ 17-1810, 17-1811 (1932); I.C. §§ 18-601, 18-602 (1947).

The definition of "preserve" is undeniably broader than that of "save." The first definition for "preserve" in the Merriam-Webster online dictionary is "to keep safe from injury, harm, or

112

destruction." https://www.merriam-webster.com/dictionary/preserve (last accessed on December 15, 2022). It identifies the synonyms of preserve as "protect" or "maintain." *Id.* The first definition for "save" is inapplicable to the context here, but the second definition is "to rescue or deliver from danger or harm." https://www.merriam-webster.com/dictionary/save (last accessed on December 15, 2022). The plain meaning of the word "preserve" thus not only encompassed an abortion to prevent the death of the mother, but also to protect her health "from injury, harm or destruction." The majority's attempt to differentiate between the definitions of "save" and "preserve" ignores the plain language of the dictionary definitions on which it relies. Regardless of whether we look to current dictionary definitions or those from the 1800s, the definitions of both "save" and "preserve" include "to preserve from injury," "to rescue from danger," and "to keep or save from injury or destruction." Each of these definitions implicates protecting a woman from death or adverse health consequences that would injure her or destroy aspects of her health.

Five of the members which enacted the criminal abortion laws in sections 6794 and 6795 of the Revised Statutes of 1887 were also delegates to the 1889 constitutional convention. Thus, the Inalienable Rights Clause was framed, at least in part, by those *same* individuals who thought abortion was largely a crime except when necessary to preserve the life of the mother. Had those individuals not intended the inalienable rights of life and safety to apply to pregnant women, they could have specifically stated as much. They made no such distinction. Idaho had always permitted abortions to save the life of the mother, and later expanded the right to include abortions to preserve her life or her health. As discussed below, Idaho's history and traditions established that these rights were implicit in Idaho's concept of ordered liberty. There was no need for the founders to discuss these points further because they were historically protected and were clearly encompassed within the inalienable rights' provisions protecting the pregnant woman's rights to life and safety.

The history and traditions related to Idaho's medical profession likewise indicates that Idaho has permitted abortions to preserve the life or health of the mother. Idaho's early medical regulations did not prohibit doctors from performing all abortions, but only from performing "criminal abortions" or "unlawful abortions." The historical medical journal Northwest Medicine, in which articles from Idaho doctors was published, discussed the difference between "criminal" and "justifiable" abortions necessary to preserve the life of the mother. NORTHWEST MEDICINE Vol. V. 289–96 (Jan. to Dec. 1907). Idaho thus recognized and condoned abortions to preserve the life or health of the mother.

The manner in which Idaho's news outlets reported on abortions focused on criminal abortions and prosecutions. None appear to report on abortions performed to preserve the life of the mother, presumably because those abortions were not criminalized.

Idaho's history and traditions, as well as the plain language of its Constitution, establish that a pregnant woman's right to obtain an abortion to preserve her life or health is implicit in Idaho's concept of ordered liberty. In the time preceding and following the adoption of the Inalienable Rights Clause the framers, the territorial assembly, the state legislature, and the physicians of Idaho recognized and condoned abortions to preserve the life or health of the mother. This conclusion is further supported by the broad grant of inalienable rights to life and safety contained in Article I, section 1. The framers' intent to protect not only the life, but the health of the mother, is reflected in the grant of inalienable rights—which expressly protect both life and safety. That such abortions were implicit in Idaho's concept of ordered liberty is also reflected in the Idaho territorial legislature's, and later the Idaho state legislature's, decision to amend the language of the criminal statute's exception from "save" to "preserve" the life of the woman.

While the majority opinion takes issue with my consideration of Idaho's historical statutes in reaching this conclusion, our laws are necessarily part of Idaho's history and traditions. The majority opinion relies on them as well for that reason. Our historical statutes also reflect the framers' knowledge at the time they drafted our Constitution. Furthermore, my conclusion today is not based solely on our historical statutes, but also on the history of Idaho's medical profession and journalists' focus on reporting on criminal abortions as opposed to those performed to preserve the life of the mother.

Further, and contrary to the majority's assertion, my decision today does not elevate statutes to the status of constitutional provisions. Instead, it recognizes the explicitly granted, inalienable constitutional rights to life and safety and also looks to Idaho's history and traditions to determine whether those inalienable rights encompass a fundamental right to obtain an abortion to preserve the life or health of the mother. My decision simply acknowledges and gives effect to this history and tradition.

A woman's pregnancy—and whether that pregnancy is terminated—drastically impacts her rights to both life and safety. Pregnancy and childbirth are indisputably fraught with danger. Pregnancy can cause a wide array of medical side effects, ranging from unpleasant, to debilitating, to fatal. These side effects run the gamut from morning sickness and significant and sometimes

114

permanent physical changes to gestational diabetes and post-partum depression, and on to preeclampsia, eclampsia, and death. As explained by the New Mexico Supreme Court:

> We also note that some physical characteristics, such as the ability to become pregnant, may have profound health consequences. For example, there is undisputed evidence in the record that carrying a pregnancy to term may aggravate pre-existing conditions such as heart disease, epilepsy, diabetes, hypertension, anemia, cancer, and various psychiatric disorders. According to these sources, pregnancy also can hamper the diagnosis or treatment of a serious medical condition, as when a pregnant woman cannot receive chemotherapy to treat her cancer, or cannot take psychotropic medication to control symptoms of her mental illness, because such treatment will damage the fetus.

*New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 855 (1998).

Pregnancy can also drastically affect a woman's mental health. As noted by the New Mexico Supreme Court, pregnancy may aggravate a woman's pre-existing psychiatric disorders, while at the same time require her to stop "tak[ing] psychotropic medication to control symptoms of her mental illness, because such treatment will damage the fetus." *New Mexico Right to Choose/NARAL*, 975 P.2d at 855. These mental health risks similarly implicate the constitutional rights of life and safety.

The life and safety of a woman's family can also be dramatically impacted by her pregnancy. The health risks and complications a woman faces during pregnancy can leave her unable to care for her existing children throughout the pregnancy. Even after childbirth, it can take months or years for a woman to fully recover—*if* she completely recovers. As discussed above, pregnancy complications can result in permanent health issues or death, both of which would leave the woman unable to care for her remaining children and would adversely affect their respective rights to life and safety. Those children have a right to be parented by their mother. And, pursuant to Article I, section 21 of the Idaho Constitution, the mother of those children has the constitutional right to parent those children and make decisions about how those children are raised, including whether she is the adult to raise them. *Electors of Big Butte Area v. State Bd. of Educ.*, 78 Idaho 602, 612, 308 P.2d 225, 231 (1957); *see also Martin v. Vincent*, 34 Idaho 432, 433, 201 P. 492, 493 (1921) ("The right of a parent to the custody, control, and society of his child is one of the highest known to the law."). A mother cannot care for, teach, and otherwise rear her children if pregnancy complications claim her life or lead to serious health consequences. Additionally, women are often caregivers for other family members, such as a disabled spouse or elderly parent.

Her inability to terminate a pregnancy could cause great physical harm or death to her, creating a domino effect where she can no longer provide care to those who need her most.

I realize that this conclusion leaves unanswered questions. The most obvious of which is when is an abortion necessary to preserve the health of the mother? I do not have occasion to answer that question today because neither party has proposed a standard. Suffice it to say, however, that Idaho's history and traditions do not suggest that every illness or health concern would necessitate an abortion to preserve the health of the mother. As with other constitutional rights, the answer to this and other questions would have to be answered on a case-by-case basis, because each pregnancy presents different health issues for each woman. The majority opinion suggests that recognizing a fundamental right of this nature is fraught with uncertainty and raises many questions that must be answered. Such is the nature of constitutional interpretation. Not every constitutional right comes with a bright line test for its application. We do not decline to recognize or enforce constitutional rights because the precise contours of the right must be determined on a case-by-case basis. Rather, we recognize the right and then work to interpret and apply it to those cases that come before us. Over time, we thus define the contours of the right. Our jurisprudence interpreting and applying the prohibition against unlawful searches and seizures has evolved in such a manner and the same can be done here.

I recognize that fundamental rights are, by nature, few and far between. However, the right to obtain an abortion to preserve the life or health of the mother, while not expressly written in the constitution, implicates at least two of the rights—life and safety—that are explicitly enumerated in Article I, section 1. This, coupled with the intentionally broad drafting of Article I, section 1, along with Idaho's history and traditions condoning abortions to preserve the life or health of the pregnant woman, leads me to conclude that this is one of the occasions in which we must construe an implicit right as fundamental under the Idaho Constitution because it is "implicit in Idaho's concept of ordered liberty." *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181 (quoting *Van Valkenburgh*, 135 Idaho at 126, 15 P.3d at 1134).

To be clear, the consequence of determining that there is a fundamental right to obtain an abortion to preserve the life or health of the mother does not render the legislature incapable of legislating in this arena. "The ability of the legislature to make laws related to a fundamental right arises from the reality that, in an ordered society, few rights are absolute." *Reclaim Idaho*, 169 Idaho at 429, 497 P.3d at 183. Indeed, even *Roe* allowed for some governmental regulation of

abortion. Rather, our recognition of a fundamental right affects the standard under which this Court reviews statutes that infringe upon that fundamental right.

In sum, due to the plain language of Article I, section 1 of our Constitution, Idaho's history and traditions, and the impacts that pregnancy can have on a woman's inalienable rights to life or health, the right to obtain an abortion to preserve the life or health of the mother is implicit in Idaho's concept of ordered liberty. That right is, therefore, fundamental. Thus, before the State dictates the circumstances in which a pregnant woman may exercise that right, it must show that doing so is "necessary to serve a compelling state interest, and [the statutes are] narrowly tailored to achieve that interest." *Id.*

**B. Idaho's history and traditions do not indicate that a broader right to abortion was implicit in Idaho's concept of ordered liberty.**

I do not find as broad a right to abortion as that advocated by Petitioners. As discussed above, the language of our constitution, as well as Idaho's history and traditions, compels my decision today. I have not found evidence to support Petitioners' arguments for why we should disregard our history, or at least afford it less weight, when analyzing whether a fundamental right to abortion is implicit in Idaho's concept of ordered liberty. First, for the reasons stated in the majority opinion, I cannot conclude that a constitutional challenge to Idaho's criminal abortion statutes prior to the United States Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973) would have been successful.

Second, I have not found sufficient evidence to support Petitioners' contention that finding a right less broad than that advanced by Petitioners "would perpetuate the disenfranchisement and discriminatory treatment of women that existed circa 1890." In support of this contention Petitioners cite *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 491 (Kan. 2019), where the Kansas Supreme Court declared a fundamental right to abortion as implicitly protected by the inalienable rights clause in the Kansas Constitution. The Kansas Supreme Court's holding in *Hodes & Nauser*, however, is based on its own history and precedent as well as its interpretation of the Lockean "natural rights" theory embodied in Kansas's inalienable rights clause. *See Id.* at 486–491. However, there are two reasons why I do not find the Kansas Supreme Court's decision controlling when interpreting our Constitution.

For one, the history of Kansas, along with its jurisprudence, is not Idaho's history or jurisprudence. Thus, while the Kansas Supreme Court concluded that Kansas's history and traditions supported finding an implied fundamental right to abortion in the Kansas constitution

117

which apparently was unbounded, the decision in *Hodes & Nauser* did not address what *Idaho's* history and traditions are on the issue of abortion.

Additionally, I have been unable to locate historical evidence supporting the contention that the framers of Idaho's Constitutions intended to grant the same inalienable rights that the Kansas Supreme Court concluded its framers intended to grant. The Kansas Supreme Court's opinion recognized that when the Fourteenth Amendment to the federal constitution was ratified in 1868, twenty-four of thirty-seven state constitutions contained provisions guaranteeing inalienable, natural, or inherent unenumerated rights. *Id.* at 625, 440 P.3d at 472. The court noted that such provisions are often referred to as "Lockean Natural Rights Guarantees." *Id.* at 626, 440 P.3d at 472. The majority examined the writings of Locke and other political philosophers and legal writers and concluded that, "one's control over one's own person stands at the heart of the concept of liberty, one of the enumerated natural rights in section 1." *Id.* at 640-42, 440 P.3d at 480-82. After analyzing Kansas precedents, the majority concluded that "[e]ach of these court-recognized principles acknowledging the natural-law right to control one's own body and to exercise self-determination stands firmly on the shoulders of the Lockean philosophies embraced in section 1's natural rights, which include liberty and the pursuit of happiness." *Id.* at 643-44, 440 P.3d at 482. The majority opinion, however, failed to address the fact that Locke explicitly condemned the destruction of life, including abortion. S*ee Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 740 n.19 (Iowa 2022). This may be due to something unique to Kansas' history and jurisprudence; I do not know. However, I cannot disregard this fact when analyzing whether the natural rights philosophy compels the conclusion that Idaho's framers intended to grant broad, implicit fundamental rights that included the right to obtain an abortion.

It cannot be ignored that in the case of abortion, there is a life on both sides of the equation. Petitioners have not argued that the life of the unborn should be disregarded when evaluating whether a fundamental right to abortion is implicit in Idaho's concept of ordered liberty. While the evidence and history indicate that our framers' inclusion of the Inalienable Rights Clause drew from natural rights philosophy, the historical evidence also indicates that at least one of the fathers of that philosophy explicitly condemned abortion. This Court's precedent compels me to interpret our Constitution to determine the framers' intent, rather than substituting my judgment for that of the framers. After examining the underpinnings of natural rights philosophy, I cannot conclude

that the framers' reliance on that philosophy for the Inalienable Rights Clause compels the conclusion that they intended to grant implicit fundamental rights that encompassed a broad right to abortion. In light of this, I cannot conclude that Idaho's historical criminal abortion statutes perpetuated the disenfranchisement and discriminatory treatment of women.

Nor can I join my dissenting colleague's conclusion that the inalienable rights articulated in Article I, Section 1 encompass a broader right to abortion for the pregnant woman. This is because his analysis fails to account for the life of the unborn. As set out in the majority's opinion, Idaho's history and traditions plainly indicate that Idahoans criminalized some abortions in order to protect the life of the unborn. It is also without question that Idaho criminalized some abortions in order to protect the life and health of the pregnant woman. These two interests predated the adoption of our Constitution and thus the founders were aware of both interests when drafting our Constitution. I have not located evidence indicating that the drafters of our constitution only intended Article I, section 1 to apply to the pregnant woman. I therefore cannot conclude that the founders intended the pregnant woman's inalienable rights of liberty, happiness and safety to encompass a fundamental right to terminate another, unborn life. As noted above, Petitioners have not argued that we should disregard the life of the unborn when interpreting our Constitution. Further, although both *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992) recognized a constitutionally significant distinction between viable and nonviable pregnancies, Petitioners have not argued that we should recognize such a constitutional distinction here. As a result, and without any evidence suggesting the founders intended the inalienable rights provision to only apply to "born" Idahoans, I cannot conclude that the founders intended the inalienable rights of liberty, happiness and safety to permit a broader right to terminate a pregnancy.

**C. Idaho's history and traditions disprove the contention that there is no fundamental right to abortion.**

Although I cannot find a broad right to abortion in our Constitution, I cannot agree with the State's and the Intervenor's assertion that our Constitution recognizes no right to abortion, even to preserve the life and health of the pregnant woman. The State and the Intervenors point to the historical criminal statutes as evidence that the drafters of Idaho's constitution cannot have viewed the termination of a pregnancy as a fundamental right under any circumstances. There are several flaws with this logic.

First, their argument ignores the broad grant of inalienable rights protected by Article I, section 1. For reasons already discussed, the framers intended the inalienable rights clause to be a broad grant of rights to Idaho's citizens. The framers specifically included life and safety as rights possessed by Idahoans, including pregnant women.

Second, their argument ignores the plain language of the very statutes on which their argument relies, which unambiguously provided an exception to protect the life or health of the mother. When Idaho's territorial legislature amended the criminal statutes to change the language of the exception from saving the health of the mother to preserving the health of the mother, this change in language suggests the legislature intended to condone abortions in more situations than just those involving the potential death of the mother. The territorial and state legislatures recodified and amended the statutes over the years, until the United States Supreme Court announced a federal constitutional right to abortion in *Roe*. At no time did the legislature seek to change the language of the exception. We must give effect to the language as written, and the word "preserve" extends to both the life and the health of the mother.

Finally, their argument ignores Idaho's history and traditions. Idaho's history and traditions permitted and condoned abortions to preserve the life or health of the mother. Although the early prohibitions against termination of a pregnancy were in place in no small measure to protect potential prenatal life, the statutes were also intended to protect the pregnant woman. *Alcorn*, 7 Idaho at 604, 64 P. at 1019 (explaining that criminal abortion was "not only destructive of a life unborn, but place[d] in jeopardy the life of a human being,—the pregnant woman"). The drafters of the Idaho Constitution would have been aware that the life and health of the pregnant woman were protected by the statutes. Notably, in the only Idaho criminal case to address the abortion statute, the pregnant woman died as a result of the procedure. *Id*. at 600–01, 64 P. at 1015–16. Moreover, medical professionals condoned the performance of abortions to preserve the life or health of the mother.

The majority opinion points out that neither party asked us to find a right to obtain an abortion to preserve the life or health of the mother. This Court, however, is charged with interpreting our Constitution to determine what it provides. In conducting that interpretation, we are not bound to only accept the parties' interpretations, especially if they are faulty. All parties asked this Court to determine whether our constitution provides an implicit, fundamental right to abortion. Idaho's history and traditions, as well as the plain language of the Constitution itself,

120

indicate it does, but only to preserve the life or health of the mother. That the contours of that right do not exactly match the arguments of either party does not mean our Constitution is silent on the issue. If we interpreted our constitution as containing no fundamental right to abortion whatsoever, we would read the inalienable rights clause out of our Constitution and ignore Idaho's history and traditions. If we do not recognize and give effect to the framers' intent, there is nothing to prevent a future legislature from ignoring this fundamental right and eliminating all affirmative defenses and exceptions. The parties have asked us to determine whether our Constitution provides an implicit fundamental right to abortion. This is how I would have answered that question.

**D. The statutes unconstitutionally infringe upon a pregnant woman's fundamental right to obtain an abortion to preserve her life or health.**

A statute which restricts fundamental rights is subject to a strict scrutiny standard of review and can only be justified if it furthers a compelling government purpose, and even then, only if no less restrictive alternative is available. *State v. Doe*, 148 Idaho 919, 935, 231 P.3d 1016, 1032 (2010), *quoting Regents of the Univ. of Cal. V. Bakke*, 98 S.Ct. 2733, 2782 (1979). Because these statutes restrict a fundamental right, it is the State's burden to show that the Total Abortion Ban, the Fetal Heartbeat Ban, and the Civil Liability Law survive strict scrutiny. *Bradbury*, 136 Idaho at 68, 28 P.3d at 1011 ("When a statute infringes on a fundamental right . . . the presumption is that the statute is invalid unless the state can demonstrate the statute is necessary to serve a compelling state interest."). Applying strict scrutiny to the challenged statutes, I conclude that the statutes are not narrowly tailored and, therefore, unconstitutionally infringe upon the fundamental right of pregnant women to obtain an abortion to preserve their life or health.

For these statutes to survive strict scrutiny, the State must first show that it has a compelling state interest in enacting the statutes. The State asserts it has a compelling state interest in protecting preborn human life at all stages of development. Petitioners do not challenge this assertion.

Nevertheless, the State must still show that each of the three laws are narrowly tailored to achieve that objective. The State has not met this burden. The laws as written protect "preborn human life" at the expense of the rights to life and safety of the woman carrying the child. These laws clearly prevent a pregnant woman from exercising her fundamental right to obtain an abortion to preserve her life or health. Though it is possible for the State to regulate fundamental rights, it—not Petitioners—has the burden to prove that a law is narrowly tailored to achieve that interest.

121

First, the Total Abortion Ban is not narrowly tailored to achieve the State's compelling interest. The Total Abortion Ban effectively prevents pregnant women from exercising their fundamental right to preserve their health, unless they are in danger of death. As the State acknowledges in its briefing, the Total Abortion Ban prohibits the termination of a pregnancy in Idaho "*except in the rarest circumstances*[.]" (Italics in original.) Under the Total Abortion Ban, a physician is unable to terminate a pregnancy in order to prevent damage to a woman's health, no matter how extensive that damage may be. A physician may only terminate a pregnancy if he or she determines that an abortion is "necessary" to prevent the pregnant woman's death (or if the pregnancy was a result of rape or incest, if the woman supplies the physician with a copy of the law enforcement report). A pregnant woman may not terminate her pregnancy for any other reason, including (as acknowledged by counsel for the State at oral argument) to preserve her own health, regardless of how damaging or long-lasting the health consequences of her pregnancy may be. The Total Abortion Ban offers a pregnant woman little choice as to whether she is willing to endure the immeasurable risks of pregnancy and childbirth; it simply requires her to do so unless her life is in danger.

Maternal health concerns about bringing a child to term clearly cover more than just conditions resulting in the death of the mother. Severe, long-term health risks to the mother are just that: severe. As the United States District Court for the District of Idaho recently explained:

> Pregnant women in Idaho routinely arrive at emergency rooms experiencing severe complications. The patient might be spiking a fever, experiencing uterine cramping and chills, contractions, shortness of breath, or significant vaginal bleeding. The ER physician may diagnose her with, among other possibilities, traumatic placental abruption, preeclampsia, or a preterm premature rupture of the membranes. In those situations, the physician may be called upon to make complex, difficult decisions in a fast-moving, chaotic environment. She may conclude that the only way to prevent serious harm to the patient or save her life is to terminate the pregnancy— a devastating result for the doctor and the patient.
>
> So the job is difficult enough as it is. . . . But when the stabilizing treatment is an abortion, offering that care is a crime under Idaho Code § 18-622 [the Total Abortion Ban]—which bans *all* abortions. If the physician provides the abortion, she faces indictment, arrest, pretrial detention, loss of her medical license, a trial on felony changes, and at least two years in prison [and possible civil liability under the Civil Liability Law]. Yet if the physician does not perform the abortion, the pregnant patient faces grave risks to her health—such as severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury, or even death. And this woman, if she lives, potentially may have to live the remainder of her life with

122

significant disabilities and chronic medical conditions as a result of her pregnancy complication. All because Idaho law prohibited the physician from performing the abortion. . . . And the physician cannot enjoy the benefit of this [good faith medical judgment] defense if she performed the abortion merely to prevent serious harm to the patient, rather than save her life.

*United States v. Idaho*, No. 1:22-cv-00329-BLW, 2022 WL 3692618, at *1 (D. Idaho Aug. 24, 2022).

Additionally, the Total Abortion Ban fails to protect pregnant women's inalienable right to life. Although it purports to allow the termination of pregnancy to save the life of the mother, the statute explicitly excludes any scenario in which the life of the mother is in jeopardy due to her mental illness. I.C. § 6-222(3)(a)(ii). If the pregnant woman has a serious mental health condition, such as bipolar disorder or schizophrenia, and takes medications which are contraindicated for pregnancy, the Total Abortion Ban forces her to either take those medications and deal with the impacts the medication will have on the unborn or stop taking potentially life-saving medications and hope for the best.

Furthermore, the severe penalties for doctors who violate the Total Abortion Ban—even those to whom the affirmative defenses apply—ensure that those doctors must delay life-saving medical care to seek legal advice prior to performing an abortion. Thus, in practice, decisions about life-saving medical care will ultimately be made by lawyers rather than medical professionals. Moreover, the Total Abortion Ban criminalizes all abortions, exposing doctors to the fraught circumstance of providing life-saving care permitted under the statute and then having to spend the time and money before a medical board and jury to defend their good faith medical judgment in order to retain their livelihood and their personal liberty. This will undoubtedly chill the medical provider's exercise of independent, good faith medical judgment. A pregnant woman's right to obtain an abortion to preserve her life or health necessarily includes the right to consult with a medical provider and obtain medical care to preserve her life or health.

Similarly, the Fetal Heartbeat Ban and the Civil Liability Law also unconstitutionally infringe upon a pregnant woman's fundamental right to obtain an abortion to preserve her life or health because its restrictions are not narrowly tailored. At first blush, the Fetal Heartbeat Ban and the Civil Liability Law seemingly protect the health of Idaho mothers, at least more so than the Total Abortion Ban. However, the legislature limits the situations in which a pregnant woman may obtain an abortion to preserve her health. If the pregnant woman's health condition does not meet the legislature's requirements, it does not matter how serious the potential health complications

123

are, she cannot obtain an abortion to preserve her health. Additionally, as with the Total Abortion Ban, this exception would force a doctor faced with a patient who has potentially life-threatening injuries as the result of a pregnancy to either risk criminal liability or withhold much-needed medical care. Again, these severe penalties ensure that doctors must seek legal advice prior to terminating a pregnancy, which means it is likely that decisions about life-saving or life-altering medical care will not be made by a highly-trained medical provider in conjunction with the pregnant woman, but instead by lawyers.

The State has not attempted to explain how the statutes are narrowly tailored such that its alleged compelling interest in protecting potential prenatal life may be achieved without putting the lives and health of Idaho women at significant risk. Moreover, the State has submitted no evidence to support the restrictions imposed on the health conditions for which a pregnant woman may obtain an abortion to preserve her health. Instead, the State's briefing is devoid of any acknowledgement that pregnancy can adversely affect the lives and health of women. Though the State relies on *Dobbs* as support for its interest in protecting human life, the State blatantly ignores some of the other interests that *Dobbs* recognized, which included the protection of maternal health and safety and the preservation of the integrity of the medical profession. *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2284 (June 24, 2022). The State's reluctance to address these interests actively works *against* its stated interest in protecting the mother's life. Without any evidence to establish that the restrictions are narrowly tailored, the restrictions placed on a pregnant woman's fundamental right cannot withstand strict scrutiny.

The State has not met its burden to demonstrate that the Civil Liability Law, the Total Abortion Ban, and the Fetal Heartbeat Ban are narrowly tailored to achieve its stated interest in protecting human life. As a result, I would hold that these laws unconstitutionally infringe upon a pregnant woman's fundamental right to obtain an abortion to preserve her life or health.

To be clear, such a conclusion would not prevent the legislature from regulating abortion. The legislature may regulate abortion within the confines of the Idaho Constitution. However, if the legislature wishes to regulate a pregnant woman's fundamental right to obtain an abortion to preserve her life or health, then its regulation must withstand strict scrutiny. I do not envy the pregnant women faced with the decision of whether to terminate a pregnancy when their lives or health are in danger. I recognize that making such a decision is a heavy burden to bear, fraught with personal, moral, and religious implications. However, as the ones who will be impacted the

124

most, regardless of their ultimate choice, pregnant women are entitled to make their own choices about their lives and health. I would find that under the broad retention of rights the drafters set forth in Article I, section 1 and Idaho's history and traditions, the right to obtain an abortion to preserve one's life or health is a fundamental right under the Idaho Constitution. Thus, while the decision whether to terminate a pregnancy is of profound magnitude, it is a decision that is constitutionally left to the pregnant woman and her medical provider, not the legislature or lawyers.

I do not reach this decision lightly. While the termination of a pregnancy is a health care procedure, it is *sui generis* in that there is a potential life on the other side of the equation. In this way, the termination of a pregnancy is unique from other medical procedures. I recognize that proponents on both sides of this topic hold their views on the subject deeply and fervently. *See Dobbs*, 142 S.Ct. at 2240. However, "[p]assing on the constitutionality of statutory enactments, even enactments with political overtones, is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1813)." *Miles*, 116 Idaho at 640, 778 P.2d at 762. If my view were to prevail, the State could pass a statute regulating abortions in Idaho which passes constitutional muster. But it has not done so with respect to the three statutes we have been called upon to review today. Accordingly, as is our duty and responsibility, I would declare the Civil Liability Law, the Total Abortion Ban, and the Fetal Heartbeat Ban unconstitutional under the Idaho Constitution. For my stated reasons, I respectfully dissent from the majority's decision.

Justice STEGNER concurs in the dissent.

**STEGNER, J., dissenting.**

I concur in Justice Zahn's conclusion that the inalienable rights of a pregnant woman to life and safety render the right to abortion to protect those rights fundamental under the Idaho Constitution. However, I write separately because I view Idaho's constitution as providing broader fundamental rights to Idaho's women. I would go further and hold that Idaho women have a fundamental right to obtain an abortion because pregnancy—and whether that pregnancy may be terminated—has a profound effect on pregnant women's inalienable right to liberty, as well as their rights to life and safety.

The decision the majority hands down today is, in my view, simply wrong. Today's decision strips Idaho's women of their most basic rights, which in Idaho's constitution, in contrast

125

with the federal constitution, explicitly include life, safety, liberty, and happiness. These rights are unequivocally protected by Article I, section 1 of the Idaho Constitution—or rather, those rights *were* protected by Idaho's constitution. The decision the majority has issued today effectively reads these rights out of Idaho's constitution. It nullifies the constitutional provision our forefathers saw fit to place first in our constitution, in a place of obvious primacy and importance. The men who drafted our constitution cannot have intended their chosen words to mean nothing, and yet, that is the meaning afforded them today. I cannot support an interpretation that renders Article I, section 1 a nullity. Instead, I would hold that Article I, section 1 of the Idaho Constitution protects the fundamental right of a woman in Idaho to terminate a pregnancy. Accordingly, I respectfully dissent.

In reviewing the constitutionality of the challenged statutes, this Court's duty is to interpret the Idaho Constitution such that the drafters' intent is brought to life. As with statutory interpretation, this begins with an analysis of the plain language of the constitution: "The fundamental object in construing constitutional provisions is to ascertain the intent of the drafters by reading the words as written, employing their natural and ordinary meaning, and construing them to fulfill the intent of the drafters." *Sweeney v. Otter*, 119 Idaho 135, 139, 804 P.2d 308, 312 (1990).

Article I, section 1 of the Idaho Constitution protects Idahoans' inalienable rights. The language is simple and forthright: "All men are by nature free and equal, and have certain inalienable rights, among which are enjoying and defending life and liberty; acquiring, possessing and protecting property; pursuing happiness and securing safety." Additionally, section 21 of Article I explicitly states that "[t]his enumeration of rights *shall not* be construed to impair or deny other rights retained by the people." IDAHO CONST. art. I, § 21 (italics added). Read together, it is clear that, by the plain language of sections 1 and 21, the drafters of the Idaho Constitution intended Article I, which protects the rights of Idahoans from intrusion by their government, to be read broadly. The drafters made abundantly clear that the rights they listed were not the only individual rights to be constitutionally protected. They explicitly adopted the Idaho Constitution to "secure" the "blessings" of "freedom" for Idahoans. IDAHO CONST. Preamble ("We, the people of the state of Idaho, grateful to Almighty God for our freedom, to secure its blessings and promote our common welfare do establish this Constitution."). While the Idaho Constitution venerates our freedom, today's decision makes that promise a hollow one.

126

The right to terminate a pregnancy, while not expressly listed in our constitution, implicates no fewer than four of the five rights that the drafters listed in Article I, section 1. Article I, section 1 expressly protects Idahoans' rights to life, liberty, safety, and happiness. All of these expressed rights are significantly impacted by issues surrounding a pregnant woman's health and freedom to choose her path forward. In my view, this provides more than ample support to conclude that the right to terminate a pregnancy is "implicit in Idaho's concept of ordered liberty" and is, therefore, a fundamental right protected by the Idaho Constitution. *Reclaim Idaho v. Denney*, 169 Idaho 406, 427, 497 P.3d 172, 181 (2021).

Whether a woman may choose to become pregnant or remain pregnant significantly affects her right to liberty. This Court has recognized that Idahoans are entitled to some level of personal autonomy. For example, as Petitioners point out, "the right to wear one's hair in a manner of his choice" is protected by sections 1 and 21 of Article I of the Idaho Constitution. *Murphy v. Pocatello School Dist. No. 25*, 94 Idaho 32, 38, 480 P.2d 878, 884 (1971). The right in *Murphy* was described by this Court as stemming from a right to privacy. *Id.* at 37–38, 480 P.2d at 883–84. As thoroughly explained by Justice Zahn, a pregnancy can and does wreak havoc on a woman's body and mind. The right to liberty protects a pregnant woman's personal autonomy and right to safety. By its plain language, our constitution affords a woman the freedom of agency over her body and her life. It recognizes that in a matter of profound importance to a woman that she, not Idaho's government, has the inalienable right to make that decision.

The right to terminate a pregnancy is substantially more important than other rights this Court has previously recognized under the right to liberty as set out in Article I, section 1. For example, this Court has held that "[t]he right to follow a recognized and useful occupation is a right protected by the constitutional guaranty of liberty" pursuant to sections 1 and 13 of Article I of the Idaho Constitution. *Berry v. Summers*, 76 Idaho 446, 451, 283 P.2d 1093, 1095 (1955). Given the effects of pregnancy on a woman's physical and psychological well-being and life, the right to terminate a pregnancy has more bearing on a woman's liberty than either the "right of personal taste" protected in *Murphy*, or the "right to follow a recognized and useful occupation" protected in *Berry*. Rather than grapple with the holding in *Murphy,* this inconvenient precedent that stands in the way of its decision, the majority simply "disavows" it. The fact that these rights are protected by Idaho's constitutional guarantee of liberty under Article I, section 1 further

supports Petitioners' contention that the right to terminate a pregnancy is a liberty interest protected by our constitution.

I acknowledge that "liberty" as used in Article I, section 1 does not grant individuals unlimited freedom to live their lives outside the confines and laws of society. For example, it cannot be said that the right to liberty spelled out in Article I, section 1 protects the freedom to disobey a posted speed limit whenever one chooses. However, I believe the right to liberty cannot be so easily read out of the constitution. Idaho's constitution protects individual freedoms.

Only when an individual can make her own choices regarding the ultimate trajectory of her life is her right to liberty realized. John Locke described the "necessity of pursuing true happiness" as the "foundation of liberty." JOHN LOCKE, AN ESSAY CONCERNING HUMAN UNDERSTANDING 171 (27th ed., T. Tegg and Son, 1836) (1689). As Locke explained, "the highest perfection of intellectual nature lies in a careful and constant pursuit of true and solid happiness; so the care of ourselves, that we mistake not imaginary for real happiness, is the necessary foundation of our liberty." *Id.* In other words, individual liberty is contingent upon the ability to make a choice for oneself. The choice to bear a child—or not—is life-altering in a way that very few decisions are. That choice profoundly implicates a woman's life and decisions that go to the very core of who she is as a person. To categorically rob her of that choice is to take away her most basic rights to life, liberty, safety, and the pursuit of happiness.

Where precisely the guideposts are that govern the right to liberty is not a question before this Court, but I am convinced the right to terminate a pregnancy falls squarely within them. Out of the four inalienable rights enumerated in Article I, section 1 other than liberty, the right to abortion implicates at least three. Those rights—life, safety, and happiness—must be read in unison with the right to liberty: When interpreting our constitution, we must "read[] the words as written" and "give effect 'to all the words . . . so that none will be void, superfluous, or redundant.'" *Sweeney*, 119 Idaho at 139, 804 P.2d at 312; *State v. Pizzuto*, ___ Idaho ___, ___, 518 P.3d 796, 807 (2022) (quoting *State v. Burke*, 166 Idaho 621, 623, 462 P.3d 599, 601 (2020)). When, as here, an Idahoan's rights to life, safety, and happiness are so inextricably linked to the claimed fundamental right, the plain language of Article I, section 1 protects that person's liberty to decide whether to place those other rights in jeopardy. To allow the government unfettered power to make that choice effectively nullifies not only the individual right to liberty, but also her rights to life, safety, and happiness. Thus, when the tension exists between a woman's freedom to choose and

128

the government's ability to restrict that freedom to a nullity, the woman's freedom, can and should, prevail unless the State can demonstrate a compelling need to do so that is narrowly tailored to effectuate its concerns.

This is more than simply "the freedom to do whatever one wants." Rather, it is the liberty to decide how to exercise one's own inalienable rights, and even whether to exercise those rights at all. A pregnant woman who chooses to bear a child to term is also at liberty to make that decision, even though pregnancy and childbirth place her rights to life, safety, and happiness at risk. Reading all four rights together, the Idaho Constitution does not simply afford Idahoans with the right to a life; rather, our constitution allows Idahoans to live a life worth living, and the liberty to decide what kind of life that is for themselves. Giving the legislature preeminence over this right is precisely what the founders rejected in Article 1, section 1. Requiring a pregnant woman to bear these substantial medical risks and paramount personal and familial concerns without her consent strips away her constitutionally protected liberty and forces her to live the life someone else has chosen for her.

It is clear to me that the constitutional rights of life, liberty, safety, and happiness, taken together, demonstrate that the right to terminate a pregnancy "is implicit in Idaho's concept of ordered liberty." *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181. Accordingly, I would conclude that the right to terminate a pregnancy is a woman's fundamental right pursuant to Article I, section 1 of the Idaho Constitution.

The majority circumvents this conclusion by adopting—for the first time—the federal "deeply rooted in history and tradition" test and casually "disavowing" constitutional precedent set forth by this Court over fifty years ago in *Murphy*. In doing so, the majority disregards the Idaho Constitution and this Court's long-standing case law.

I disagree with the majority's adoption of the federal "deeply rooted in history and tradition" test. This Court is under no obligation to follow federal precedent when it comes to interpreting our own state constitution. "Generally, the federal framework is appropriate for analysis of state constitutional questions unless the state constitution, the unique nature of the state, or Idaho precedent clearly indicates that a different analysis applies." *CDA Dairy Queen, Inc. v. State Ins. Fund*, 154 Idaho 379, 383, 299 P.3d 186, 190 (2013). "However, it is clear that the state constitution sometimes provides greater protection than the federal constitution." *Id.* "[W]hen interpreting the Idaho Constitution, this Court will use federal rules and methodology unless clear

precedent or circumstances unique to the state of Idaho or its constitution indicates that Idaho's constitution provides greater protection than the analogous federal provision." *Id.* at 384, 299 P.3d at 191.

In my view, this case presents a clear instance in which we should interpret our state constitution in its own right and should "not 'blindly apply United States Supreme Court interpretation and methodology' when interpreting the state constitution." *Id.* (quoting *State v. Newman*, 108 Idaho 5, 11 n. 6, 696 P.2d 856, 862 n. 6 (1985)). There is simply no "analogous federal provision" to Article I, section 1 of Idaho's constitution. *Dobbs* concluded that the federal right to due process under "the Fourteenth Amendment does not protect the right to an abortion." *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2248 (2022). The analogous provision under our constitution to the Fourteenth Amendment is Article I, section 13, not Article I, section 1. *Compare* U.S. CONST. amend. XIV ("No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]") *with* IDAHO CONST. art. I, § 13 ("No person shall . . . be deprived of life, liberty or property without due process of law."). Article I, section 1 is not a guarantee of due process, nor is it a duplication of section 13. Rather, section 1 boldly sets forth Idahoans' inalienable rights, some of which are not included in the due process provision, such as "pursuing happiness and securing safety." Thus, our interpretation of Article I, section 1 should not track the United States Supreme Court's interpretation of the Fourteenth Amendment because Article 1, section 1 of Idaho's constitution is unequivocally more expansive than the Fourteenth Amendment. Sadly, today's decision effectively invalidates Article 1, section 1, the provision Idaho's drafters chose to place first in Idaho's constitution.

Moreover, this Court has already set forth the test regarding whether a right is fundamental under the Idaho Constitution: "This Court has *consistently recognized* that 'a right is fundamental under the Idaho Constitution if it is expressed as a positive right, or if it is implicit in Idaho's concept of ordered liberty.'" *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181 (quoting *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 126, 15 P.3d 1129, 1134 (2000)) (italics added); *see also Idaho Sch. For Equal Educ. Opportunity v. Evans*, 123 Idaho 573, 581–82, 850 P.2d 724, 732–33 (1993); *Simpson v. Cenarrusa*, 130 Idaho 609, 615, 944 P.2d 1372, 1378 (1997)). Never before today has this Court adopted the "deeply rooted in history and tradition" test, even though we have had ample opportunities to do so. In my view, this was not a mistake by prior members of this Court—I do not think this Court blithely sets down controlling precedent,

particularly where our constitution is concerned. As I see it, the correct test to determine whether an implicit right is fundamental remains whether that right "is implicit in Idaho's concept of ordered liberty." *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181.

I further disagree with the majority's decision to disavow *Murphy*—a case that is over fifty years old and predates *Roe v. Wade*—in the manner it does. I fully recognize that there are cases in which this Court must overrule or abrogate prior decisions. However, those cases mandate that this Court undertake such a task only when necessary and only after a carefully reasoned explanation as to why we must do so. *See, e.g.*, *Durst v. Idaho Comm'n for Reapportionment*, 169 Idaho 863, 870–72, 505 P.3d 324, 331– 33 (2022) (disavowing certain components of two prior decisions only after extensive analysis). To do otherwise does nothing to explain to the public what was erroneous about the prior decision. At best, this leaves the public with an uninformed view of the law. At worst, this leaves the public with the impression that binding precedent is simply disregarded when it does not support the majority's conclusion, undermining confidence in our judicial system. Either way, in my view, it is improper for this Court to disavow *Murphy* without analysis.

Additionally, I disagree with my dissenting colleague's view that the personal views of John Locke regarding abortion were adopted into Idaho's constitution. While it is true that John Locke's writings were of great importance to both the drafters of our nation's Declaration of Independence as well as the drafters of Idaho's constitution, I am unconvinced that the drafters intended to implicitly adopt every one of Locke's personal views. Article I, section 1 was adopted without debate at the constitutional convention, and the plain language of Article I, section 1 simply states that life, liberty, property, happiness, and safety are inalienable rights. Nowhere in Locke's writings do those five rights appear simultaneously; thus, the drafters could not have simply copied down Locke's ideas as their own. Rather, they must have given conscious thought as to the individual rights they wished to include in our state constitution. There is no basis—textual, historical, or otherwise—that leads me to believe the drafters intended the inalienable right to liberty to somehow vanish once one became pregnant. Had the drafters intended to adopt Locke's views on abortion as part of our constitution, they could have done so. The drafters chose the language that they chose, language that explicitly protected the individual rights to life, liberty, safety, and happiness—not language that prohibited abortion. They did so for a reason. They

131

wanted to emphasize that, in Idaho, individuals and their rights are preeminent and take primacy ahead of their government.

I recognize that my conclusion that a right to abortion is fundamental under the Idaho Constitution's protection of individual liberty may seem surprising in light of the United States Supreme Court's recent decision in *Dobbs*. However, as I have explained, this Court is under no obligation to follow federal precedent when it comes to interpreting our state constitution. Additionally, although *Dobbs* garnered national attention, it should be noted that it is the outlier because the vast majority of other state appellate courts that have considered this question have determined that their respective state constitutions provide an implicit fundamental right to terminate a pregnancy.[1]

---

[1] *Compare Valley Hosp. Ass'n, Inc. v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997); *Comm. to Defend Reprod. Rights v. Myers*, 625 P.2d 779, 784 (Cal. 1981); *In re T.W.*, 551 So.2d 1186, 1192–93 (Fla. 1989); *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 492 (Kan. 2019); *Moe v. Secr'y of Admin. & Fin.*, 417 N.E.2d 387, 645–46 (Mass. 1981); *Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, (Minn. 1995); *Pro-Choice Mississippi v. Fordice*, 716 So.2d 645, 653–54 (Miss. 1998); *Armstrong v. State*, 989 P.2d 364, 376 (Mont. 1999); *Planned Parenthood of Cent. N.J. v. Farmer*, 762 A.2d 620, 631 (N. J. 2000); *Hope v. Perales*, N.Y.S.2d 972, 977–78 (N.Y. App. Div. 1991), *rev'd on other grounds by* 634 N.E.2d 183 (N.Y. 1994); *Planned Parenthood of Middle Tennessee v. Sundquist*, 38 S.W.3d 1, 15 (Tenn. 2000), *superseded by constitutional amendment*, TENN. CONST. art. I, § 36 (enacted 2014); *with Hope Clinic for Women, Ltd. v. Flores*, 991 N.E. 2d 745, 757 (Ill. 2013); *Planned Parenthood of the Heartland v. Reynolds*, 975 N.W.2d 710, 742 (Iowa 2022); *and Mahaffey v. Attorney General*, 564 N.W.2d 104, 111 (Mich. Ct. App. 1997), *superseded by constitutional amendment*, MI. CONST. Art. I, § 28 (effective Dec. 24, 2022). Earlier this very day, the Supreme Court of South Carolina joined its sister courts and deemed an abortion ban unconstitutional under Article I, section 10 of the South Carolina Constitution, which protects the right to privacy: "We hold that the decision to terminate a pregnancy rests upon the utmost personal and private considerations imaginable, and implicates a woman's right to privacy." *Planned Parenthood, et. al. v. South Carolina, et. al.*, No. 28127, slip op. at 5 (S.C. Jan. 5, 2023).

The Mississippi Supreme Court, for example, held that its constitution protected the right to terminate a pregnancy even though the Mississippi constitution did not expressly provide such a right. *Pro-Choice Mississippi*, 716 So.2d at 653. The court determined that this right derived from Article 3, section 32 of the Mississippi constitution, a provision analogous to Article I, section 21 of the Idaho Constitution: "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." *Id.*; MISS. CONST. art. 3, § 32. In attempting to persuade the court that the Mississippi constitution did not protect the right to terminate a pregnancy, the State of Mississippi made essentially the same arguments the State of Idaho makes here:

> The State contends that the Mississippi Constitution does not protect a right to abortion, because the framers of the Constitution did not intend to create a right to abortion. They point out that abortion was illegal at the time the Mississippi Constitution of 1890 was drafted, [a year after Idaho's constitution was drafted, but the same year in which Idaho joined the Union] so the framers would not have found it necessary to proscribe a right that did not exist. Alternatively, the State argues that even if abortion had been legal at the time the Constitution was drafted, merely because abortion was legal in 1890 does not, *ipso facto*, determine that a right to abortion is actually protected. The State also asserts that since the Constitution does not grant a specific right to abortion, the judiciary may not create one.

*Pro-Choice Mississippi*, 716 So.2d at 650. The Mississippi Supreme Court was not swayed, explaining:

> "Each individual enjoys a right of privacy. Each of us has a right to the inviolability and integrity of our persons, a freedom to choose or a right of bodily self-determination, if you will." *In re Brown*, 478 So.2d [1033,] 1039 [(Miss. 1985)]. The right to privacy is "the most comprehensive of rights

As for Idaho, there is simply no "analogous federal provision" to Article I, section 1 of Idaho's constitution. Counter to the majority in *Roe v. Wade*, which concluded that the right to liberty set forth in the Fourteenth Amendment encompassed the right to abortion, the majority in *Dobbs* concluded that the federal right to due process under "the Fourteenth Amendment does not protect the right to an abortion." *Compare Roe v. Wade*, 410 U.S. 113, 153 (1973) (explaining that the "right of privacy [that is] founded in the Fourteenth Amendment's concept of personal liberty . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy") *with Dobbs*, 142 S.Ct. at 2248 ("[T]he clear answer is that the Fourteenth Amendment does not protect the right to abortion.") (footnote omitted). However, as explained above, the analogous provision under our constitution to the Fourteenth Amendment is Article I, section 13, not Article I, section 1. As such, *Dobbs* has no bearing on whether a right to abortion exists under the Idaho Constitution.

Furthermore, unlike the Idaho Constitution, the federal constitution does not begin with a recitation of any rights enjoyed by the people. Rather, it begins its Article I by creating the Legislative Department. Article II then explains the creation of the Executive Department, and Article III addresses the creation of the Judicial Department. The federal constitution went into

---

and the right most valued by civilized man." *Id.* (*quoting* Warren and Brandeis, *The Right To Privacy*, 4 Harv. L.Rev. 193, 195 (1890)). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* (quoting *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)).

*Id.* at 653. The court further noted "[i]t requires little awareness of personal prejudice and human nature to know that, generally speaking, no aspects of life is [sic] more personal and private than those having to do with one's . . . reproductive system." *Id.* (quoting *Young v. Jackson*, 572 So.2d 378, 382 (Miss. 1990)) (capitalization altered; other alterations in original). Therefore, the court held "that autonomous bodily integrity is protected under the right to privacy" and "[p]rotected within the right of autonomous bodily integrity is an implicit right to have an abortion." *Id.*

More recently, the Kansas Supreme Court held that section 1 of the Kansas Bill of Rights (the Kansan equivalent to Article I, section 1 of the Idaho Constitution) "protects a woman's right to make decisions about whether she will continue a pregnancy[.]" *Hodes & Nauser*, 440 P.3d at 491. Section 1 of the Kansas Bill of Rights provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." KAN. CONST. Bill of Rights § 1. The court explained:

[S]ection 1's declaration of natural rights, which specifically includes the rights to liberty and the pursuit of happiness, protects the core right of personal autonomy—which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows Kansans to make their own decisions regarding their bodies, their health, their family formation, and their family life. Pregnant women, like men, possess these rights.

*Hodes & Nauser*, 440 P.3d at 491–92. Thus, in addition to being implicit in Idaho's concept of ordered liberty, a fundamental right to terminate a pregnancy is further supported by persuasive authority from states with similar constitutional provisions as well.

133

effect March 9, 1789. It was not until December 15, 1791, that the federal constitution was amended to include the Bill of Rights—and even then, the Bill of Rights did not set forth inalienable rights as does our constitution. Idaho's constitution reverses this order and puts its "Declaration of Rights" as Article I. In other words, the drafters chose to place the "Inalienable rights of man" as its first, and presumably foremost, provision of the Idaho Constitution.

Additionally, at the time of Idaho's constitutional convention, the federal Bill of Rights applied only to the federal government. The first inklings of the United States Supreme Court incorporating any of the Bill of Rights to the States did not appear until 1897 and "the rest of the specific restraints [against state action] was slow in coming." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 493 (1977) (hereafter "Brennan, *State Constitutions*") (citing *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226 (1897)). Thus, had Idaho's drafters intended to craft a state constitution identical to the federal constitution, they could have copied the federal Bill of Rights verbatim. They did not do so. Instead, knowing that the federal constitution did not have an analogous provision, the drafters chose not only to adopt the inalienable rights provision, but to put that provision first.[2]

I appreciate the majority's reluctance to deem an unlisted right fundamental. Judicially editing the constitution we are sworn to uphold is a grave dereliction of duty. However, where, as here, the drafters have made clear their intent that Idahoans have the inalienable rights to life, liberty, safety, and the pursuit of happiness, this is not an exercise in editing. Rather, it is simply an act of according the actual words the drafters chose to use the weight they are due. The plain language of the Idaho Constitution—inalienable rights, originally formulated by John Locke, chosen by the drafters, and ratified by the people—demand that they be given meaning. Unfortunately, they have been given no meaning by today's majority decision.

The majority skirts the plain language in Article I, section 1 by pointing out that abortion was criminally prohibited in Idaho at the time the constitution was drafted. While I do not dispute this fact, allowing a territorial statute to dictate our interpretation in the way chosen by the majority is improper. *State v. Clarke*, 165 Idaho 393, 397, 446 P.3d 451, 455 (2019) ("[P]reexisting statutes

---

[2] This Court has recently explained that rights are not necessarily deemed less important because they were enacted later in time and, therefore, were not among the first rights listed. *Reclaim Idaho*, 169 Idaho at 439 n.19, 497 P.3d at 193 n.19 (stating that "many of the people's most important rights have come about by constitutional amendment"). While true that these later-enacted rights are not "of lesser importance[,]" *see id.*, the fact that the drafters chose to place the "Inalienable rights of man" as the very first provision in the Idaho Constitution supports the conclusion that we should refrain from simply applying federal precedent here.

and the common law may be used to help inform our interpretation of the Idaho Constitution, *but they are not the embodiment of, nor are they incorporated within, the Constitution*. To hold otherwise would elevate statutes and the common law that predate the Constitution's adoption to constitutional status." (Italics added)). The majority's focus on the criminal prohibitions effectively allow territorial statutes—which were not ratified by the people of Idaho—to override the plain language of the constitution.

I recognize that the constitution was not adopted in a vacuum and that the drafters were likely aware that abortion was criminally prohibited by territorial statute (absent the preservation of the woman's life being implicated). However, that the drafters did not explicitly disclaim the statutes does not mean they approved of them in a constitutional sense. The purpose of the constitutional convention was to draft a constitution, not to review existing territorial statutes one by one and determine whether those statutes should remain in effect once Idaho attained statehood.

Additionally, as deftly elucidated by Justice Zahn's dissent, the statutes at the time made clear that the founders were amply aware that the prohibition against abortion had to yield to the life and health of the prospective mother. The majority ignores this nuance and effectively grants a future legislature free reign to attempt to impose a ban on abortion even more restrictive than the territorial statutes.[3] Thus, the majority not only elevates a territorial statute to a status superior to that of our constitution, but it also does so with *only a portion of that statute*—the portion that ignores a pregnant woman's life and health.

Further, the inalienable rights protected by Article I, section 1 are "natural rights," meaning that they are rights "that [are] conceived as part of natural law and that [are] therefore thought to exist independently of rights created by government or society." *Right: Natural Right*, BLACK'S LAW DICTIONARY (10th ed. 2014). That the territorial legislatures sought to curtail rather than permit the termination of a pregnancy has little bearing on whether such a right is *inalienable*

---

[3] For example, by failing to hold that a pregnant woman has an inalienable right to life or safety, even without including liberty, or the pursuit of happiness, the majority leaves open the distinct possibility that the "life of the mother" exception will be abolished in future legislation. This is not an idle worry: The Idaho Republican Party—which currently holds a super majority in both the state senate and the house of representatives, as well as the governor's mansion—recently adopted a platform that intentionally excluded a "life of the mother" as a basis for allowing an abortion. Brad Dress, *Idaho GOP Rejects Platform Change Allowing Abortion to Save Person's Life*, THE HILL (July 18, 2022, 10:27AM), https://thehill.com/homenews/state-watch/3563905-idaho-gop-rejects-platform-change-allowing-abortion-to-save-womans-life/. If this stated platform were to become law, due to the majority's rejection of a fundamental right today, it is unclear whether Idaho women would have any legal recourse to protect even their own lives. Future legislatures have been given *carte blanche* to try to limit abortion even in ways it was not limited at the time Idaho became a state—in ways that would subject Idaho women to mortal risk.

because natural rights are not bestowed by the government. They are innate within the citizenry and stand as a bulwark against the government's intrusion. They are, in the words of our constitution, inalienable. As the Supreme Court of Kansas recently explained:

> William Blackstone in his Commentaries identified the private rights to life, liberty, and property as the three "absolute" rights—so called because they "appertain[ed] and belong[ed] to particular men, merely as individuals," not "to them as members of society [or] standing in various relations to each other"—that is, not dependent upon the will of the government. 1 Blackstone, Commentaries on the Laws of England *123, *129-38 (1765). American courts reaffirmed these observations in applying the common law in this country. *See, e.g.*, *State v. Moore*, 42 N.J.L. 208, 13 Vroom 208 (1880) (quoting 1 Blackstone, at *134: "[T]he law ... regards, asserts and preserves the personal liberty of individuals.").

*Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 481 (2019). Natural rights exist independent of, and oftentimes in spite of, government interference. *See, e.g.*, Thomas Paine, RIGHTS OF MAN 5, 30 (Paul Negri & Ronald Herder eds., Dover Publ'ns 1999) (1791) ("Man did not enter into society to become *worse* than he was before, nor to have fewer rights than he had before, but to have those rights better secured. His natural rights are the foundation of all his civil rights." (Italics in original)).

If the majority is insistent in looking beyond the words of the constitution for the drafters' intent, it should not stop at the territorial statutes. Both "preexisting statutes *and the common law* may be used to help inform our interpretation of the Idaho Constitution[.]" *Clarke*, 165 Idaho at 397, 446 P.3d at 455 (italics added). While abortion was prohibited by statute in the Idaho Territory prior to the drafting of our constitution (absent certain, limited exceptions), it was permitted at common law prior to quickening. *State v. Alcorn*, 7 Idaho 599, 606, 64 P. 1014, 1016 (1901). Additionally, just after the constitutional convention in Idaho, the United States Supreme Court explained that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person." *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 (1891). Of course, like preexisting statutes, the common law is "not the embodiment of, nor [is it] incorporated within, the Constitution." *Clarke*, 165 Idaho at 397, 446 P.3d at 455. However, it is noteworthy that preexisting statutes and the common law contradict each other in the realm of abortion. Given this contradiction, it is especially inappropriate for the majority to allow the territorial statute to trump the plain language of the constitution. I decline to allow pre-statehood statutes that were never constitutionally challenged

136

to constrain the interpretation of the Idaho's enunciation of inalienable rights which are relegated to history in today's majority opinion.

Further, as noted by Justice Zahn in her dissent, the historical and legal backdrop against which the Idaho Constitution was adopted supports a broad interpretation of the individual rights protected by the plain language of Article I, as does this Court's early interpretations of Idaho's constitution. *See, e.g.*, *Boyd v. United States*, 116 U.S. 616, 635 (1886); *McDonald v. Doust*, 11 Idaho 14, 17, 81 P. 60, 63 (1905); *J.C. Penney Co. v. Diefendorf*, 54 Idaho 374, 385, 32 P.2d 784, 795 (1934); *State v. Kouni*, 58 Idaho 493, 497, 76 P.2d 917, 921 (1938). This historical context, coupled with the broad manner in which Article I, sections 1 and 21 are written, make it clear that the drafters of the Idaho Constitution intended the inalienable rights provisions to be a broad retention of rights enjoyed by Idahoans—rights which may evolve and strengthen over time, but may never be stripped away.

While today's decision has an immediate effect on Idaho women who may become pregnant, the ultimate ramifications are much more pernicious. Every Idahoan—whether they can become pregnant or not—is affected by the majority's decision to read Article I, section 1 out of the Idaho Constitution. If the personal autonomy to decide one of life's biggest decisions—whether to bear a child—is not protected by our inalienable rights to life, liberty, safety, and the pursuit of happiness, what is?

The majority attempts to placate Idahoans by offering them what it proposes to be a solution: Simply amend the Idaho Constitution to protect your rights. In my view, such an amendment would be redundant. The constitution already protects—or rather, did protect—Idahoans' lives, liberty, safety, and pursuits of happiness. Constitutional provisions are supposed to triumph over statutes, not the other way around. Idahoans should not have to amend their constitution to force this Court to recognize the individual rights already protected by the Idaho Constitution.

For the reasons set forth above, I would hold that a woman's right to terminate a pregnancy is fundamental under Idaho's constitution. The drafters' intent and the language they used has not been realized today. The Idaho Constitution was adopted to govern Idaho for years to come, not to stop the clock in 1889. *See* Brennan, *State Constitutions* at 495 ("[T]he genius of our Constitution resides not in any static meaning that it had in a world that is dead and gone, but in the adaptability of its great principles to cope with the problems of a developing America."). And

137

yet, that is what the majority decision accomplishes today: Idahoans are thrust backward in time, forced to live their twenty-first century lives by nineteenth century standards and mores. Despite the great strides for equality women have made in the decades since the constitutional convention, they are once again relegated to their traditional (and outdated) roles as only child-bearers and mothers. *See, e.g.*, *Muller v. Oregon*, 208 U.S. 412, 420 (1908) (noting the "widespread belief that woman's physical structure, and the functions she performs in consequence thereof, justify special legislation restricting or qualifying the conditions under which she should be permitted to toil"); *see also Hoyt v. Florida*, 368 U.S. 57, 61–62 (1961) ("Despite the enlightened emancipation of women from the restrictions and protections of bygone years, and their entry into many parts of community life formerly considered to be reserved to men, woman is still regarded as the center of home and family life."). The plain language of the Idaho Constitution should—and, in my view, does—prevent this from occurring. Pregnant women, like men, should be protected by their inalienable rights to life, liberty, safety, and the pursuit of happiness set out in Article I, section 1.

To be clear, the result of holding that there is a fundamental right to terminate a pregnancy is not—contrary to the majority's view of my analysis—that the legislature may *never* regulate abortion. Nor does my interpretation of Idaho's constitution fail to account for the potential life at stake, contrary to my dissenting colleague's view. Our well-established strict scrutiny standard sufficiently accounts for both of these concerns: The legislature may still regulate a fundamental right, so long as that regulation withstands strict scrutiny. "Strict scrutiny requires that the government action be necessary to serve a compelling state interest, and that it is narrowly tailored to achieve that interest." *Reclaim Idaho*, 169 Idaho at 427, 497 P.3d at 181 (quoting *Bradbury v. Idaho Judicial Council*, 136 Idaho 63, 69, 28 P.3d 1006, 1012 (2001)). At some point during the pregnancy, preserving the life of the unborn child undoubtedly becomes a compelling state interest. At that point, the legislature may regulate if it chooses to do so, provided it narrowly tailors any regulation to adequately balance the interests of both the unborn child and its pregnant mother. For example, at oral argument, the State conceded that the legislature's statutes gave preservation of the life of the unborn child superiority over the health of its mother. I find that calculation—which the majority preserves today—to violate a pregnant woman's inalienable rights. However, the question of when precisely the unborn life takes primacy over its mother is not before this Court in these consolidated cases, and I emphatically reject the majority's suggestion to the contrary. I

138

also decline the majority's invitation to adopt the viability line or trimester framework set forth in overruled federal precedent when our strict scrutiny test will more than suffice.

In my view, the brilliance of our constitution is that our founders recognized the primacy of an individual's freedom, and while a woman did not have many rights when Idaho's constitution was adopted, we have now recognized the ignorance and paternalism of that time. Our founders put their faith in individuals by expressing what Locke first described as a human being's natural rights. Those inalienable rights could not be usurped by a government or subjected to what was aptly described as "the tyranny of the majority." When questions of extreme importance must be answered, Idaho's founders put their faith in the individual, not her government. The majority removes that recognition, embodied in Idaho's constitution, that the individual is the master of her fate, she is the captain of her soul. No other person should make life's profound decision to go through that discomfort and pain, as well as the risk of potential complications that result from a pregnancy, not to mention the responsibility that carrying a pregnancy to term entails. Today's decisions places unfettered control over a woman's body with the legislative process. It affords no responsibility to the woman. It gives no recognition to her life, her liberty, her happiness, or her health. Nor does it afford her the medical care that would be readily available to her, but for the legislature's refusal to afford her the decision over which she should have control. For that, she must go elsewhere. A decision which should be made by a woman and her physician is now subject to the caprice of the legislature. Today's decision removes a woman's control over her life and health from her and her doctor, and to the extent any choice still remains, places it in the hands of lawyers and legislators. To my way of thinking, this is backwards. The right should be placed where it belongs, with the woman herself. We should not countenance the fettering of her right to choose the life she seeks to lead in the way this decision does.

This Court's solemn duty is to protect the people and their rights from encroachment by the government. That duty has gone unfulfilled today, and it is the people of Idaho who will suffer for it. Women will leave this great state as a result of this decision, as will the people who love them and wish to see them healthy and alive. As much as that saddens me, I cannot blame them. I cannot overstate the devastating blow Idaho's women have been dealt today. As a result, I respectfully dissent.